U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
2005
CLERK, U.S. DISTRICT COURT
By Deputy

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

ORIGINAL

**BILLY J. MULLINS, JR. and FARAWAY ENTERPRISES, INC.,** §

**Plaintiffs,** §

v. §

**TESTAMERICA, INC., SAGAPONACK PARTNERS, L.P., and MARC WEISMAN,** §

**Defendants.** §

**CAUSE NO. 3-02-CV-0106-K**

---

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

---

**TO THE HONORABLE COURT:**

Defendants Marc Weisman ("Weisman"), Sagaponack Partners, L.P. ("Sagaponack") and TestAmerica, Inc. ("TestAmerica") (collectively "Defendants") file this Motion for Judgment as a Matter of Law:

**A. Plaintiff Mullins admitted on the stand that he has no individual damages.**

- During the cross-examination of Plaintiff Mullins, he admitted that the only damages that he seeks are damages related to the Subordinated Note of Plaintiff Faraway Enterprises, Inc. Mr. Mullins admitted that he had no personal damages apart from the damage to Faraway.

- Accordingly, Mr. Mullins can have no viable personal claim as a matter of law for any of Plaintiffs' allegations of breach of contract, fraud, and fraudulent transfer; all of those claims require proof of damages. Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiff Mullins on any cause of action alleged. *See* Fed. R. Civ. P. 50(a)(1).

**B. <u>Plaintiff Mullins' admission on the stand that he does not contend that "reasonably equivalent value" was not received from HIG in the sale of the assets of Defendant TestAmerica defeats Plaintiffs' claims under both § 24.005(a)(2) and § 24.006.</u>**

**1. <u>TEX. BUS. & COMM. CODE § 24.006.</u>**

- During cross-examination, Plaintiff Mullins admitted that Plaintiffs do not contend that TestAmerica did not receive "reasonably equivalent value" from HIG in connection with the sale of substantially all of TestAmerica's assets. Mr. Mullins said in several ways during cross-examination that he thought HIG paid a "fair value" for the assets of TestAmerica and the negotiation between TestAmerica and HIG was an arm's length negotiation.

- Plaintiffs have asserted a claim under TEX. BUS. & COMM. CODE § 24.006. § 24.006 provides as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COMM. CODE § 24.006 (**<u>TAB 1</u>**). Accordingly, a claim under this section consists of three elements: (1) the creditor's claim arose before the transfer was made; (2) **the debtor made the transfer without receiving reasonably equivalent value in exchange**; and (3) the debtor was insolvent at that time or became insolvent as a result of the transfer. *See* § 24.006 (emphasis added).

- "<u>Debtor</u>" is defined in § 24.002(6) as "a person who is liable on a claim." TEX. BUS. & COMM. CODE § 24.002(6) (**<u>TAB 2</u>**). The "claim" at issue is the "8% Convertible Subordinate Note" of Plaintiff Faraway. The only "debtor" on that claim is TestAmerica. *See also* Plaintiffs' Second Amended Complaint at ¶ 4.5.

- Therefore, a necessary finding for Plaintiffs to prevail on their § 24.006 claim is that <u>TestAmerica</u> transferred its assets to <u>HIG</u> and did not receive "reasonably equivalent value" for those assets.

- "<u>Reasonably equivalent value</u>" is defined as "includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS. & COMM. CODE § 24.004(d) (**<u>TAB 3</u>**).

- Unequivocally, Plaintiffs have conceded that reasonably equivalent value was received by TestAmerica from HIG. Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their § 24.006 claim. *See* Fed. R. Civ. P. 50(a)(1).

2. <u>TEX. BUS. & COMM. CODE § 24.005(a)(2).</u>

- § 24.005(a)(2) provides as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> . . .
>
> (2) **without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor**:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

§ 24.005(a)(2) (emphasis added) (**<u>TAB 4</u>**).

- Therefore, the necessary elements of a fraudulent transfer under § 24.005(a)(2) include the following: (1) the creditor's claim arose before or within a reasonable time after the transfer was made; (2) **the debtor did not receive reasonably equivalent value in exchange for the transfer**; and (3) the debtor was engaged in a business or transaction for which its remaining assets were unreasonably small or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur debts beyond its ability to pay as they became due. *See* § 24.005(a)(2) (emphasis added) (**<u>TAB 4</u>**).

- As discussed *supra* in Section C(1), unequivocally, Plaintiffs have conceded that reasonably equivalent value was received by TestAmerica for the transfer of its assets to HIG. Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their § 24.005(a)(2) claim. *See* Fed. R. Civ. P. 50(a)(1).

C. **<u>Plaintiffs have offered no evidence that the money Sagaponack received was an "asset" under the Texas Fraudulent Transfer Act.</u>**

- A transfer includes "every mode . . . of disposing of or parting with an asset or an interest in an asset." TEX. BUS. & COMM. CODE § 24.002(12) (**<u>TAB 2</u>**).

- Under the Texas Uniform Fraudulent Transfer Act, "<u>Asset</u>" is defined as follows:

> (2) "Asset" means property of a debtor, **but the term does not include**:
>
> (A) **property to the extent it is encumbered by a valid lien**;

(B) property to the extent it is generally exempt under nonbankruptcy law; or

(C) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant, under the law of another jurisdiction.

TEX. BUS. & COMM. CODE § 24.002(2)(A) (**TAB 2**).

- Therefore, "Asset," means the "property of a debtor," but does not include "property to the extent it is encumbered by a valid lien." TEX. BUS. & COMM. CODE § 24.002(2)(A) (**TAB 2**).

- "Lien," is defined as "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and **includes a security interest created by agreement**." TEX. BUS. & COMM. CODE § 24.002(8) (emphasis added) (**TAB 2**).

- An encumbered asset cannot be "fraudulently transferred" because unsecured creditors, such as Plaintiff Faraway, could never execute on that encumbered asset in the first place:

> This Act, like its predecessor . . . declares rights and provides remedies for unsecured creditors against transfers that impeded them in the collection of their claims. The laws protecting valid liens against impairment by levying creditors, exemption statutes, and the rules restricting levyability of interest in entireties property are limitations on the rights and remedies of unsecured creditors, and **it is therefore appropriate to exclude property interests that are beyond the reach of unsecured creditors from the definition of "asset" for the purposes of this Act.**

UNIF. FRAUDULENT TRANSFER ACT § 1, cmt. 2, 7A(II) U.L.A. 276 (1998) (emphasis added) (**TAB 5**). Moreover, § 24.012 provides that "[t]his chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." TEX. BUS. & COMM. CODE § 24.012 (**TAB 6**). Therefore, if the plain language is not sufficiently clear, the above comment to the Uniform Act is very persuasive authority on this point.

- Plaintiffs offered the testimony of Walter Schuppe, Fleet's corporate representative, by deposition. He unequivocally stated that TestAmerica's debt to Fleet was secured by a lien on the assets of TestAmerica. Plaintiffs also offered the testimony of Clifford Brandeis, TestAmerica's corporate counsel during this period of time, who likewise testified that Fleet's loan was secured by a lien on the assets of TestAmerica. (During Defendants' case, Tom Letsou testified to the same).

- There has been no evidence offered by Plaintiffs that Fleet was not legally entitled to $26,336,585.64, or that all of that money was not subject to a valid lien by Fleet on TestAmerica's assets.

- Fleet directed that $3,202,800 of the $26,336,585.64 owed to Fleet by TestAmerica go to Sagaponack. *See* Defendants' Trial Exhibit 88 (**TAB 7**).

- It is uncontested that the money owed to Fleet and secured by their lien on TestAmerica's assets is money that Plaintiff Faraway, as an unsecured creditor, could never have received in any event.

- As it is uncontested that the money at issue that went to Sagaponack was subject to the valid lien of Fleet and beyond the reach of Plaintiff Faraway regardless, accordingly, the money received by Sagaponack cannot be an "asset" under the Texas Fraudulent Transfer Act as a matter of law. Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find that Sagaponack received the transfer of any "asset," and as a consequence, there is no "legally sufficient evidentiary basis" for Plaintiffs to prevail on their remaining fraudulent transfer claim under § 24.005(a)(1) (**TAB 4**). *See* Fed. R. Civ. P. 50(a)(1).

**D. The admission by Plaintiffs' attorney that he knew the Schedule to the Subordination Agreement was incomplete when the Plaintiffs executed the Agreement and would be completed later defeats as a matter of law Plaintiffs' Fraud claim regarding the Subordination Agreement.**

- Richard Hamilton testified that he knew that the schedule to the Subordination Agreement would be completed after the Plaintiffs executed the Subordination Agreement. Moreover, Mr. Hamilton testified that he knew that Sagaponack would be added the schedule.

- Though Mr. Mullins testified that he should not be held to any agreement made by his attorney to complete the Subordination Agreement schedule, Texas law provides exactly the opposite.

- An agent's knowledge is imputed to the principal. *Williams v. Jennings*, 755 S.W.2d 874, 882 (Tex. App.--Houston [14th Dist.] 1988, writ denied) (**TAB 8**). Notice to an agent received while the agent is acting for the principal constitutes notice to the principal. *Elite Towing, Inc. v. LSI Financial Group*, 985 S.W.2d 635 (Tex. App.--Austin 1999, no pet); (**TAB 9**). Because the agent's knowledge is imputed to the principal, it is immaterial that the agent does not actually inform the principal of the particular facts under consideration. *Williams*, 755 S.W.2d at 882 (**TAB 8**). The principal is nonetheless charged with constructive notice. *Williams*, 755 S.W.2d at 882 (**TAB 8**).

- The attorney/client relationship is governed by the doctrine of agency; accordingly, an attorney's knowledge is imputed to the client. *See American Cent. Ins. Co. v. Canal Ins. Co.*, 810 S.W.2d 246, 256 (Tex. App.–Houston [1st Dist.] 1991), *aff'd in part & rev'd in part on other grounds*, 843 S.W.2d 480 (Tex. 1992) (**TAB 10**); *see also Carter v. Converse*, 550 S.W.2d 322, 329 (Tex. Civ. App.–Tyler 1977, writ ref'd n.r.e.) (**TAB 11**); *Kemp v. Harrison*, 431 S.W.2d 900, 904 (Tex. Civ. App.–Houston [14th Dist.] 1968, writ ref'd n.r.e.) (**TAB 12**).

- Therefore, as a matter of law, Plaintiffs are imputed with the knowledge of their attorney that the schedule to the Subordination Agreement was not complete and would be completed and include Sagaponack. Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their fraud claim related to v.6/v.7 of the Subordination Agreement. *See* Fed. R. Civ. P. 50(a)(1).

- Moreover, in addition to the imputation of knowledge, there has been no proof that any of the Defendants drafted the Subordination Agreement or participated in preparing the final executed version of the Subordination Agreement. All of the testimony has been either that it was not known who drafted and prepared the executed Subordination Agreement or that the Key Mezzanine's attorneys, Moses & Singer, drafted the Subordination Agreement. Accordingly, as Plaintiffs can offer no proof of participation in the fraud by any of the Defendants, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their fraud claim related to v.6/v.7 of the Subordination Agreement. *See* Fed. R. Civ. P. 50(a)(1).

- With particular regard to Defendants Weisman and Sagaponack, the statute of limitations bars this claim as a matter of law. The alleged fraud occurred in 1998. Plaintiff did not bring suit against Weisman and Sagaponack until December 13, 2003, more than five years later.

    - When a cause of action is dismissed and later refiled, as it was against Sagaponack in this case, limitations is calculated to run from when the cause of action accrued until when the claim is refiled. *See Clary Corp. v. Smith*, 949 S.W.2d 452, 459 (Tex. App.—Fort Worth, 1997, no pet.) (**TAB 13**). Therefore, if a party is dismissed, the statute of limitations is not tolled for any new pleading later filed. *Id.*

    - The statute of limitations for fraud is four years. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4) (**TAB 14**).

- Accordingly, as Plaintiffs can offer no evidence that the statute of limitations should not bar Plaintiffs' 1998 fraud claims against Weisman and Sagaponack, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their fraud claim related to v.6/v.7 of the Subordination Agreement. *See* Fed. R. Civ. P. 50(a)(1).

## E. Plaintiffs have no evidence of any actionable misrepresentation by Tom Barr or an intent by him to deceive.

- Mullins alleges that TestAmerica President Barr knowingly made false promises that interest payments on Mullins' Note would be paid throughout 2001.

- Promises of future performance are generally not actionable. A promise of future performance can be an actionable misrepresentation only "if the promise was made with the intent to deceive and with no intention of performing as represented." *Schindler v. Austwell Farmers Coop*, 841 S.W.2d 853, 853 (Tex. 1992) (**TAB 15**).

- A representation by a party that it will fulfill its contractual duties and a failure later to do so does not constitute, of itself, fraud. *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13-14 (Tex.

1996) (**TAB 16**). In other words even if the alleged representations were made, a representation by a party that it will fulfill its contractual duties and a failure later to do so does not, of itself, constitute fraud. *Id.*

- Mullins' has testified that his only damages from this alleged fraud are the failure by TestAmerica to make the interest and principal payments due under the Subordinated Note.

- Plaintiffs are thus attempting to recast a breach of contract claim against TestAmerica as a fraud claim based on Barr's alleged statements; this is impermissible under Texas law. Therefore, Plaintiffs' fraud claim based on Barr's representations that TestAmerica would perform its obligations under the Subordinated Note is a contract claim, not a fraud claim. *Crawford*, 917 S.W.2d at 13-14 (when the alleged representations are simply representations that a party will fulfill its contractual duty, the claim arises only in contract and a tort claim is inappropriate); *see also Southwestern Bell Tele. Co. v. Delanney*, 809 S.W.2d 493, 495 (Tex. 1991) (**TAB 17**).

- In addition, Plaintiffs have offered no evidence that Barr did not intend that TestAmerica fulfill its obligations at the time it agreed to them.

- Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their fraud claim related to the alleged promises of Tom Barr. *See* Fed. R. Civ. P. 50(a)(1).

**F. Defendant Weisman cannot be the alter-ego of Defendant Sagaponack Partners, L.P., as a matter of law.**

- In Plaintiffs' Second Amended Complaint, Plaintiffs make one conclusory statement alleging that Weisman is the alter ego of Sagaponack. Plaintiffs state, "Sagaponack is essentially the alter ego of Weisman and vice versa."

- "Alter ego" is a basis for disregarding the corporate entity and imposing individual liability on a shareholder or affiliate of the corporation. The doctrine of "alter ego" does not apply to limited partnerships, such as Sagaponack Partners, L.P.

- Alter ego theories are inapplicable to partnerships "because there is no veil that needs piercing." *Pinebrook Properties, Ltd. v. Brookhaven Lake Property Owners Ass'n*, 77 S.W.3d 487, 499-500 (Tex. App.--Texarkana 2002, review denied) (**TAB 18**). This rule applies "even when dealing with a limited partnership, because the general partner is always liable for the debts and obligations of the partnership to third parties." *Pinebrook Properties*, 77 S.W.3d at 500.[1]

- Just two months ago, another court within the Northern District of Texas applied this very principal – the theory of alter ego does not apply to partnerships – in dismissing such a claim as a matter of law, pursuant to Fed. R. Civ. P. 12. The Court held as follows:

[1] Plaintiffs have never alleged that Defendant Weisman was the general partner of Sagaponack. Moreover, such allegation is disproven as a matter of public record. RSP Capital, L.L.C., is the general partner of Sagaponack.

> [A]n alter ego theory of liability is inapplicable to the relationship between KPMG LLP and the Moroccan member firm, because KPMG LLP is not a corporate entity but a limited liability partnership organized under Delaware law. *See, e.g., Pinebrook Prop., Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499-500 (Tex. App.--Texarkana 2002, pet. denied) (holding that alter ego theories are inapplicable to partnerships because they are unnecessary). The Plaintiffs have failed to plead a cognizable claim against KPMG LLP based on the actions of its member firm in Morocco. Therefore, the Court GRANTS KPMG's motion and DISMISSES all of the Plaintiffs' claims against it.

*Skidmore Energy Inc. v. KPMG*, No. Civ.A.3:03CV2138-B, 2004 WL 3019097, *5 (N.D. Tex. December 28, 2004) (**TAB 19**).

- Moreover, even if the "alter ego" theory did apply, Article 2.21(A)(2) of the Texas Business Corporation Act provides as follows:

> A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:
>
> ...
>
> (2) **any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation,** or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, **unless the obligee demonstrates** that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an **actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate.**

Tex. Bus. Corp. Act, art. 2.21(a)(2) (**TAB 20**).

- All of Plaintiffs' claims relate to a contract, the "8% Convertible Subordinate Note," thus the actual fraud requirement would apply to Plaintiffs' claims if the "alter ego" theory were appropriate in the partnership context.

- Therefore, though the "alter ego" theory is not an appropriate basis for liability under Texas law to hold Defendant Weisman liable for the actions of Defendant Sagaponack, the Plaintiffs have offered no proof of actual fraud by Defendant Weisman as would be required under § 2.21(A)(2).

- Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs that Defendant is the "alter ego" of Sagaponack Partners, L.P. *See* Fed. R. Civ. P. 50(a)(1).

## G. <u>Conspiracy To Fraudulently Transfer Is Not A Valid Claim Under Texas Law.</u>

- Plaintiffs' claim that Defendant Sagaponack and/or Defendant Weisman conspired with TestAmerica to fraudulently transfer assets is legally invalid.

- Texas law does not permit an action for civil conspiracy to violate either state or federal fraudulent transfer laws. *Mack v. Newton*, 737 F.2d 1343 (5th Cir. 1984) ("a mere general creditor may take advantage of the Texas fraudulent conveyance statute, but, as we have seen, may not recover damages for conspiracy to commit a fraudulent conveyance.") (**<u>TAB 21</u>**); *accord FDIC v. White*, 1998 WL 120298, *2 (N.D. Tex. March 5, 1998) (**<u>TAB 22</u>**); *see also Forum Ins. Co. v. Devere Ltd.*, 151 F. Supp. 2d 1145, 1148 (C.D. Cal. 2001) ("A civil conspiracy claim does not expand the remedies afforded by UFTA.") (**<u>TAB 23</u>**).

- The reasoning for this prohibition is that the statute provides very specifically for whom may be a "transferee" under the statute. *See* TEX. BUS. & COMM. CODE § 24.009 (defining appropriate defendants under TUFTA) (**<u>TAB 24</u>**). Those statutory protections would be eviscerated if the tagging on of a common law conspiracy count against any potential defendant is permitted.

- Moreover, conspiracy is a derivative tort and "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). For the reasons discussed *supra*, Plaintiffs' fraudulent transfer claims are invalid; therefore, the derivative conspiracy claims are invalid.

- Moreover, an actionable conspiracy must consist of wrongs that could have been actionable against each conspirator. *Ross v. Arkwright Mut. Ins. Co.*, 892 S.W.2d 119, 132 (Tex. App.--Houston [14th Dist.] 1994, no writ). Accordingly, if an alleged act cannot give rise to a cause of action for fraud, then the same act cannot give rise to a claim for conspiracy to defraud. *Stroud v. VBFSB Holding Corp.*, 917 S.W.2d 75, 82 (Tex. App.--San Antonio 1996, writ denied). For the reasons discussed *supra*, Plaintiffs have no valid claims against either Sagaponack or Weisman; therefore, this claim is legally invalid.

- In addition to the legal deficiency, the elements of a conspiracy claim in Texas are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). A party must be aware of the harm or wrongful conduct at the inception of the combination or agreement and must have the specific intent to agree to accomplish the unlawful purpose or to accomplish the lawful purpose by unlawful means. *Triplex Comm., Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). Conspiracy is established by proof of facts and circumstances that "unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators." *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963).

- Plaintiffs have offered no evidence of who comprised the alleged conspiracy or any other details of the conspiracy sufficient to establish the requisite elements.

- Accordingly, there is no legal basis or "legally sufficient evidentiary basis" for the jury to find for Plaintiffs that any of the Defendants conspired to fraudulently transfer assets. *See* Fed. R. Civ. P. 50(a)(1).

**H.    Plaintiffs have alleged but offered no proof that TestAmerica failed to provide a timely period income statement to Plaintiffs under the Subordinated Note.**

- Plaintiffs have alleged but not offered any evidence at trial that TestAmerica breached any obligation to the Plaintiffs by not timely providing a period income statement under the Subordinated Note.

- Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their breach of contract claim related to the alleged breach by TestAmerica related to the provision of the Period Income Statement. *See* Fed. R. Civ. P. 50(a)(1).

**I.    Plaintiffs have not pled an ambiguity, and, therefore, as a matter of law cannot show any basis for excusing them from the plain language that renders the right of payment to Mullins subordinate until all other TestAmerica debt has been paid in full.**

- A contract is unambiguous when, after applying construction rules, it can be concluded that the contract can be given a definite legal meaning. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.*, Inc., 907 S.W.2d 517, 520 (Tex. 1995). When the contract is unambiguous, the Court must give effect to its plain language. *Perrotta v. Farmers Ins. Exch.*, 47 S.W.3d 569, 574 (Tex. App.--Houston [1st Dist.] 2001, no pet.). Ambiguity is a question of law. *CBI Indus., Inc.*, 907 S.W.2d at 520. A contract is ambiguous when, after applying construction rules, it can be concluded that it could have two or more reasonable interpretations. Parol evidence of the parties' interpretation may be considered only if the contract is ambiguous. *CBI Indus., Inc.*, 907 S.W.2d at 520.

- Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Kelley-Coppedge*, 980 S.W.2d at 464 (citing *CBI Indus., Inc.*, 907 S.W.2d at 520). An ambiguity does not arise merely because the parties advance conflicting contract interpretations. *Id.* at 465. Only when, after applying the applicable rules of construction, a contract term is susceptible of two or more reasonable interpretations will the term be considered ambiguous. *Id.*

- Plaintiffs have not pled any ambiguity in the contracts at issue. *See generally* Plaintiffs' Second Amended Complaint.

- The Court has implicitly found that there is no ambiguity and excluded all parol evidence.

- Accordingly, the plain language of the contracts governs.

- Under the plain language of the Subordination Agreement, it does not apply as a matter of law to the Plaintiffs' debt. First, it does not provide rights under which Mullins gets paid; it provides that the "Subordinated Creditors [Mullins and Sagaponack] hereby agree as follows **for the benefit of the Senior Creditors** [Fleet and Key/Regis]." *See* Subordination Agreement, Introduction. The Subordination Agreement then lists various rights that inure to the benefit of the Senior Creditors – not to Mullins. *See* Subordination Agreement, § 8 ("Nothing contained in this Agreement...(b) is intended to or shall affect the relative rights of the holders of Subordinated Debt, on the one hand, and the creditors of the Company other than the holders of Senior Debt, on the other hand."). Further, the Subordination Agreement specifically references the terms of the Subordinated Debt: "Nothing contained in the Agreement (a) is intended to or shall impair, as between the Company and the holders of Subordinated Debt, the obligations of the Company, which are absolute and unconditional, to pay the holders of Subordinated Debt all Obligations in respect of Subordinated Debt as and when the same shall become due and payable **in accordance with their terms.**" *Id.* (Subordination Agreement, § 8). This language clearly provides that the terms of the Subordinated Debt documents must govern. Mullins' subordinated debt document is his Subordinated Note.

- The Subordinated Note provides, "[t]he holder of this Note agrees that this Note shall be subordinated to the extent required by Maker...and subject in right of payment to the **prior payment in full of all of Maker's debt facilities whether now existing or hereafter created.**" *Id.* (Subordinated Note, § 1) (emphasis added).

- Plaintiffs have offered overwhelming evidence that prior to the HIG transaction TestAmerica had extensive outstanding debt facilities. That fact is uncontested.

- The only factual issue for the jury is whether since the conclusion of the HIG transaction, any of TestAmerica's debt facilities still remained owing.

- Moreover, there can be no breach of the Asset Purchase Agreement, when that Agreement provided that Plaintiffs receive money and a Subordinated Note. Plaintiffs have stipulated to receiving both. Any rights of the Plaintiffs must be found under the Subordinated Note, the form of which they agreed to in signing the Asset Purchase Agreement.

- Accordingly, there is no legal basis or "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on any of their alleged breach of contract claims, except to the extent that Plaintiff Faraway contends that subsequent to the HIG transaction no outstanding debt facilities of TestAmerica exist. *See* Fed. R. Civ. P. 50(a)(1).

## J. Plaintiffs have not offered any evidence to support their claim for conspiracy to defraud.

- Conspiracy is a derivative tort and "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton*, 925 S.W.2d at 681. For the reasons discussed *supra*, Plaintiffs' fraud claims are invalid; therefore, the derivative conspiracy claims are invalid.

- Moreover, an actionable conspiracy must consist of wrongs that could have been actionable against each conspirator. *Ross*, 892 S.W.2d at 132. Accordingly, if an alleged act cannot give rise to a cause of action for fraud, then the same act cannot give rise to a claim for conspiracy to defraud. *Stroud*, 917 S.W.2d at 82. For the reasons discussed *supra*, Plaintiffs have no valid claims against either Sagaponack or Weisman; therefore, this claim is legally invalid.

- In addition to the legal deficiency, the elements of a conspiracy to defraud in Texas are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Massey*, 652 S.W.2d at 934. A party must be aware of the harm or wrongful conduct at the inception of the combination or agreement and must have the specific intent to agree to accomplish the unlawful purpose or to accomplish the lawful purpose by unlawful means. *Riley*, 900 S.W.2d at 719. Conspiracy is established by proof of facts and circumstances that "unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators." *Holloway*, 368 S.W.2d at 581.

- Plaintiffs have offered no evidence of who comprised the alleged conspiracy or any other details of the conspiracy sufficient to establish the requisite elements.

- Accordingly, there is no "legally sufficient evidentiary basis" for the jury to find for Plaintiffs on their claim of conspiracy to defraud. *See* Fed. R. Civ. P. 50(a)(1).

**K. <u>Plaintiffs have no legal or factual basis for the imposition of exemplary damages under Texas law.</u>**

- For the reasons discussed *supra*, there is no actionable tort upon which to base exemplary damages. The fraud claims are legally defective. The fraudulent transfer claims do not support an action for exemplary damages.

- Exemplary damages cannot be recovered in an action for breach of contract, unless Plaintiffs prove an independent tort with actual damages. Plaintiffs cannot prove an independent tort. Likewise, Plaintiffs have conceded that there is no damage other than the interest and principal payments provided for under their Subordinated Note and subject to their breach of contract claim thereunder. There are no damages apart from the contractual damages sought.

- Plaintiffs have offered no factual basis for an award of exemplary damages. At the very best, Plaintiffs have offered an alternative interpretation of the agreements at issue. There has been no evidence that the interpretation of Defendants that the Subordinated Note is subordinated according to its terms – subject in right of payment to all other debt facilities of TestAmerica – is unreasonable, much less the requisite clear and convincing showing of maliciousness or gross misconduct required to support the award of exemplary damages.

- In addition, the award of exemplary damages must be based on the actual conduct of the defendant. There is no basis for attributing conduct from any other defendants or non-parties to TestAmerica, Sagaponack or Weisman.

- Accordingly, there is no legal basis or "legally sufficient evidentiary basis" for the jury to award any exemplary damages. *See* Fed. R. Civ. P. 50(a)(1).

## I. CONCLUSION

For the reasons stated above, Defendants are entitled to judgment as a matter of law against the Plaintiffs on all of the above claims.

Respectfully submitted,

Michael P. Lynn, P.C.
State Bar No. 12738500
Edward Jason Dennis
State Bar No. 24045776
Britta Erin Liukonen
State Bar No. 24036976
**LYNN TILLOTSON & PINKER, LLP**
750 North St. Paul Street, Suite 1400
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile

**ATTORNEYS FOR DEFENDANTS MARC WEISMAN, SAGAPONACK PARTNERS, L.P., and TESTAMERICA, INC.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was served as shown below on counsel of record on February 14th, 2005.

**VIA HAND DELIVERY**
J. Stephen Hunnicutt
THE HUNNICUTT LAW FIRM
5949 Sherry Lane, Suite 1650
Dallas, Texas 75225
(214) 361-6740 Telephone
(214) 691-5099 Facsimile

Edward Jason Dennis

tionally incurring debts beyond its ability to pay, precluded entry of summary judgment in avoidance proceeding brought by trustee under constructive fraud provisions of fraudulent transfer statute and Texas fraudulent conveyance law. Weaver v. Kellogg, S.D.Tex.1997, 216 B.R. 563.

Material fact questions, including questions as to Chapter 11 debtor's intent in allowing its shareholders to substitute, for their original promissory notes, notes which lowered the interest rate that shareholders were obligated to pay, extended payment deadlines, and extinguished debtor's right to annual interest payments, precluded entry of summary judgment in adversary proceeding brought by trustee to avoid transfers under the subjective fraud provisions of bankruptcy "fraudulent transfer" statute and Texas fraudulent conveyance law. Weaver v. Kellogg, S.D.Tex.1997, 216 B.R. 563.

Whether any indebtedness was owed by assignor or assignee to assignee's transferee, and whether assignment of interest in oil and gas leasehold estate to assignee's transferee was made in settlement thereof were for finder of facts in proceeding by assignor's judgment creditor, wherein assignee's transferee claimed to be bona fide purchaser for value, to garnish fund arising from production of minerals. Hunter v. Pitcock (Civ.App. 1961) 346 S.W.2d 509.

**91. Instructions**

An instruction that if the purchaser's only purpose in taking the transfer was to collect his debt, it was valid though the debtor intended to defraud other creditors, was faulty as omitting to charge that the purchaser must have no notice of the debtor's intent. Koch v. Bruce (Civ. App. 1899) 20 Tex.Civ.App. 634, 49 S.W. 1101.

**92. Judgment**

In trespass to try title by wife of defendants' deceased grantee and wife's second husband against grantors who had remained in possession of land since execution of deed conveying land to their children subject to parol trust in favor of grantees' mother, regardless of whether conveyance was fraudulent as to grantors' creditors, a judgment which merely denied plaintiffs any recovery and awarded grantors a writ of restitution was not erroneous as permitting a grantor to recover from his grantee land conveyed in fraud of grantor's creditors. Kidd v. Young (Civ.App. 1945) 185 S.W.2d 173, reversed 144 Tex. 322, 190 S.W.2d 65.

## § 24.006. Transfers Fraudulent as to Present Creditors

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Amended by Acts 1987, 70th Leg., ch. 1004, § 1, eff. Sept. 1, 1987.

### Historical and Statutory Notes

Section 2 of the 1987 Act provides:

"This Act applies only to transfers made and obligations incurred by debtors, as determined under Section 24.007, Business & Commerce Code, as added by this Act, on or after the effective date of this Act. Transfers made and obligations incurred before that date are governed by the law in effect immediately before this Act took effect, and that law is continued in effect for that purpose."

**Prior Laws:**

Acts 1840, 4th Cong. p. 28.
P.D. 3876 to 77
Rev.Civ.St., 1879, art. 2466.
Rev.Civ.St., 1895, art. 2545.
Rev.Civ.St., 1911, art. 3967.
Vernon's Ann.Civ.St. art. 3997.
Acts 1967, 60th leg., p. 2343, ch. 785, § 1.
V.T.C.A., Bus. & C. Code § 24.03.

EXHIBIT 1



### Law Review and Journal Commentaries

Marital liability in Texas . . . till death, divorce, or bankruptcy do they part. Thomas M. Featherston, Jr., and Lynda S. Still, 44 Baylor L.Rev. 1 (1992).

1989 Amendments to the Texas Business Corporation States: Part II—Amendments affecting indemnification, corporate finance, close corporations, dissolution and other matters. J. Leon Lebowitz, 9 Corp.Couns.Rev. 1 (Nov. 1990).

Nonuniform Texas "Uniform" Fraudulent Transfer Act. Richard F. Dole, Jr. and Vernon Teofan, 42 Sw.L.J. 1029 (1989).

### Library References

**Texts and Treatises**

17 Texas Jur 3d, Cred R §§463-490, 494, 496, 498, 504, 525-527, 529, 530, 542, 576; 39 Texas Jur 3d, Fam L § 302.

39A Texas Jur 3d, Fam L § 651.

## § 24.002. Definitions

In this chapter:

(1) "Affiliate" means:

(A) a person who directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

(i) as a fiduciary or agent without sole discretionary power to vote the securities; or

(ii) solely to secure a debt, if the person has not exercised the power to vote;

(B) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds, with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

(i) as a fiduciary or agent without sole power to vote the securities; or

(ii) solely to secure a debt, if the person has not in fact exercised the power to vote;

(C) a person whose business is operated by the debtor under a lease or other agreement, or a person substantially all of whose assets are controlled by the debtor; or

(D) a person who operates the debtor's business under a lease or other agreement or controls substantially all of the debtor's assets.

(2) "Asset" means property of a debtor, but the term does not include:

(A) property to the extent it is encumbered by a valid lien;

(B) property to the extent it is generally exempt under nonbankruptcy law; or

(C) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant, under the law of another jurisdiction.

tabbles® EXHIBIT 2

(3) "Claim" means a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(4) "Creditor" means a person, including a spouse, minor, person entitled to receive court or administratively ordered child support for the benefit of a child, or ward, who has a claim.

(5) "Debt" means a liability on a claim.

(6) "Debtor" means a person who is liable on a claim.

(7) "Insider" includes:

(A) if the debtor is an individual:

(i) a relative of the debtor or of a general partner of the debtor;

(ii) a partnership in which the debtor is a general partner;

(iii) a general partner in a partnership described in Subparagraph (ii) of this paragraph; or

(iv) a corporation of which the debtor is a director, officer, or person in control;

(B) if the debtor is a corporation:

(i) a director of the debtor;

(ii) an officer of the debtor;

(iii) a person in control of the debtor;

(iv) a partnership in which the debtor is a general partner;

(v) a general partner in a partnership described in Subparagraph (iv) of this paragraph; or

(vi) a relative of a general partner, director, officer, or person in control of the debtor;

(C) if the debtor is a partnership:

(i) a general partner in the debtor;

(ii) a relative of a general partner in, a general partner of, or a person in control of the debtor;

(iii) another partnership in which the debtor is a general partner;

(iv) a general partner in a partnership described in Subparagraph (iii) of this paragraph; or

(v) a person in control of the debtor;

(D) an affiliate, or an insider of an affiliate as if the affiliate were the debtor; and

(E) a managing agent of the debtor.

(8) "Lien" means a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien.

(9) "Person" means an individual, partnership, corporation, association, organization, government or governmental subdivision or agency, business trust, estate, trust, or any other legal or commercial entity.

(10) "Property" means anything that may be the subject of ownership.

(11) "Relative" means an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree.

(12) "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. The term does not include a transfer under a disclaimer filed under Section 37A, Texas Probate Code, or Section 112.010, Property Code.

(13) "Valid lien" means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings.

Amended by Acts 1987, 70th Leg., ch. 1004, § 1, eff. Sept. 1, 1987; Acts 1993, 73rd Leg., ch. 846, § 2, eff. Sept. 1, 1993; Acts 1997, 75th Leg., ch. 911, § 95, eff. Sept. 1, 1997.

## Historical and Statutory Notes

Section 2 of the 1987 Act provides:

"This Act applies only to transfers made and obligations incurred by debtors, as determined under Section 24.007, Business & Commerce Code, as added by this Act, on or after the effective date of this Act. Transfers made and obligations incurred before that date are governed by the law in effect immediately before this Act took effect, and that law is continued in effect for that purpose."

The 1993 amendment added the last sentence of subsec. (12).

Section 35(a) of the 1993 amendatory act provides:

"The changes in law made by Sections 1, 2, and 3 of this Act apply only to a disclaimer made on or after the effective date of this Act. A disclaimer made before the effective date of this Act is covered by the law in effect when the disclaimer was made, and the former law is continued in effect for that purpose."

Acts 1997, 75th Leg., ch. 911, in subd. (4), inserted "person entitled to receive court or administratively ordered child support for the benefit of a child".

**Prior Laws:**

Acts 1840, 4th Cong., p. 28.
P.D. 3876.
Rev.Civ.St.1879, art. 2465.
Rev.Civ.St.1895, art. 2544.
Rev.Civ.St.1911, art. 3966.
Acts 1927, 40th Leg., ch. 30, § 1.
Vernon's Ann.Civ.St. art. 3996.
Acts 1967, 60th Leg., p. 2343, ch. 785, § 1.
V.T.C.A., Bus. & C. Code § 24.01.

**Uniform Law:**

This section is similar to § 1 of the Uniform Fraudulent Transfer Act. See 7A, Uniform Laws Annotated, Master Edition or ULA Database on Westlaw.

## Law Review and Journal Commentaries

Marital liability in Texas . . . till death, divorce, or bankruptcy do they part. Thomas M. Featherston, Jr., and Lynda S. Still, 44 Baylor L.Rev. 1 (1992).

Nonuniform Texas "Uniform" Fraudulent Transfer Act. Richard F. Dole, Jr. and Vernon Teofan, 42 Sw.L.J. 1029 (1989).

3

the husband was insolvent. Allen v. Crutcher (Civ.App. 1919) 216 S.W. 236, error refused.

Creditor attacking, as fraudulent, debtor's conveyance for valuable consideration, has burden of showing debtor's insolvency at time of conveyance. Wester v. Strickland (Civ.App. 1935) 87 S.W.2d 765, affirmed 131 Tex. 23, [illegible] S.W.2d 1047.

## § 24.004. Value

(a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

(b) For the purposes of Sections 24.005(a)(2) and 24.006 of this code, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

(c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

(d) "Reasonably equivalent value" includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.

Amended by Acts 1987, 70th Leg., ch. 1004, § 1, eff. Sept. 1, 1987; Acts 1993, 73rd Leg., ch. 570, § 9, eff. Sept. 1, 1993.

### Historical and Statutory Notes

Section 2 of the 1987 Act provides:

"This Act applies only to transfers made and obligations incurred by debtors, as determined under Section 24.007, Business & Commerce Code, as added by this Act, on or after the effective date of this Act. Transfers made and obligations incurred before that date are governed by the law in effect immediately before this Act took effect, and that law is continued in effect for that purpose."

The 1993 amendment, in subsec. (d), preceding "sold the assets", deleted "wilfully", and substituted "arm's" for "arms".

**Uniform Law:**

This section is similar to § 3 of the Uniform Fraudulent Transfer Act. See 7A, Uniform Laws Annotated, Master Edition or ULA Database on Westlaw.

### American Law Reports

Conveyance as fraudulent where made in contemplation of possible liability for future tort, 38 ALR3d 597.

### Library References

Fraudulent Conveyances ⇐73–100.
Westlaw Topic No. 186.
C.J.S. Fraudulent Conveyances §§ 103–119, 121–137, 201.
7 Texas Pl & Pr Forms, Fraudulent Transfers §§124:10-124:28.

**Texts and Treatises**

17 Texas Jur 3d, Cred R § 466.3.

EXHIBIT 3

4

:y at time of
ıd (Civ.App.
Tex. 23, 112

ge for the
is secured
ade other-
sh support

ıis code, a
interest of
ıve foreclo-
ition of the
or security

the debtor
d is in fact

transfer or
eror would

3, 73rd Leg.,

c. (d), preced-
wilfully", and

ıf the Uniform
7A, Uniform
or ULA Data-

3.

### Notes of Decisions

Burden of proof 2
Reasonably equivalent value 1

**1. Reasonably equivalent value**

Evidence that on or near date that secured creditor received backdated deed of trust covering assets of debtor's gas delivery business, debtor owed $202,876.49 on the $300,000 loan but secured creditor had received purchase offers of $700,000 for the assets and that the replacement value of the assets was between $900,000 and $1 million, established that debtor did not receive reasonably equivalent value as to the transfer of assets by deed of trust, as element of judgment creditors' fraudulent transfer claim against secured creditor under Uniform Fraudulent Transfer Act (UFTA). First Nat. Bank of Seminole, Texas v. Hooper (App. 8 Dist. 2001) 48 S.W.3d 802, rehearing overruled, review denied, rehearing of petition for review filed.

**2. Burden of proof**

Burden to prove that value of property conveyed was in excess of debt, in settlement of which it was made, was upon creditor seeking to set conveyance aside. Morgan Plan Co. v. Ferguson (Civ.App. 1931) 45 S.W.2d 308.

Creditor, seeking to set aside conveyance as fraudulent, must show fraudulent intent of grantor; when such intent is shown, grantee, to sustain transaction, must show that he paid value; when this is shown, creditor, to prevail, must show that at time of payment grantee had notice of fraud. Hunter v. Pitcock (Civ.App. 1961) 346 S.W.2d 509.

## § 24.005. Transfers Fraudulent as to Present and Future Creditors

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

EXHIBIT
tabbles
4

5

C
Uniform Laws Annotated Currentness
Uniform Fraudulent Transfer Act 1984 (Refs & Annos)

**→§ 1. Definitions.**

As used in this [Act]:

(1) "Affiliate" means:

(i) a person who directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities,

(A) as a fiduciary or agent without sole discretionary power to vote the securities; or

(B) solely to secure a debt, if the person has not exercised the power to vote;

(ii) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds, with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities,

(A) as a fiduciary or agent without sole power to vote the securities; or

(B) solely to secure a debt, if the person has not in fact exercised the power to vote;

(iii) a person whose business is operated by the debtor under a lease or other agreement, or a person substantially all of whose assets are controlled by the debtor; or

(iv) a person who operates the debtor's business under a lease or other agreement or controls substantially all of the debtor's assets.

(2) "Asset" means property of a debtor, but the term does not include:

(i) property to the extent it is encumbered by a valid lien;

(ii) property to the extent it is generally exempt under nonbankruptcy law; or

(iii) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

(3) "Claim" means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(4) "Creditor" means a person who has a claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
tabbies
5

(5) "Debt" means liability on a claim.

(6) "Debtor" means a person who is liable on a claim.

(7) "Insider" includes:

(i) if the debtor is an individual,

(A) a relative of the debtor or of a general partner of the debtor;

(B) a partnership in which the debtor is a general partner;

(C) a general partner in a partnership described in clause (B); or

(D) a corporation of which the debtor is a director, officer, or person in control;

(ii) if the debtor is a corporation,

(A) a director of the debtor;

(B) an officer of the debtor;

(C) a person in control of the debtor;

(D) a partnership in which the debtor is a general partner;

(E) a general partner in a partnership described in clause (D); or

(F) a relative of a general partner, director, officer, or person in control of the debtor;

(iii) if the debtor is a partnership,

(A) a general partner in the debtor;

(B) a relative of a general partner in, a general partner of, or a person in control of the debtor;

(C) another partnership in which the debtor is a general partner;

(D) a general partner in a partnership described in clause (C); or

(E) a person in control of the debtor;

(iv) an affiliate, or an insider of an affiliate as if the affiliate were the debtor; and

(v) a managing agent of the debtor.

(8) "Lien" means a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien.

(9) "Person" means an individual, partnership, corporation, association, organization, government or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

governmental subdivision or agency, business trust, estate, trust, or any other legal or commercial entity.

(10) "Property" means anything that may be the subject of ownership.

(11) "Relative" means an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree.

(12) "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.

(13) "Valid lien" means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings.

COMMENT

1998 Main Volume

(1) The definition of "affiliate" is derived from § 101(2) of the Bankruptcy Code.

(2) The definition of "asset" is substantially to the same effect as the definition of "assets" in § 1 of the Uniform Fraudulent Conveyance Act. The definition in this Act, unlike that in the earlier Act, does not, however, require a determination that the property is liable for the debts of the debtor. Thus, an unliquidated claim for damages resulting from personal injury or a contingent claim of a surety for reimbursement, contribution, or subrogation may be counted as an asset for the purpose of determining whether the holder of the claim is solvent as a debtor under § 2 of this Act, although applicable law may not allow such an asset to be levied on and sold by a creditor. *Cf.* Manufacturers & Traders Trust Co. v. Goldman (*In re* Ollag Construction Equipment Corp.), 578 F.2d 904, 907-09 (2d Cir.1978).

Subparagraphs (i), (ii), and (iii) provide clarification by excluding from the term not only generally exempt property but also an interest in a tenancy by the entirety in many states and an interest that is generally beyond reach by unsecured creditors because subject to a valid lien. This Act, like its predecessor and the Statute of 13 Elizabeth, declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims. The laws protecting valid liens against impairment by levying creditors, exemption statutes, and the rules restricting levyability of interest in entireties property are limitations on the rights and remedies of unsecured creditors, and it is therefore appropriate to exclude property interests that are beyond the reach of unsecured creditors from the definition of "asset" for the purposes of this Act.

A creditor of a joint tenant or tenant in common may ordinarily collect a judgment by process against the tenant's interest, and in some states a creditor of a tenant by the entirety may likewise collect a judgment by process against the tenant's interest. See 2 American Law of Property 10, 22, 28-32 (1952); Craig, An Analysis of Estates by the Entirety in Bankruptcy, 48 Am.Bankr.L.J. 255, 258-59 (1974). The levyable interest of such a tenant is included as an asset under this Act.

The definition of "assets" in the Uniform Fraudulent Conveyance Act excluded property that is exempt from liability for debts. The definition did not, however, exclude all property that can not be reached by a creditor through judicial proceedings to collect a debt. Thus, it included the interest of a tenant by the entirety although in nearly half the states such an interest can not be subjected to liability for a debt unless it is an obligation owned jointly by the debtor with his or her cotenant by the entirety. See 2 American Law of Property 29 (1952); Craig, An Analysis of Estates by the Entirety in Bankruptcy, 48 Am.Bankr.L.J. 255, 258 (1974). The definition in this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Act requires exclusion of interests in property held by tenants by the entirety that are not subject to collection process by a creditor without a right to proceed against both tenants by the entirety as joint debtors.

The reference to "generally exempt" property in § 1(2)(ii) recognizes that all exemptions are subject to exceptions. Creditors having special rights against generally exempt property typically include claimants for alimony, taxes, wages, the purchase price of the property, and labor or materials that improve the property. See Uniform Exemptions Act § 10 and the accompanying Comment. The fact that a particular creditor may reach generally exempt property by resorting to judicial process does not warrant its inclusion as an asset in determining whether the debtor is insolvent.

Since this Act is not an exclusive law on the subject of voidable transfers and obligations (see Comment (8) to § 4 *infra*), it does not preclude the holder of a claim that may be collected by process against property generally exempt as to other creditors from obtaining relief from a transfer of such property that hinders, delays, or defrauds the holder of such a claim. Likewise the holder of an unsecured claim enforceable against tenants by the entirety is not precluded by the Act from pursuing a remedy against a transfer of property held by the entirety that hinders, delays, or defrauds the holder of such a claim.

Nonbankruptcy law is the law of a state or federal law that is not part of the Bankruptcy Code, Title 11 of the United States Code. The definition of an "asset" thus does not include property that would be subject to administration for the benefit of creditors under the Bankruptcy Code unless it is subject under other applicable law, state or federal, to process for the collection of a creditor's claim against a single debtor.

(3) The definition of "claim" is derived from § 101(4) of the Bankruptcy Code. Since the purpose of this Act is primarily to protect unsecured creditors against transfers and obligations injurious to their rights, the words "claim" and "debt" as used in the Act generally have reference to an unsecured claim and debt. As the context may indicate, however, usage of the terms is not so restricted. See, *e.g.* §§ 1(1)(i)(B) and 1(8).

(4) The definition of "creditor" in combination with the definition of "claim" has substantially the same effect as the definition of "creditor" under § 1 of the Uniform Fraudulent Conveyance Act. As under that Act, the holder of an unliquidated tort claim or a contingent claim may be a creditor protected by this Act.

(5) The definition of "debt" is derived from § 101(11) of the Bankruptcy Code.

(6) The definition of "debtor" is new.

(7) The definition of "insider" is derived from § 101(28) of the Bankruptcy Code. The definition has been restricted in clauses (i)(C), (ii)(E), and (iii)(D) to make clear that a partner is not an insider of an individual, corporation, or partnership if any of these latter three persons is only a limited partner. The definition of "insider" in the Bankruptcy Code does not purport to make a limited partner an insider of the partners or of the partnership with which the limited partner is associated, but it is susceptible of a contrary interpretation and one which would extend unduly the scope of the defined relationship when the limited partner is not a person in control of the partnership. The definition of "insider" in this Act also differs from the definition in the Bankruptcy Code in omitting the reference in 11 U.S.C. § 101(28)(D) to an elected official or relative of such an official as an insider of a municipality. As in the Bankruptcy Code (see 11 U.S.C. § 102 (3)), the word "includes" is not limiting, however. Thus, a court may find a person living with an individual for an extended time in the same household or as a permanent companion to have the kind of close relationship intended to be covered by the term "insider." Likewise, a trust may be found to be an insider of a beneficiary.

(8) The definition of "lien" is derived from paragraphs (30), (31), (43), and (45) of § 101 of the Bankruptcy Code, which define "judicial lien," "lien," "security interest," and "statutory lien" respectively.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(9) The definition of "person" is adapted from paragraphs (28) and (30) of § 1-201 of the Uniform Commercial Code, defining "organization" and "person" respectively.

(10) The definition of "property" is derived from § 1-201(33) of the Uniform Probate Code. Property includes both real and personal property, whether tangible or intangible, and any interest in property, whether legal or equitable.

(11) The definition of "relative" is derived from § 101(37) of the Bankruptcy Code but is explicit in its references to the spouse of a debtor in view of uncertainty as to whether the common law determines degrees of relationship by affinity.

(12) The definition of "transfer" is derived principally from § 101(48) of the Bankruptcy Code. The definition of "conveyance" in § 1 of the Uniform Fraudulent Conveyance Act was similarly comprehensive and the references in this Act to "payment of money, release, lease, and the creation of a lien or incumbrance" are derived from the Uniform Fraudulent Conveyance Act. While the definition in the Uniform Fraudulent Conveyance Act did not explicitly refer to an involuntary transfer, the decisions under that Act were generally consistent with an interpretation that covered such a transfer. See, *e.g.* Hearn 45 St. Corp. v. Jano, 283 N.Y. 139, 27 N.E.2d 814, 128 A.L.R. 1285 (1940) (execution and foreclosure sales); Lefkowitz v. Finkelstein Trading Corp., 14 F.Supp. 898, 899 (S.D.N.Y. 1936) (execution sale); Langan v. First Trust & Deposit Co., 277 App.Div. 1090, 101 N.Y.S.2d 36 (4th Dept. 1950), *aff'd* 302 N.Y. 932, 100 N.E.2d 189 (1951) (mortgage foreclosure); Catabene v. Wallner, 16 N.J.Super. 597, 602, 85 A.2d 300, 302 (1951) (mortgage foreclosure).

(13) The definition of "valid lien" is new. A valid lien includes an equitable lien that may not be defeated by a judicial lien creditor. See, *e.g.,* Pearlman v. Reliance Insurance Co., 371 U.S. 132, 136 (1962) (upholding a surety's equitable lien in respect to a fund owing a bankrupt contractor).

ACTION IN ADOPTING JURISDICTIONS

2004 Electronic Pocket Part Update

**Variations from Official Text:**

**ALABAMA**

In par. (3), adds "and specifically shall include the nonpayment of child support pursuant to a court order" following "or unsecured".

**ARKANSAS**

In par. (8), adds ", including child support liens arising under §§ 9-14-230 and 9-14-231" following "statutory lien".

**DELAWARE**

In par. (9), inserts "statutory trust," following "governmental subdivision or agency,".

**KANSAS**

In par. (2), the introductory paragraph provides:

" 'Asset' means property of a debtor. 'Asset' does not include:"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6

ment 397 Filed 02/14/05

Laches 4
Waiver and estoppel 3

---

**1. Controlling statute**

Former § 24.02 (see, now, § 24.005) dealing explicitly with case of bona fide purchaser of real estate was more specific than § 27.01(b) regarding "beneficiaries" of false promise made in a transaction involving real estate, and thus was controlling in suit seeking to recover title to land from bona fide purchaser. Carr v. Hunt (App. 5 Dist. 1983) 651 S.W.2d 875, ref. n.r.e..

**2. Bankruptcy law**

When a debtor which has fraudulently transferred property in an effort to put the property out of the reach of its creditors is forced into bankruptcy, the debtor is considered to have a continuing legal or equitable interest in the property fraudulently transferred; therefore automatic stay prevented creditor from continuing to pursue a cause of action under former §§ 24.02 and 24.03 (see, now, § 24.005 et seq.) against individual who controlled corporate debtor after the petition had been filed. In re Mortgageamerica Corp., C.A.5 (Tex.)1983, 714 F.2d 1266.

**3. Waiver and estoppel**

Creditors were estopped from attacking a transfer of corporate property as fraudulent, where they have acquiesced in such transfer. Tenney v. Ballard, Webb & Burnette Hat Co. (Civ.App. 1897) 17 Tex.Civ.App. 144, 43 S.W. 296, error refused.

The owner of a stock of goods intrusting it to a firm, and allowing it to deal with the goods as its own, was estopped as to creditors of the firm from claiming the goods. Holder v. Shelby (Civ.App. 1909) 118 S.W. 590.

Creditors of sellers by affirming contract of sale made it their own, and would be estopped to set up that it was originally illegal. Warren v. Parlin-Orendorff Implement Co. (Civ.App. 1918) 207 S.W. 586, error refused.

Creditors whose debtor fraudulently land to his mother, by availing themselves appropriate means of enforcing their against the land in suing out attachment the son as if the conveyance had not been attachment being in a sense an execution advance, did not estop themselves to deny debtor had such title subsequent to his ance as would support his claim of home Stevens v. Cobern (Sup. 1919) 109 Tex. 213 S.W. 925.

Owner who branded cattle with own and put them in possession of rancher for than two years could, in absence of facts ing estoppel in pais, assert title to cattle against party to whom they were mortgaged rancher. Strawn Nat. Bank v. Marchbanks (Civ.App. 1934) 74 S.W.2d 447, error refused.

That judgment creditor of husband joined power of attorney reciting that property longed to wife in her own right did not creditor from questioning validity of deed such property from husband to wife, under creditor's testimony that power of attorney for convenience in managing estate from which husband received property. Rosenthal v. Rosenthal (Civ.App. 1937) 107 S.W.2d 641.

Under evidence that judgment creditor released lien on part of debtor's land in favor of holder of secured notes to forestall such party's suit against debtor and creditor, and that there was no realizable equity in such land, release of lien did not estop creditor from questioning validity of conveyance of other property from debtor to wife. Rosenthal v. Rosenthal (Civ.App. 1937) 107 S.W.2d 641.

**4. Laches**

Where creditor of husband had constructive notice of a deed from husband to wife from date of recordation, and no facts were pleaded to excuse lack of diligence in pursuing property before right to do so was barred in law, such creditor was guilty of laches and not entitled in equity to have the conveyance set aside for fraud. Central Nat. Bank of Waco v. Barclay (Civ.App. 1923) 254 S.W. 140.

## § 24.012. Uniformity of Application and Construction

This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.

Amended by Acts 1987, 70th Leg., ch. 1004, § 1, eff. Sept. 1, 1987.

tabbies EXHIBIT 6

7

FLEET CAPITAL CORPORATION

January 2, 2003

H.I.G Capital, LLC
1001 Brickell Bay Drive, 27th Floor
Miami, Florida 33131
Attention: John Black and Anthony DiSimone

Re: TestAmerica Incorporated and Affiliates ("Borrowers")

Gentlemen:

The undersigned, Fleet Capital Corporation ("Fleet"), as agent for itself ("Agent") and the other lenders, Key Corporate Capital Inc. and Sovereign Bank (Fleet and such other lenders, jointly and severally, "Lenders"), have each been advised by TestAmerica Incorporated ("TestAmerica"), Geotek Drilling Company, Inc. ("Geotek"), Specialized Assays, Inc. ("Specialized"), Metco Environmental, Inc. ("Metco") and West Hazmat Drilling Corp. ("Hazmat") (TestAmerica, Geotek, Specialized, Metco and Hazmat each a "Borrower" and collectively, the "Borrowers") that TestAmerica Environmental Services LLC, TestAmerica Analytical Testing Corp., TestAmerica Air Emission Corp. and TestAmerica Drilling Corp., each a Delaware corporation (collectively, the "Buyers") will be acquiring substantially all of Borrowers' assets (the "Sale").

It is the understanding of Agent and Lenders that a portion of the proceeds of the Sale will be used to repay the indebtedness of Borrowers to Lenders under the Loan and Security Agreement dated as of December 18, 1998 (as same has been amended from time to time, the "Loan Agreement"). Such repayment should be wire transferred to Agent pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | Fleet National Bank<br>Hartford, CT |
| ABA #: | 011900571 |
| For the Account of: | Fleet Capital NE Collections |
| Account # | 936-933-7579 |
| Reference: | TestAmerica – Payoff |

Based on Agent's books and records, the full amount due and owing to Lenders at the time of closing of the Sale is $26,336,585.64, which such sum includes $452,800 in breakage fees due with respect to the termination of a certain interest rate swap contract, which is chargable as an Obligation allocable solely to Fleet ("Swap Obligation"). In accordance with the terms of that certain letter agreement dated in July 2002, the total [obscured] Lenders at closing (the

DEPOSITION EXHIBIT 36 Mullins 12.1.04 DW PENGAD 800-631-6989

1140193.5/MISC/18405/050 1/3/03

M 013467

Ex. 5

DEFENDANT'S EXHIBIT 88

App. 39

EXHIBIT 7

"Closing Payment" or "Payoff Amount"), if paid on January 3, 2003, after giving effect to confirmed collections of receivables through January 2, 2003, is $23,133,785.64, which amount includes $15,800,000 in respect of the principal amount of the Term Loan (the "Discounted Term Loan Payment"), $7,333,785.64 in respect of the principal amount of the Revolving Credit Loans, and all interest, fees, costs and expenses as of such date; provided, however, that if the full amount of the Closing Payment is not received by 2:00 p.m. on January 3, 2003, then this payoff letter shall be null and void and of no further force or effect.

The Discounted Term Loan Payment represents a $2,750,000 reduction from the full amount due and owing on the Term Loan and the Swap Obligation represents a $452,800 reduction from the full amount due and owing Fleet on other Obligations. In consideration for (a) the consent of Sagaponack Partners, L.P. ("Sagaponack") to the Sale and (b) Sagaponack's agreement to cooperate and assist with certain post-closing matters arising from and in connection with the Sale, Lenders hereby agree to the payment of $3,202,800 (the "Allocated Amount") to Sagaponack from the proceeds of the Sale that would otherwise be payable to Lenders pursuant to the terms and conditions of the Loan Agreement. The parties hereto acknowledge and agree that but for the agreement of Lenders to share with Sagaponack the proceeds of the assets that were granted as collateral to Agent and Lenders under the terms of the Loan Agreement, Lenders would be entitled to receipt of the Allocated Amount in its entirety. The parties hereto also acknowledge and agree that, notwithstanding any provision to the contrary contained in any Subordination Agreement between Fleet and Sagaponack relating to the Borrowers, Sagaponack may retain the Allocated Amount, and any other amount that Sagaponack may receive in connection with the Sale, and have no obligation to turn over such monies to Agent or the Lenders.

In consideration of the payment in full of the Payoff Amount to Fleet as set forth above, and the agreements of each Borrower contained herein, each of Agent and Lenders, hereby (i) acknowledges and agrees that payment of the Payoff Amount in immediately available funds will constitute payment in full of all of Borrowers' Obligations to Lenders, (ii) represents that it has no other credit arrangements with, loans outstanding to, guaranties by, or interests or liens against any Borrower or any of Borrowers' personal or real property arising from or relating to the Loan Agreement, (iii) releases, effective upon the receipt of the Payoff Amount in immediately available funds, all security interests and liens which any Borrower may have granted to Agent or Lenders arising from or related to the Loan Agreement, (iv) agrees that it will, at Borrower's expense, terminate all of its agreements with each Borrower arising from or related to the Loan Agreement and (v) agrees that Borrowers have no further liabilities or obligations arising from or related to the Loan Agreement, except for those which by the terms of the Loan Agreement survive the termination thereof and except as set forth herein.

Fleet agrees, at Borrowers' expense, to deliver to Buyers after receipt of the Payoff Amount in immediately available funds, such releases, cancellations, discharges or other agreements as may reasonably be requested by Borrowers or Buyers in connection with its release of the security interests and liens (collectively, the "Termination Documents"); provided, however, that Borrowers or Buyers supply Agent with the forms of any such Termination Documents to be executed by Agent subsequent to the date hereof, and that any such Termination Documents are in form and substance acceptable to Agent in its discretion.

Notwithstanding anything to the contrary hereinabove contained, Agent and Lenders hereby reserve all of their rights against each Borrower or any payor of any such checks or similar instruments with respect to any and all checks or similar instruments for payment of money heretofore received by it in connection with its arrangements with Borrowers, and all of its rights to any monies due or to become due under said checks or similar instruments and/or all of its claims thereon. By its signature appearing at the end of this letter, TestAmerica Environmental Services LLC, on behalf of each of the Buyers, hereby assumes the obligations of Borrowers with respect to the foregoing and further agrees that Fleet may setoff against any account maintained, or to be maintained, at Fleet by any of the Buyers, the full amount of any checks returned for nonpayment, and for any other rights of Fleet to monies due under such checks or similar instruments and/or all of its claims thereof.

For and in consideration of Fleet's and Lenders' agreements contained herein, (i) each Borrower hereby indemnifies Agent and each Lender from, and holds Agent and each Lender harmless against, all losses, liabilities, charges, expenses and fees which Agent or any Lender may have incurred or may now or hereafter incur in connection with the transactions contemplated by this letter which have not as yet been reflected in Borrowers' loan account which any Borrower is, or may be, required to bear pursuant to the Loan Agreement. The amount of any such losses, charges, fees, expenses or other liabilities for which Agent and each Lender hereinabove indemnified shall be paid to Fleet promptly upon Fleet's demand therefor and (ii) each Borrower hereby releases Agent, each Lender and their respective officers, directors, representatives, employees, attorneys-in-fact and affiliates from any obligations to any Borrower for any liabilities, damages, costs or expenses relating to the Loan Agreement or any other documents or any of the transactions relating to the Loan Agreement or such other documents and hereby indemnifies Agent and each Lender from and holds Agent and each Lender harmless against the same.

All questions concerning the construction, validity and interpretation of the matters referred to in this letter shall be governed by the laws of the State of New York.

This letter may be executed in one or more counterparts each of which taken together shall constitute one and the same agreement. Any signature delivered by facsimile transmission shall be deemed an original signature hereto.

FLEET CAPITAL CORPORATION, as Agent and Lender

By: [signature]
Name: WALTER SCHUPPE
Title: SENIOR VICE PRESIDENT

(signatures continued on page four)

KEY CORPORATE CAPITAL INC., as Lender

By: [signature]
Name: Leslie A. Jones
Title: Vice President

SOVEREIGN BANK, as Lender

By: ______________________
Name:
Title:

Acknowledged and Agreed to
this 2nd day of January, 2003

TESTAMERICA INCORPORATED

By: ______________________
Name:
Title:

TESTAMERICA ENVIRONMENTAL SERVICES LLC

By: ______________________
Name:
Title:

SAGAPONACK PARTNERS, L.P.

By: ______________________
Name:
Title:

KEY CORPORATE CAPITAL INC., as Lender

By: ______________________
Name:
Title:

SOVEREIGN BANK, as Lender

By: [signature]
Name: Roland D. Lamothe
Title: Vice President

Acknowledged and Agreed to
this 2nd day of January, 2003

TESTAMERICA INCORPORATED

By: ______________________
Name:
Title:

TESTAMERICA ENVIRONMENTAL SERVICES LLC

By: ______________________
Name:
Title:

SAGAPONACK PARTNERS, L.P.

By: ______________________
Name:
Title:

KEY CORPORATE CAPITAL INC., as Lender

By: ____________________
Name:
Title:

SOVEREIGN BANK, as Lender

By: ____________________
Name:
Title:

Acknowledged and Agreed to
this 2nd day of January, 2003

TESTAMERICA INCORPORATED

By: [signature]
Name: Thomas R. Barr
Title: CEO

TESTAMERICA ENVIRONMENTAL SERVICES LLC

By: ____________________
Name:
Title:

SAGAPONACK PARTNERS, L.P.

By: ____________________
Name:
Title:

KEY CORPORATE CAPITAL INC., as Lender

By: ______________________
Name:
Title:

SOVEREIGN BANK, as Lender

By: ______________________
Name:
Title:

Acknowledged and Agreed to
this 2nd day of January, 2003

TESTAMERICA INCORPORATED

By: ______________________
Name:
Title:

TESTAMERICA ENVIRONMENTAL SERVICES LLC

By: [signature]
Name:
Title:

SAGAPONACK PARTNERS, L.P.

By: ______________________
Name:
Title:

Westlaw.

**H**

Court of Appeals of Texas,
Houston (14th Dist.).
Clayton W. WILLIAMS, Jr. and Williams Company, Appellants,
v.
Dorothy M. JENNINGS, Appellee.
**No. B14-86-00170-CV.**

May 5, 1988.
Rehearing Denied Aug. 4, 1988.

Vendors sold land and their entire one-half interest in mineral rights to purchaser. Subsequent to sale, vendors executed and recorded oil and gas lease to third parties. Purchaser sued vendor and holders of lease for slander of title. Following jury trial, the 272nd District Court, Brazos County, John M. Delaney, J., entered judgment in favor of purchasers awarding actual damages, exemplary damages, and attorney fees. Holders of lease appealed. The Court of Appeals, Cannon, J., held that: (1) reformed deed had no legal effect, so that purchaser received vendors' entire one-half mineral interest via original deed; (2) purchaser's recordation of warranty deed from ex-husband did not estop her from claiming slander of title; (3) purchaser did not accept and ratify mineral lease; (4) leaseholder's status as bona fide purchaser for value was immaterial where holder's agent had notice of infirmity in title; (5) purchaser proved uttering and publishing of words by leaseholder disparaging purchaser's title; (6) execution and recording of lease by leaseholder was done with malice; (7) award of special damages was sustained by evidence; (8) exemplary damages of $65,000 were not excessive; and (9) attorney fees were not recoverable in slander of title action.

Judgment modified and affirmed as modified.

Sears, J., dissented and filed opinion.

West Headnotes

**[1] Libel and Slander 🔑139**
237k139 Most Cited Cases
To recover in action for slander of title, party must allege and prove utterings and publishing of disparaging words, that those words were false, that they were malicious, that special damages were sustained thereby, that party possessed an estate or interest in property disparaged, and that party suffered loss of specific sale.

**[2] Libel and Slander 🔑130**
237k130 Most Cited Cases
Purchaser received vendors' entire one-half mineral interest via original deed and vendor proved she possessed an interest in property for purposes of slander of title action where reformed deed, which reserved in vendors one half of their original mineral interest, was neither executed nor acknowledged and had no legal effect. V.T.C.A., Property Code § 5.021.

**[3] Appeal and Error 🔑931(1)**
30k931(1) Most Cited Cases

**[3] Appeal and Error 🔑989**
30k989 Most Cited Cases
In reviewing a "matter of law" point of error, Court of Appeals must first examine record for evidence that supports finding, while ignoring all evidence to contrary, and if there is no evidence to support finding, Court must then further examine entire record to see if contrary proposition is established as matter of law.

**[4] Libel and Slander 🔑136**
237k136 Most Cited Cases
Wife was not estopped from claiming slander of title for vendors' lease to third party of wife's mineral interest subsequent to sale of property, absent evidence that wife knew of contents or appearance of reform deed recorded at direction of wife's ex-husband reserving to vendors one half of their original mineral interest when wife later recorded deed from ex-husband granting his community share of their mineral interest to her.

**[5] Husband and Wife 🔑265**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 8

205k265 Most Cited Cases
Where joint management community property is involved, husband and wife are joint managers and neither spouse may virtually represent the other. V.T.C.A., Family Code §§ 5.01(b), 5.22(c).

**[6] Husband and Wife ⚿265.5**
205k265.5 Most Cited Cases
(Formerly 205k2651/2, 205k26.160)
Ex-husband did not act on behalf of his wife in his efforts to correct original deed granting vendors' entire mineral interest to husband and wife or in his acceptance of reformed deed which reserved to vendors one half of their original mineral interest, where husband was joint manager with wife in community property and he told her nothing of his actions, so that wife was not estopped from claiming entire mineral interest embraced within first deed but not second deed. V.T.C.A., Family Code §§ 5.01(b), 5.22(c).

**[7] Mines and Minerals ⚿55(1)**
260k55(1) Most Cited Cases
Wife's recordation of warranty deed from ex-husband granting to her his community share of their mineral interest in subject tract was not ratification of reformed deed reserving to vendors one half of their original mineral interest in tract and subsequent lease by vendors to third party of wife's mineral interest; wife's action of calling vendors' leasing agent and telling him he had made a "terrible mistake" and that she wanted it corrected indicated repudiation rather than acceptance when she had discovered lease's existence.

**[8] Vendor and Purchaser ⚿231(1)**
400k231(1) Most Cited Cases
Recording acts are intended to affect with notice only those persons who have reason to apprehend some transfer or encumbrance prior to their own as none arising afterwards can affect them or their estate in land.

**[9] Libel and Slander ⚿136**
237k136 Most Cited Cases
Mineral lease by original vendors of land to third party was not a transfer or encumbrance occurring prior to wife's ownership of property, as she actually owned it jointly with her husband at time lease was taken, and, as owner, she had no reason to apprehend lease, so that she did not have constructive notice of lease when she recorded her warranty deed from husband in her action for slander of title.

**[10] Libel and Slander ⚿136**
237k136 Most Cited Cases
(Formerly 232Ak136)
Wife claiming slander of title did not accept and ratify reformed deed which reserved to vendors one half of their original mineral interest and vendors' subsequent lease of that interest to third party when wife recorded her warranty deed from ex-husband granting to her his community share of their joint mineral interest, where ex-husband's deed specifically referred to original deed granting vendors' entire mineral interest to husband and wife rather than reformed deed, ex-husband's grant to wife was made subject to all valid conveyances and leases, reformed deed had no legal effect, and mineral lease was invalid as per original deed and parties' intent.

**[11] Vendor and Purchaser ⚿220**
400k220 Most Cited Cases
Bona fide purchaser is one who acquires apparent legal title to property in good faith for a valuable consideration without actual or constructive notice of an infirmity in title.

**[12] Mines and Minerals ⚿73.1(5)**
260k73.1(5) Most Cited Cases
Fact that holder of mineral lease was bona fide purchaser for value without notice that landowner was claiming title and ownership to full one-half interest in minerals was not controlling where agents represented leaseholder in obtaining mineral lease from original vendors and special issue submitted to jury did not include an instruction on agency.

**[13] Vendor and Purchaser ⚿229(1)**
400k229(1) Most Cited Cases
Every purchaser of land is charged with knowledge of all facts appearing in chain of title through which he claims that would place a reasonably prudent person on inquiry as to rights of other parties in property conveyed.

**[14] Mines and Minerals ⚿73.1(5)**
260k73.1(5) Most Cited Cases
Finding that mineral leaseholder may have been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bona fide purchaser for value without notice of fact that purchaser of land was claiming title in ownership to full one-half interest in minerals was immaterial where agents represented leaseholder in obtaining mineral lease from vendors, and agents had notice of infirmity in title.

**[15] Judgment 199(1)**
228k199(1) Most Cited Cases
Trial court, on its own motion, may disregard jury finding on a special issue that is immaterial.

**[16] Libel and Slander 130**
237k130 Most Cited Cases
Purchaser of land and mineral interest proved uttering and publishing of words by holder of mineral lease disparaging her title to property where lease stated
that vendors of lease had interest in property, which they did not; lease was recorded, which constituted publication; and purchaser could not enter into a mineral lease until cloud on her title was removed, which was disparaging.

**[17] Libel and Slander 131**
237k131 Most Cited Cases
(Formerly 232Ak131)
Malice as basis for recovery of actual damages in slander of title cases has been defined to mean merely that act must have been deliberate conduct without reasonable cause.

**[18] Libel and Slander 139**
237k139 Most Cited Cases
Finding that conduct of holder of mineral lease was deliberate and without reasonable cause so as to support recovery of actual damages in slander of title action was supported by evidence that leaseholder had constructive notice through agents that reformed deed upon which lease was based created an ambiguity and passed no title and that between time such notice arose and taking of lease, leaseholder had sufficient time to do thorough check of deed records and to contact parties to clarify their intent.

**[19] Brokers 2**
65k2 Most Cited Cases
"Broker" is one who is engaged by others on a commission basis and is recognized as an agent employed to make or negotiate bargains or contracts for sale or lease of real estate or other property between other persons.

**[20] Principal and Agent 3(2)**
308k3(2) Most Cited Cases
Contract lease broker who participated in acquisition of mineral lease was agent of leaseholder, rather than independent contractor, for purposes of determining if conduct could form basis for recovery of actual damages in slander of title action, where broker located tracts on behalf of leaseholder that he thought were good prospects and contacted owners to see if they were interested in leasing, broker acted under authority of landman employed by leaseholder and was to follow procedures set out by leaseholder,and leaseholder honored bank draft to vendors' mineral lease which implied ratification of lease and steps taken to obtain it.

**[21] Principal and Agent 177(1)**
308k177(1) Most Cited Cases
If an agent's acts are within scope of his authority and are related to matters over which such authority extends, notice to agent is then deemed to be notice to principal.

**[22] Principal and Agent 177(3.1)**
308k177(3.1) Most Cited Cases
(Formerly 308k177(3))
In determining whether notice to agent is deemed to be notice to principal, it is immaterial that principal has not actually been informed of particular facts under consideration, and a principal may be deemed to be bound by knowledge that his agent, by use of ordinary care, could have acquired, especially where agent has information sufficient to instigate an inquiry.

**[23] Libel and Slander 139**
237k139 Most Cited Cases
Finding in slander of title action that leaseholder's delay in releasing mineral lease was done with malice was supported by evidence that true owner of mineral interest discovered existence of recorded lease and immediately contacted vendor and lease agent, subsequent to this discovery leaseholder and his wife executed release of mineral lease, but release was not received by true owner's attorney until more than one year later, and there was no explanation for either delay.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[24] Libel and Slander 135**
237k135 Most Cited Cases
One of elements that plaintiff must prove in slander of title action is that special damages were sustained.

**[25] Libel and Slander 135**
237k135 Most Cited Cases
Special damages in slander of title action are those damages proximately, naturally, and reasonably resulting from alleged slander.

**[26] Libel and Slander 135**
237k135 Most Cited Cases
In addition to proving that special damages were sustained, plaintiff in slander of title action must prove loss of a specific sale, that is, that pending sale was defeated by slander.

**[27] Libel and Slander 135**
237k135 Most Cited Cases
Where owner of tract of land had orally accepted an offer for mineral lease but was unable to complete transaction because of existence of spurious lease from original vendors of land to third party, owner was entitled to recover special damages for slander of title through loss of bonus payments and royalty provisions of intended lease.

**[28] Libel and Slander 135**
237k135 Most Cited Cases
Where owner of tract of land had orally agreed to accept offer of party identified by name who was ready, willing, and able to lease mineral interest of property, but owner was unable to complete transaction because of existence of spurious lease from original vendors of land to third party, owner was entitled to recover special damages for slander of title through loss of a specific sale.

**[29] Libel and Slander 139**
237k139 Most Cited Cases
Evidence of an unaccepted offer to purchase property made by one not a party to action for slander of title was admissible for purposes of proving basis for special damages where owner of land who had received offer from third party to lease mineral rights testified that she had verbally accepted offer.

**[30] Libel and Slander 139**
237k139 Most Cited Cases
In slander of title case resulting in loss of oil lease, plaintiff may recover amount for which he could and would have sold lease, had sale not been frustrated, less amount for which he could have sold lease on land at time of trial with cloud on title removed.

**[31] Evidence 571(10)**
157k571(10) Most Cited Cases
In action for slander of title, finding that $23,075 representing bonus payments of $500 per acre for owner's one-half mineral interest in 92.3 acres would compensate owner for actual damages sustained by her because of spurious mineral lease which was recorded and prevented her from accepting offer to lease property, was supported by expert testimony concerning range of payments and dearth of leasing opportunities at time of trial.

**[32] Libel and Slander 130**
237k130 Most Cited Cases
(Formerly 356k130)
Notice to holder of spurious mineral lease that true owner of land would suffer loss of lease bonus offers because of existence of spurious lease or any delay in its release is not an element of an action for slander of title.

**[33] Evidence 267**
157k267 Most Cited Cases
Many out-of-court statements do not constitute hearsay, but are received because mere utterance of words has legal significance.

**[34] Evidence 267**
157k267 Most Cited Cases
Where necessary element of landowner's slander of title case was loss of specific sale, her statements concerning lease offers of property were not admitted to prove truth of their terms, so as to be hearsay, but to prove their utterance and, thus, that such a sale existed.

**[35] Interest 67**
219k67 Most Cited Cases
Finding that true owner of land did not fail to mitigate actual damages for slander of title by not recording release of spurious mineral lease, so as to support prejudgment interest from date actual damages accrued, was supported by evidence that release from leaseholder was unsolicited and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appeared not to be proper release, true owner could not remember whether she had been shown copy of release during her deposition, and leaseholders could have recorded release themselves.

**[36] Libel and Slander** ⚿139
237k139 Most Cited Cases
Finding that mineral leaseholder acted with such gross indifference to rights of true landowner in executing spurious lease as to amount to willful and wanton acts was supported by evidence that at some point in year following recording of lease, leaseholders realized there were problems associated with it and endeavored to release it by executing document but, leaseholders did not record document as they could have under terms of lease and did not send release to landowner's attorney for well over a year, so that exemplary damages of $65,000 for slander of title were not excessive.

**[37] Damages** ⚿94
115k94 Most Cited Cases
Exemplary damages must be reasonably proportioned to actual damages, though there is no set rule or ratio that will be considered reasonable.

**[38] Libel and Slander** ⚿139
237k139 Most Cited Cases
(Formerly 163k65)
Exemplary damage award of $65,000 in slander of title case was not excessive where holders of spurious mineral lease did not record release themselves and waited for over one year before sending to landowner's attorney, award was slightly less than three times actual damages, and award was considerably less than those requested by landowner.

**[39] Libel and Slander** ⚿139
237k139 Most Cited Cases
Attorney fees are not recoverable in a slander of title action.
***878** Eugene B. Labay, San Antonio, for appellants.

R. Tate Young, Kennedy, Burleson, Sanford, Kuhl & Hackney, Houston, for appellee.

Before PAUL PRESSLER, SEARS and CANNON, JJ.

**OPINION**

CANNON, Justice.

This is an appeal from a judgment rendered in a slander of title lawsuit. In thirty-four points of error, appellants Clayton W. Williams, Jr., and Williams Company dispute whether appellee Dorothy Jennings proved all elements of her cause of action. In addition, they contest the award of attorney's fees. We find error in the award of attorney's fees and modify the judgment to delete them. We affirm the judgment as modified.

We begin with a somewhat lengthy recitation of the facts. In 1972 Mr. and Mrs. A.D. Jennings bought 92.3 acres owned by Mr. and Mrs. Charles Brightwell in Brazos County. The Brightwells owned fifty percent of the mineral rights in the property; however, during negotiations, the real estate agent mistakenly told the Jennings that the Brightwells owned one hundred percent. He later revised that figure to fifty-one percent, which was also incorrect, but that amount was written into the earnest money contract. The Brightwells originally planned to retain fifty percent of their mineral rights. However, at closing, they agreed to sell all of their rights, and the earnest money contract was revised to read that "Seller agrees to convey all mineral rights to property in his possession." A general warranty deed was recorded on August 29, 1972. This deed contained no mineral reservation.

Concerned that the deed did not specify that the Jennings now owned fifty percent of the minerals, Jennings wrote the title company on September 12, 1972, but mistakenly asked that the deed be reformed to reserve one-half of the minerals to the Brightwells with an additional clause specifically granting one-half of all minerals to the Jennings. The requested reformation was incorrect because, according to the parties' intent, the Brightwells owned no interest, the Jennings owned fifty percent, and a Mrs. Pugh owned the remaining fifty percent. Jennings stated that the reformation was necessary because the specific mineral reservation had been inadvertently omitted during changes made in the land description at closing. The title company corrected the deed (sending Jennings a copy with the correction taped to it), and it was recorded in the Brazos County Deed Records on September 29, 1972. The reformed deed was neither re-executed nor re-acknowledged. The original filing and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recording dates were crossed out and the new dates entered thereon. The following paragraph was added to the second page:

> There is hereby excepted and reserved by Grantors herein one-half ( 1/2 ) of all the oil, gas, and other minerals produced from the above-described parcell [sic] of land. It being our intention to reserve one-half ( 1/2 ) of the oil, gas and other minerals and one-half ( 1/2 ) of the oil, gas and other minerals to pass to the Grantee herein.
>
> This Deed is being refiled to show the above reservation.

Mrs. Jennings testified that she knew nothing about the reformed deed until 1979.

Increased drilling activity in the area in the early 1980's stimulated leasing activity. Sometime in 1980, James Frierson, a leasing broker acting on behalf of appellants, contacted the Brightwells to lease their mineral rights in the 92.3 acres that had ***879** been sold to the Jennings. When Mr. Brightwell expressed doubt concerning their ownership of any mineral rights, Frierson assured him they owned at least fifty percent. Brightwell then sought confirmation from the real estate agent involved in the sale. The agent told him they owned fifty percent of the mineral rights at the time of the sale, conveyed one-half of that to the Jennings and thus retained twenty-five percent.
The Brightwells therefore signed an oil and gas lease in April 1981 and accepted a bonus check for $5000. The lease was recorded in the Brazos County Oil and Gas Lease Records on May 29, 1981.

In the meantime the Jennings divorced, and, during the divorce proceedings, one of the lawyers suggested the reformed deed might be unclear. Jennings once again wrote the title company, pointing out that the reformed deed had neither been re-executed nor re-acknowledged and that the Brightwells owned none of the minerals. He asked for clarification of the fact that he and his wife owned one-half of all oil, gas and other minerals.
The title company took no action but assured the Jennings they indeed owned one-half. Jennings obtained a copy of the earnest money contract with the intent to file it in Brazos County but never did so. The Jennings divorced in 1981, and, as part of the property settlement, Jennings conveyed his one-half community interest in the 92.3 acres to his wife. That deed was executed on June 5, 1981, and recorded on June 19, 1981.

Mrs. Jennings received offers to enter into oil and gas leases on her property, including several that did not meet her price from agents of Clayton Williams. However, she discovered the Brightwell/Williams lease and suspended existing negotiations. She then sued to clear her title. The case was tried to a jury, which found appellants liable for $23,075 in actual damages, $65,000 in exemplary damages and $12,361.81 in attorney's fees and expenses.

[1] To recover in an action for slander of title, a party must allege and prove: 1) the utterings and publishing of disparaging words; 2) that they were false; 3) that they were malicious; 4) that special damages were sustained thereby; 5) that the plaintiff possessed an estate or interest in the property disparaged; and 6) the loss of a specific sale. *Clark v. Lewis,* 684 S.W.2d 161, 163-64 (Tex.App.--Corpus Christi 1984, no writ). In point of error one, appellants argue that appellee failed to prove she possessed superior title to the mineral estate at issue during the time of the Brightwell/Williams lease. In points of error two through four, appellants maintain that appellee failed to carry her burden because of their affirmative defenses of estoppel, ratification and bona fide purchaser.

Appellants' argument is predicated on the legal effect of the reformed deed. The original deed from the Brightwells to the Jennings contained no mineral reservation. The deed thus conveyed the entire estate, including the Brightwells' entire mineral interest (one-half). *See Harris v. Currie,* 142 Tex. 93, 176 S.W.2d 302, 304 (1943). This was indisputably the parties' intent. However, the reformed deed, based on Mr. Jennings' incorrect letter to the title company, reserved one-half of the Brightwells' mineral interest (or one-fourth of the total) to the Brightwells and granted one-half (also one-fourth of the total) to the Jennings. Appellants leased the Brightwells' one-fourth interest and claim that appellee cannot prove she possessed title to that interest because the reformed deed reserved it to the Brightwells.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[2] The Texas Property Code requires that a conveyance of land must be in writing and must be subscribed and delivered by the conveyor. Tex.Prop.Code Ann. § 5.021 (Vernon 1984). Also, cases involving correction deeds refer to the preparation of new documents and their execution, acknowledgment and delivery. *See, e.g., Humble Oil & Refining Co. v. Clark,* 126 Tex. 262, 87 S.W.2d 471, 472 (Tex.Comm'n App. 1935, opinion adopted); *Loeffler v. King,* 149 Tex. 626, 236 S.W.2d 772, 775 (1951). Without such formalities, deeds could be changed at will without the knowledge of some parties. The reformed deed ***880** was neither executed nor acknowledged. Indeed, the conveyors, the Brightwells, apparently knew nothing about it. Because the reformed deed did not comply with basic tenets of property law, we find that it had no legal effect. Therefore, the Jennings received the Brightwells' entire one-half mineral interest via the original deed, and appellee has proved she possessed an interest in the property at issue. Point of error one is overruled.

Appellants maintain that appellee failed to carry her burden of establishing superior title to the mineral estate at issue because of the affirmative defenses of estoppel, ratification and bona fide purchaser. In points of error three and four, they assert that the trial court erred in rendering judgment against them because the evidence established estoppel and ratification as a matter of law.

Appellants argue that appellee is estopped from claiming slander of title because when she recorded the warranty deed from her ex-husband on June 19, 1981, she knew about the reformed deed and had actual and constructive notice of the Brightwell/Williams lease recorded on May 29, 1981. Appellants also claim that the reformed deed forms a link in appellee's chain of title, and that when a grantee accepts a correcting deed, he is estopped from claiming any property embraced within the first but not the second deed and from repudiating its recitals. Appellants further argue that appellee accepted and thus ratified the reformed deed and the lease when she recorded her deed, which was made subject to the one-half mineral interest reserved by Marion Pugh (when he sold the property to the Brightwells) and to "all other conveyances, exceptions, reservations, restrictions, conditions, covenants and leases, including oil, gas and mineral leases, and all other instruments of whatever nature of record...."

[3] There was no issue on estoppel submitted to the jury, and appellants do not specifically complain of its omission. In answer to the issue on ratification, the jury found that Mrs. Jennings did not ratify the Brightwell/Williams lease prior to filing suit. In reviewing a "matter of law" point of error, we must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. If there is no evidence to support the finding, we must then further examine the entire record to see if the contrary proposition is established as a matter of law. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982).

[4] Appellee testified that she did not learn about the reformed deed until 1979 during a discussion with her estranged husband about their community property. He explained to her that the purpose of that deed was to clarify the mineral ownership. She was unhappy that he had not previously discussed his actions with her. She did not attempt to ascertain the contents of the deed but "left all that up to" her divorce attorney. There is no evidence that appellee knew of the contents or the appearance of the reformed deed when she recorded the warranty deed. Indeed, she testified that she did not actually see the reformed deed until she went to the courthouse to verify the existence of the Brightwell/Williams lease.

Mr. Jennings testified that he took no action to correct the reformed deed because he thought it was proper. It was not until during the divorce proceedings that one of the attorneys involved suggested the reformed deed might be unclear. Jennings then wrote a second letter to the title company on October 29, 1980, noting that the deed had been filed without re-acknowledgment or re-execution and with an incorrect mineral reservation. In the letter, Jennings stated that he and his wife needed to clarify that they owned one-half of the minerals and asked for the original of the earnest money contract so that he could record it. After sending the letter, he went to the title company and discussed the matter with someone who confirmed that he and his wife owned one-half of the minerals. He obtained a copy of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

earnest money contract but never recorded it because, having been assured of his ownership, he thought it unimportant. Sometime in 1980 or 1981 he asked his attorneys to ***881** clear it up but was again assured that the Brightwells had retained no interest, and no further action was taken.

[5][6] The property at issue was joint management community property. Tex.Fam.Code Ann. §§ 5.01(b), 5.22(c) (Vernon 1975). As joint managers, neither spouse may virtually represent the other. *Williams v. Saxon,* 521 S.W.2d 88, 90 (Tex.Civ.App.--San Antonio 1975, writ ref'd n.r.e.). Thus, Mr. Jennings did not act on behalf of his wife in his efforts to correct the original deed and his acceptance of the reformed deed, particularly as he told her nothing of his actions.

[7] Concerning her knowledge of the Brightwell/Williams lease, appellee testified she first found out about it in the spring of 1981 through a neighbor, who came across it while going through some records at the courthouse. Appellee immediately called Mr. Brightwell, who told her to talk to the leasing agent. She then called James Frierson to tell him he had made a "terrible mistake" and she wanted it corrected. Later, she filed suit. "Spring of 1981" is not very precise and is not evidence that appellee learned of the lease during the three-week period between its recordation on May 29 and the recordation of her warranty deed on June 19. Also, her actions indicate repudiation rather than acceptance once she discovered its existence.

[8][9] As to appellants' argument that appellee had constructive notice of the lease when she recorded her warranty deed, we note that recording acts are intended to affect with notice only those persons who have reason to apprehend some transfer or encumbrance prior to their own as none arising afterwards can affect them or their estate in the land. *Cox v. Clay,* 237 S.W.2d 798, 804 (Tex.Civ.App.--Amarillo 1950, writ ref'd n.r.e.). The mineral lease was not a transfer or encumbrance occurring prior to appellee's ownership of the property as she actually owned it (jointly with her husband) at the time the lease was taken. As an owner, appellee had no reason to apprehend the lease.

[10] Appellants also claim that appellee accepted and ratified the reformed deed and the lease when she recorded her deed. However, the latter deed specifically referred to the original deed of August 21, 1972, rather than to the reformed deed. Also, the grant to appellee is made subject to all *valid* conveyances and leases. *See Dean v. Hidalgo County Water Improvement District Number Two,* 320 S.W.2d 29, 32 (Tex.Civ.App.--San Antonio 1959, writ ref'd n.r.e.). The reformed deed has previously been determined to have no legal effect, and the mineral lease is invalid as per the original deed and the parties' intent. Finally, the cases cited by appellants in support of their ratification argument have to do with documents "which expressly recognized in clear language the validity of the lifeless deed or lease...." *Hastings v. Pichinson,* 370 S.W.2d 1, 4 (Tex.Civ.App.--San Antonio 1963, no writ). Nowhere in appellee's deed is there any reference to the Brightwell/Williams lease such as would give it life. Points of error three and four concerning estoppel and ratification are thus overruled.

[11] In point of error two, appellants argue that the trial court erred in rendering judgment against them on a theory of slander of title because appellant Williams was a bona fide purchaser. A bona fide purchaser is one who acquires (apparent) legal title to property in good faith for a valuable consideration without actual or constructive notice of an infirmity in the title. *Swanson v. Grassedonio,* 647 S.W.2d 716, 718 (Tex.App.--Corpus Christi 1982, no writ). Appellants point out that in answer to Special Issue No. 8, the jury found that at the time he purchased the Brightwell/Williams lease, appellant Williams was a bona fide purchaser for value without notice of the fact that appellee was claiming title and ownership to a full one-half interest in the minerals.

[12][13] Despite appellee's objection, Special Issue No. 8 did not include an instruction on agency; therefore, the issue was not a controlling one. Agents represented Clayton Williams, Jr., in obtaining the mineral lease from the Brightwells. ***882** Every purchaser of land is charged with knowledge of all facts appearing in the chain of title through which he claims that would place a reasonably prudent person on inquiry as to rights of other parties in the property conveyed. *Blocker v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Davis,* 241 S.W.2d 698, 700 (Tex.Civ.App.--Fort Worth 1951, writ ref'd n.r.e.). We have previously described the appearance of the reformed deed. An attorney employed by Williams Company testified that had he viewed the original and reformed deeds (both of which were on file in the Brazos County Deed Records), he would have been concerned that they "created an ambiguity." He also stated that the brokers should have asked the parties involved what their intent was.

[14][15] The agents were thus placed on notice to make further inquiries to resolve the ambiguity, and, as will be discussed later in this opinion, this notice is imputed to Clayton Williams by virtue of the principal/agent relationship. Williams may have been a bona fide purchaser according to the definition in Special Issue No. 8 because, as he testified by deposition, he knew nothing about this particular lease. However, this finding is immaterial in view of the agency relationship involved and the fact that his agents had notice of an infirmity in the title. Furthermore, a trial court, on its own motion, may disregard a jury finding on a special issue that is immaterial. *Clear Lake City Water Authority v. Winograd,* 695 S.W.2d 632, 639 (Tex.App.-- Houston [1st Dist.] 1985, writ ref'd n.r.e.). Point of error two is overruled.

[16] In points of error five through fourteen, appellants address several other elements of a slander of title action. In point of error five, they argue that appellee failed to prove the uttering and publishing of words by Williams Company in the Brightwell/Williams lease disparaging her title to the property. In point of error six, they argue that she failed to prove that words uttered and published by Williams Company in the lease were false. However, these points fail because the lease stated that the Brightwells had an interest in the property, which they did not, and the lease was recorded, which constitutes publication. *See Warner v. Winn,* 145 Tex. 302, 197 S.W.2d 338 (1946). Also, appellee's title was disparaged in that she could not enter into a mineral lease until this cloud on her title was removed. Thus, points of error five and six are overruled.

In points of error eight, nine and ten, appellants contest the legal and factual sufficiency of the evidence to support the jury's answer to Special Issue No. 1 that the execution and recording of the Brightwell/Williams lease by Clayton W. Williams, Jr., by or through an agent, was done with malice.

In reviewing a "no evidence" point, we must consider only that evidence and reasonable inferences drawn therefrom in their most favorable light to support the jury's finding, disregarding all contrary evidence and inferences. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In reviewing factual insufficiency points of error, we must consider and weigh all the evidence and uphold the finding unless we find that the evidence is so weak or the finding so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.*

[17][18] Malice as a basis for recovery of actual damages in slander of title cases has been defined to mean merely that the act must have been deliberate conduct without reasonable cause. *Walker v. Ruggles,* 540 S.W.2d 470, 473 (Tex.Civ.App.--Houston [14th Dist.] 1976, no writ); *Kidd v. Hoggett,* 331 S.W.2d 515, 518 (Tex.Civ.App.--San Antonio 1959, writ ref'd n.r.e.). In the present case, appellants had constructive notice through their agents that the reformed deed created an ambiguity and passed no title. Furthermore, when agent Frierson called Charles Brightwell about leasing the mineral rights, Brightwell alerted him to the possibility that the Brightwells no longer owned any rights. There was then sufficient time between that call and the taking of the lease for ***883** appellant company to do a thorough check of the deed records and to contact the parties to clarify their intent. That this procedure was not followed was unreasonable under the circumstances. The evidence is both legally and factually sufficient to support a finding of deliberate conduct without reasonable cause, and points of error eight, nine and ten are overruled.

Appellants also object to the jury's answer to Special Issue No. 1 on the basis that there is insufficient evidence that appellant Williams had knowledge of and participated in any malicious act or conduct of his agent or later, with such knowledge, ratified or approved the malicious acts or conduct of the agent. Appellants maintain that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the undisputed evidence reflects that James Frierson, who was deceased at the time of trial, was not their agent but was simply a contract lease broker who participated in the acquisition of the lease. In addition, he allegedly had no authority to pass on title matters.

[19][20] A broker is one who is engaged by others on a commission basis and is recognized as an *agent* employed to make or negotiate bargains or contracts for the sale or lease of real estate or other property between other persons. *Burleson v. Earnest,* 153 S.W.2d 869, 873 (Tex.Civ.App.--Amarillo 1941, writ ref'd w.o.m.) (emphasis added). Mark Conway, a landman employed by Williams Company at the time of the lease, testified that Frierson was a "contract" broker paid on a day rate, who acted on behalf of Williams in obtaining leases. Whether Frierson was thus an agent or an independent contractor is dependent upon his employer's right to control his work. *See King v. Loessin,* 572 S.W.2d 87, 89 (Tex.Civ.App.--Houston [1st Dist.] 1978, no writ).

Conway testified that Frierson located tracts in Brazos County that he thought were good prospects and then contacted the owners to see if they were interested in leasing. He was given a specific price to offer and had no authority to change the offer until he cleared it with the company. He acted under Conway's authority and was to follow procedures set out by the company. Frierson was not trained to check the courthouse records, so other lease brokers employed by the company were charged with that responsibility.

Frierson's status appears to have been somewhat different from that of the company's other brokers operating in the area because he was not relied on to do mineral checks and because he occasionally received overrides on tracts. However, given the work he did for the company and for Williams and the limits placed on his authority to do that job, we are satisfied that Frierson was indeed an agent.

[21][22][23] Furthermore, it was he who was placed on notice by Mr. Brightwell that the Brightwells might no longer own the mineral rights involved. Also, we must not overlook the fact that although Frierson was not authorized to pass on title matters, someone from the company did check the records (if normal procedures were followed) and was put on notice by the appearance of the original and reformed deeds that the allocation of the mineral interests was ambiguous. If an agent's acts are within the scope of his authority and are related to matters over which such authority extends, notice to the agent is then deemed to be notice to the principal. In this connection, it is immaterial that the principal has not actually been informed of the particular facts under consideration, and a principal may be deemed to be bound by knowledge that his agent, by the use of ordinary care, could have acquired, especially where the agent has information sufficient to instigate an inquiry. 3 Tex.Jur.3d *Agency* §§ 176, 177 (1980).

Finally, appellants honored the bank draft to the Brightwells, which implies ratification of the lease and the steps taken to obtain it. We find there is sufficient evidence to support the jury's answer to Special Issue No. 1, and we overrule point of error eleven.

The jury also found in answer to Special Issue No. 1 that appellant Williams' delay in releasing theBrightwell/Williams lease was done with malice. In points of error ***884** seven and twelve through fourteen, appellants argue that appellee failed to prove Williams had a legal duty to release and that the evidence is legally and factually insufficient to support the finding of malice.

Appellee discovered the existence of the Brightwell/Williams lease in 1981 and immediately contacted Mr. Brightwell and agent Frierson. On May 20, 1982, Clayton Williams, Jr., and his wife executed a release of the lease. However, it was not received by appellee's attorney until August 1, 1983. There was no explanation for either delay. The effect of the recorded mineral lease was to cloud appellee's title to the property and prevent her from leasing it. As of May 20, 1982, appellant Williams recognized a duty to release the lease when he executed the release. Yet, he delayed forwarding the release for over fourteen months, during which time appellee continued to be damaged. The jury thus had before it sufficient evidence of deliberate conduct without reasonable cause to support a finding of malice. Points of error seven and twelve through fourteen are overruled.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[24][25][26] The next group of points of error is concerned with the jury's finding of actual damages in answer to Special Issue No. 2. One of the elements that a plaintiff must prove in a slander of title action is that special damages were sustained. *Clark v. Lewis,* 684 S.W.2d at 163. Special damages are those damages proximately, naturally and reasonably resulting from the alleged slander. *Houston Chronicle Publishing Co. v. Martin,* 5 S.W.2d 170, 173 (Tex.Civ.App.--El Paso 1928, dism'd w.o.j.). In addition, the plaintiff must prove the loss of a specific sale, *i.e.,* that a pending sale was defeated by the slander. *A.H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 146 (Tex.1982) citing *Shell Oil Co. v. Howth,* 138 Tex. 357, 159 S.W.2d 483, 490 (1942); *see also Ellis v. Waldrop,* 656 S.W.2d 902, 905 (Tex.1983). In point of error fifteen, appellants argue that appellee failed to prove that she sustained special damages.

[27][28][29] Appellee testified that she received several offers to lease her mineral rights and verbally agreed to accept an offer from a Mr. Berry of Dallas for a bonus payment of $450 an acre and a one-fourth royalty. This lease was not signed, however, as Berry was called out of the country on other business. By the time he returned several months later, appellee had discovered the existence of the Brightwell/Williams lease and determined that she could not enter into a lease of her own. Thus, she sustained special damages through the loss of the bonus payments and royalty provisions. As there was a party identified by name who was ready, willing and able to lease the property, appellee also proved the loss of a specific sale. *See A.H. Belo Corp.,* 632 S.W.2d at 145; *Houston Chronicle Publishing Co.,* 5 S.W.2d at 173. Appellants argue that evidence of an unaccepted offer to purchase made by one not a party to the suit is inadmissible. However, the cases cited in support of their argument have to do with the value of land in a condemnation suit. Furthermore, appellee testified that she had verbally accepted Berry's offer.

Appellants also argue in point of error fifteen that appellee failed to prove Williams Company had notice that she would suffer special damages. However, we are unable to find that such notice is an element of a slander of title action. *See* 50 Tex.Jur.3d *Libel and Slander* §§ 226-240 (Unreplaced Tex.Jur.2d Topics, Binder # 2, 1987). The cases cited by appellant are not slander of title cases but rather deal with damages sustained by the unauthorized blocking of a highway and tortious interference with a contract. Point of error fifteen is thus overruled.

In points of error sixteen through eighteen, appellants contest the legal and factual sufficiency of the evidence to support the jury's answer to Special Issue No. 2 that $23,075 would compensate appellee for actual damages sustained by her. In point of error nineteen, they complain that the amount is excessive under the facts and circumstances of the case.

***885** [30] In a slander of title case resulting in the loss of an oil lease, a plaintiff may recover the amount for which he could and would have sold the lease, had the sale not been frustrated, less the amount for which he could have sold a lease on the land at the time of the trial with the cloud removed. *Reaugh v. McCollum Exploration Co.,* 139 Tex. 485, 163 S.W.2d 620, 622 (1942). Appellee's expert, petroleum landman Jack Brogden, testified that bonuses on oil and gas leases ranged from $25 per acre, in the early days of the oil "boom" in that area, to $700 per acre at its peak in 1983. By 1981 the minimum price was $200 per acre, and in the Wellborn area, where appellee's property was located, an operator could expect to have to pay $500. Brogden also testified that there was no leasing going on in the area at the time of trial, and if appellee wanted to lease her property, there were no buyers. Appellants offered no contradicting evidence.

[31] The $23,075 figure found by the jury represents a bonus payment of $500 per acre for appellee's one-half mineral interest in the 92.3 acres, with no deduction for a potential lease at time of trial. This figure is supported by Brogden's testimony concerning the range of payments and the dearth of leasing opportunities at the time of trial and is not excessive. Points of error sixteen through nineteen are overruled.

[32] Point of error twenty concerns whether Williams Company had notice that appellee would suffer the loss of lease bonus offers because of the Brightwell/Williams lease or any delay in its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

release. As previously stated, however, such notice is not an element of a slander of title case, and this point also is overruled.

[33][34] Appellants argue in point of error twenty-one that the trial court erred in admitting into evidence appellee's testimony of verbal lease offers that she received from Mr. Berry and a Mr. Wilhite. Appellants claim this evidence is hearsay. Many out-of-court statements do not constitute hearsay. The fact that the words were uttered is sometimes the fact to be established. Such testimony is received because the mere utterance of the words has legal significance. *Irving Lumber Co. v. Alltex Mortgage Co.,* 446 S.W.2d 64, 71 (Tex.Civ.App.--Dallas 1969, *aff'd on other grounds,* 468 S.W.2d 341 (Tex.1971). Most obviously this is true where the words proven constitute a necessary part of the cause of action or defense, or as is sometimes said, are "operative" facts, or part of the "ultimate issue." lA R. Ray, Texas Law of Evidence Civil and Criminal § 795 (Texas Practice 3d ed. 1980).

A necessary element of appellee's case was the loss of a specific sale. Her statements concerning the lease offers were admitted not to prove the truth of their terms but to prove their utterance and thus that such a sale existed. *See also Yellow Freight System, Inc. v. North American Cabinet Corp.,* 670 S.W.2d 387, 390 (Tex.App.--Texarkana 1984, no writ). The evidence was not hearsay, and point of error twenty-one is overruled.

[35] Appellants next complain that the trial court erred in rendering prejudgment interest from May 29, 1981, because the evidence is factually insufficient to support an implied finding that appellee's actual damages accrued on that date. The jury found in answer to Special Issue No. 2 that $23,075 would compensate appellee for actual damages sustained as a result of the execution and recording (on May 29, 1981) of the Brightwell/Williams lease or any delay in its release. The jury received the following instruction concerning those damages: Do not include any amount for actual damages resulting from the failure, if any, of Dorothy M. Jennings to take reasonable steps to mitigate her damages, as would have been done by a person of ordinary prudence under the same or similar circumstances. Apparently, the jury did not find failure to mitigate. Appellants argue that appellee's failure to record the release sent to her attorney in August 1983, and then lease her mineral interest while leases were still being taken shows otherwise.

Evidently, appellants felt they could resolve the dispute with appellee merely by ***886** sending her attorney a release. The attorney testified, however, that he did not tell appellee about the release until several months prior to trial in 1985 because it was unsolicited and appeared not to be a proper release. Appellee testified that she could not remember whether she had been shown a copy of the release during her deposition in November 1983. There was also evidence that appellants could have recorded the release themselves. The jury seems to have determined that whatever duty appellee had to mitigate, she was not required to record the release. Based on the above, we cannot say the evidence does not support the implied finding. Point of error thirty-two is overruled.

[36] In response to Special Issues Nos. 3 and 4, the jury found that Clayton W. Williams, Jr., acted with malice as to the release of the Brightwell/Williams lease and, based on that answer, fixed the amount of exemplary damages at $65,000. Malice was defined as acting with ill will, bad or evil motive, or such gross indifference to the rights of the plaintiff as to amount to a willful and wanton act. In points of error twenty-two through twenty-nine, appellants contest the legal and factual sufficiency of the evidence to support the answers to these special issues. In addition, they complain that the exemplary damages are excessive and that there is insufficient evidence that appellant Williams had knowledge of and participated in any malicious act or conduct of his agent or afterwards, with such knowledge, ratified or approved the malicious acts or conduct of the agent. Having reviewed the evidence according to the standards set out earlier in this opinion, we disagree with appellants' contentions.

The conduct in question has to do with the delay in the release of the Brightwell/Williams lease. At some point in the year following the recording of the lease, appellants must have realized there were problems associated with it because they endeavored to release it by executing a document

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(with the signatures of appellant Williams and his wife) on May 20, 1982. However, appellants did not record the document as they could have under the terms of the lease nor did they immediately forward it to the Brightwells or to appellee. Indeed, the release was not sent to appellee's attorney for well over another year. This evidence supports the jury's finding of conduct with such gross indifference to the rights of plaintiff as to amount to a willful and wanton act.

Williams' liability, through his agent, has already been discussed. Furthermore, in spite of the wording of Special Issue No. 3 (asking if, in connection with the execution and recording of the Brightwell/Williams lease, or the delay, if any, in its release, any of the defendants, individually or *by or through an agent,* acted with malice), agency appears to be irrelevant regarding the release. At the least by October 1981, when the lawsuit was filed, appellants had notice of the problem and had the power to resolve it.

[37][38] Appellee requested exemplary damages in the amount of $125,000 from appellant Williams and $125,000 and $10,000, respectively, from Mr. and Mrs. Brightwell. The jury awarded her $65,000 from Williams. Exemplary damages must be reasonably proportioned to actual damages, though there is no set rule or ratio that will be considered reasonable. *Alamo National Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). The exemplary damages in this case are slightly less than three times the actual damages and are considerably less than those requested by appellee. Points of error twenty-two through twenty-nine are overruled.

[39] In answer to Special Issue No. 5, the jury awarded appellee $12,361.81 in attorney's fees and expenses. In points of error thirty and thirty-one, appellants argue that attorney's fees are not recoverable in a slander of title action and further argue that this award, in tandem with the exemplary damages, allows an impermissible double recovery.

The generally prevailing rule is that attorney's fees are not recoverable in a slander of title action. ***887** *American National Bank & Trust Co. v. First Wisconsin Mortgage Trust,* 577 S.W.2d 312, 319-20 (Tex.Civ.App.-- Beaumont 1979, writ ref'd n.r.e.). Appellee contends, however, that attorney's fees can be considered in determining exemplary damages and that those cases cited by appellants in support of non-recovery did not involve an award of exemplary damages at the trial court level. Contrary to appellee's argument, *American National* did involve such an award, and the court of appeals in that case specifically chose to follow the prevailing rule. We agree and sustain appellants' points of error thirty and thirty-one. Consequently, we modify the trial court's judgment to delete the award of attorney's fees against Clayton W. Williams, Jr.

Finally, in points of error thirty-three and thirty-four, appellants argue that appellee failed to prove all of the essential elements of her cause of action for slander of title and that the jury findings will not support any money judgment in her favor. Based on the foregoing discussion, we find otherwise and overrule these points. We affirm the judgment of the trial court with the modification regarding attorney's fees.

SEARS, Justice, dissenting.

I respectfully dissent from the majority opinion.

Appellee testified that she learned about the reformed deed in 1979. Appellant's lease with Brightwell was not executed or recorded until 1981. Mr. Jennings testified that he took no action to correct the reformed deed because he thought it was proper. He was assured by the title company that he and the Appellee owned one-half of the minerals and he was assured by his attorneys that the Brightwells retained no mineral interest in the property. Therefore, only the Appellant was unaware of any problems that existed with the reformed deed and unaware that there was no intent between the Brightwells and the Jennings to reserve any mineral interest in the land conveyed. If the doctrine of latches or estoppel would apply to a cause of action by Mr. Jennings against the Appellant, then Mrs. Jennings cannot avoid those defenses by claiming blindness and ignorance.

Mr. Jennings had a copy of the reformed deed and he advised his wife of the existence of the reformed deed as early as 1979. Therefore, Appellee had actual knowledge of the existence of the reformed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deed prior to Appellant executing a lease on the land. Further, Appellant's lease with Brightwell was recorded on May 29, 1981. Subsequently, the deed conveying Mr. Jennings' interest in the land to Mrs. Jennings was executed on June 5, 1981, and it was recorded on June 19, 1981. There was a specific recitation in that deed which conveyed property to Appellee, "Subject to ... oil and gas leases ..." Also, at the time Appellant's lease was executed and recorded, the character of the property was community property owned jointly by Mr. and Mrs. Jennings. The majority opinion imputes to Clayton Williams knowledge of the acts of the leasing agent, yet the majority opinion contends that the wife is not to be held accountable for the knowledge of her husband with regard to the community property. This is illogical and is not a correct statement of the law of this state.

There is no doubt that Mr. Jennings was dealing with the attorneys and the title company, with regard to the property in question, with the full knowledge and consent of Mrs. Jennings. It is well settled in Texas that when spouses are living together, and acting in the best interest of both, one spouse may act as the agent of the other and knowledge of the acts of the agent spouse are imputed to the principal spouse. *Walling v. Hannig,* 73 Tex. 580, 11 S.W. 547, 548 (Tex.1889). Further, agency between spouses can be imputed by their acts and conduct. *Walling v. Hannig,* 11 S.W. at 548.

This appeal is similar to *Outlaw v. Bowen,* 285 S.W.2d 280 (Tex.Civ.App. Amarillo 1955, writ ref'd n.r.e.). In *Outlaw,* the issues also involved a mineral interest in the land, and the court held that the wife cannot disassociate herself from the agreement, acts, conversations and negotiations of the husband as her agent, and at the same time receive and enjoy benefits therefrom. *Outlaw v. Bowen,* 285 S.W.2d at 286. Further, a wife is bound by the acts ***888** of her husband when he is acting in her behalf, and she cannot accept that which is to her advantage and reject that which imposes a burden on her. *Outlaw v. Bowen,* 285 S.W.2d at 286; *Smith v. Olivarri,* 127 S.W. 235, 238 (Tex.Civ.App.1910, writ dism'd). Finally, when the husband is acting for the wife, she cannot benefit by claimed ignorance. *Allen v. Garrison,* 92 Tex. 546, 50 S.W. 335, 336 (Tex.1899).

The jury found that the Appellant was a bona fide purchaser for value without notice of the fact that Appellee was claiming title and ownership to a full one-fourth interest in the minerals. Yet, the majority opinion contends that the issue failed to include an instruction on agency and was therefore to be disregarded as it was not a controlling issue. The majority fails to cite any authority for that conclusion.

The majority opinion holds that malice is recoverable where the acts are shown to have been deliberate and without reasonable cause. The majority opinion then states that the "Appellants had constructive notice through their agents that the reformed deed created an ambiguity and passed no title." Again, the majority fails to cite authority to support the contention that because a deed contains an ambiguity it passes no title. Although the majority opinion discusses the conversations of the leasing agent, Frierson, with Brightwell, to the effect that Brightwell may not own any mineral interest, the opinion fails to show any testimony or evidence that the information learned in any of these conversations was transmitted by Frierson to the Appellant. In the absence of any proof that the Appellant had any actual knowledge of these defects, there is no proof that Appellant acted in a malicious manner. Therefore, Appellant should not be liable for punitive damages. The majority opinion goes to great lengths to establish the control that Appellant had over Frierson in an effort to establish the agency relationship, in an effort to impute *implied* knowledge, and in an effort to establish malice; however, the evidence is weaker than secondhand tea.

As to special damages, the majority opinion relies solely on the testimony of the Appellee that she received a *verbal* offer from a "Mr. Berry" to pay a lease bonus of four hundred and fifty dollars an acre plus a one-fourth overriding royalty. However, the majority opinion goes on to show that *no lease was executed* because Mr. Berry was out of this country on other business. There is no showing that Mr. Berry ever returned to this country or that he renewed his offer if he did return to this country. Appellee testified that subsequent to the discovery of the Appellant's lease she *unilaterally* determined that she could not enter into a lease on her own. Therefore, based on the testimony of the Appellee it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is clear that there was no lost sale. The alleged verbal offer to lease was never consummated. No subsequent sale was offered or lost because the Appellee made the decision that she could not execute a lease. Clearly, Appellee fails in her burden of proof of a specific sale and of special damages; therefore, exemplary damages cannot be found. [FN1] The majority opinion totally ignores that evidence which establishes that the Appellant, upon discovery of the problems existing in the reformed deed upon which the lease was executed with Brightwell, offered to work things out with Appellee, and, that Appellee refused because she thought she could get more money by way of her lawsuit.

FN1. *Bellefonte Underwriters Insurance Company v. Brown,* 704 S.W.2d 742, 745 (Tex.1986).

In dealing with special damages, even though the only proof of any offer to lease Appellee's property was for a price of four hundred and fifty dollars an acre, the majority opinion nonetheless justified the twenty-three thousand and seventy-five dollars awarded by the jury on the basis that five hundred dollars an acre was *reasonable* at that point in time. The special damages assessed as a result of the loss of a sale cannot be measured by what is reasonable in the industry, but must be measured by the actual loss incurred by the Appellee. Therefore, I would hold that there is no evidence to support a finding of a specific loss of sale or special damages sustained by the Appellee.

***889** The majority opinion cites *Yellow Freight System, Inc.* [FN2] for the proposition that Appellee's testimony concerning the verbal offer to lease the land was not hearsay. However, the *Yellow Freight System, Inc.* case dealt solely with oral negotiations *between the parties to the lawsuit* and/or agents of parties to the lawsuit. Yellow Freight contended there was no valid oral agreement because the parties had failed to agree upon a value, and, that the testimony of North American's official regarding the agreement was hearsay. The case is significantly different from the facts of this appeal. In *Yellow Freight System, Inc.,* the parties to the lawsuit agreed that they had entered into oral negotiations, but one side contended it was not a contract solely on the grounds that they had not agreed upon a price. That court held: "Since there was evidence of an oral agreement, and since a reasonable price could be presumed, the trial court's findings of a contract ... are supported by the evidence." *Yellow Freight System, Inc. v. North American Cabinet Corp.,* 670 S.W.2d at 390. The *Yellow Freight System, Inc.* court even noted that because one party to the lawsuit testified about conversations with the other party's agent or representative, it would be admissible even if the hearsay testimony was admitted for its truth. The majority opinion overlooks the fact that the *Yellow Freight System, Inc.* reasoning is inapplicable because Appellee was not talking to an agent or representative of the Appellant. The majority opinion also overlooks the fact that the Appellee's hearsay testimony was offered not for the purpose of proving up a missing element of the contract, but for the purpose of proving the contract itself.

FN2. *Yellow Freight System, Inc. v. North American Cabinet Corp.,* 670 S.W.2d 387, 390 (Tex.App.--Texarkana 1984, no writ).

The majority opinion also cites *Irving Lumber Company.* [FN3] The *Irving Lumber Company* case involved statutory liens on the construction of residential homes. Irving Lumber contended that they entered into oral contracts with Alltex Mortgage Company to furnish the materials necessary to complete residential homes to be built on vacant lots. Irving Lumber also contended that although construction of the homes was to be completed in three different stages, the oral contract obligated the parties only as to the first two of the three stages. That court concluded that the testimony of the agent of Irving Lumber was not hearsay as to Alltex Mortgage Company because the testimony "together with exhibits numbers 8, 9, and 12, showed the oral contracts ...." *Irving Lumber Company v. Alltex Mortgage Company,* 446 S.W.2d at 71. The exhibits alluded to by the court listed four lots, separate plans for each lot, the date the plans were ordered, the contract price for each lot and the date the labor and materials were furnished to each lot. Obviously, the court found that the testimony, *together with the evidence* in exhibits 8, 9, and 12, showed that the parties had entered into an oral contract. Also, that court expressly held "evidence of an out of court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statement is not hearsay *unless it is offered as proof of the fact asserted.*" *Irving Lumber Company v. Alltex Mortgage Company,* 446 S.W.2d at 71. (Emphasis added.) Clearly, the authority relied upon in the majority opinion does not support the conclusion that the testimony of Appellee regarding the oral contract of sale was not hearsay. In fact, the law as shown above is to the contrary.

FN3. *Irving Lumber Company v. Alltex Mortgage Company,* 446 S.W.2d 64 (Tex.Civ.App.--Dallas 1969), *aff'd* 468 S.W.2d 341 (Tex.1971).

At best, the evidence shows that Appellee may have had *conversations* concerning a mineral lease on her land. There is no competent evidence of any contract for a lease; therefore, there is no competent evidence of any loss of a specific sale. As mentioned earlier in this dissenting opinion, even if we took the hearsay testimony as admissible and as true, Appellee has still failed to establish the existence of a contract or the loss of a *specific sale.* Therefore, damages for slander of title cannot be assessed against Appellee. *A.H. Belo Corporation v. Sanders,* 632 S.W.2d 145, 146 (Tex.1982).

***890** Appellant testified that following his unsuccessful attempts to negotiate with Appellee, he executed a release of his lease on the property and sent the release to the attorney for Appellee in August of 1983. However, to this date there is no evidence that the release was ever recorded by the Appellee, nor is there any evidence of any attempt by Appellee to lease her land after receiving the release from the Appellant. Appellee's expert witness testified that the oil boom reached its peak in 1983 and that owners of mineral estates were then receiving seven hundred dollars per acre as a leasing bonus. Therefore, according to Appellee's own witness, she could have received sixty-four thousand, six hundred and ten dollars ($64,610.00) had she leased her land *after* Appellee executed a release. Obviously, as Appellee testified, she felt she could get more money by pursuing her lawsuit. Yet, the facts show that if she had leased her land in an attempt to mitigate damages, she would have received more money than she alleged she lost.

I would hold that Appellee has failed in her burden to establish the loss of a specific sale, that there is no evidence of malice on the part of Appellant, and I would reverse and render the judgment to the trial court with instructions that a judgment be entered that Appellee take nothing.

755 S.W.2d 874

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9

Westlaw.

Court of Appeals of Texas,
Austin.
ELITE TOWING, INC., Appellant,
v.
LSI FINANCIAL GROUP, Appellee.
**No. 03-98-00047-CV**

Jan. 28, 1999.

Loan servicer and attorney-in-fact for bank that held security interest in automobile brought action against towing company that disposed of vehicle, alleging conversion, negligence, and violation of statute governing sale of motor vehicle by statutory lienholder. The District Court, Travis County, 261st Judicial District, John K. Dietz, J., granted partial summary judgment for loan servicer as to liability on statutory claim, and subsequently, Jerry Dellana, J., rendered final judgment awarding damages and attorney fees. Towing company appealed. The Court of Appeals, Yeakel, J., held that: (1) towing company's notice of sale was inadequate; (2) inclusion of hearsay statement in affidavit in support of summary judgment was harmless; (3) notice of trial setting would be imputed to towing company's attorney; (4) towing company converted vehicle when it sold vehicle; and (5) loan servicer was entitled to attorney fees.

Affirmed.

West Headnotes

**[1] Judgment 183**
228k183 Most Cited Cases
Courts can only address issues that are expressly presented in a motion for summary judgment.

**[2] Automobiles 385**
48Ak385 Most Cited Cases
Towing company "sold" vehicle at public sale, for purposes of statute governing sale of motor vehicle by statutory lienholder, even though creditor with security interest in vehicle obtained temporary restraining order preventing towing company from transferring vehicle's title to purchaser. V.T.C.A., Property Code § 70.006.

**[3] Property 9**
315k9 Most Cited Cases
When title to an automobile is a collateral issue, for example, where there are no direct competing claims to such title, a litigant might show by almost any kind of evidence that ownership in fact rests in a person other than the person named as the owner in the certificate of title.

**[4] Automobiles 385**
48Ak385 Most Cited Cases
In determining whether towing company with garageman's lien against automobile gave proper notice of sale of vehicle to creditor with security interest in vehicle, reviewing court was required to read property code chapter governing statutory liens as a whole to determine the underlying legislative intent. V.T.C.A., Property Code § 70.006.

**[5] Automobiles 385**
48Ak385 Most Cited Cases
Towing company's notice to creditor with security interest in automobile did not comply with notice requirements for sale of automobile to satisfy garageman's lien, where towing company sent notice before it had retained possession of vehicle for 30 days, and did not give additional 31 days' notice of proposed sale. V.T.C.A., Property Code § 70.006.

**[6] Automobiles 385**
48Ak385 Most Cited Cases
Statute providing that notice of abandonment sent by a law enforcement agency satisfies notice requirements for sale of vehicle to satisfy statutory lien did not apply to situation in which notice of possession was sent by private towing company. V.T.C.A., Property Code §§ 70.004, 70.006; V.T.C.A., Transportation Code §§ 683.012, 683.034 .

**[7] Judgment 181(11)**
228k181(11) Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 9

Pleadings alleging that towing company failed to give creditor with security interest in automobile the requisite notices before sale of vehicle to satisfy garageman's lien supported creditor's motion for summary judgment as to liability on statutory claim. V.T.C.A., Property Code §§ 70.004, 70.006.

**[8] Judgment 185(1)**
228k185(1) Most Cited Cases
Although pleadings set out the controversy in a case, they are not considered in determining whether fact issues are expressly presented in summary judgment motions, and they are not summary-judgment proof.

**[9] Judgment 183**
228k183 Most Cited Cases
Contentions in the written motion for summary judgment are what the court must consider in determining whether to grant the motion.

**[10] Judgment 181(11)**
228k181(11) Most Cited Cases
Summary judgment motion must be supported by the pleadings on file, and the final judgment must conform to those pleadings.

**[11] Appeal and Error 1079**
30k1079 Most Cited Cases
Appellant waived affirmative defense raised on appeal where its brief did not contain argument or authorities in support of the defense. Rules App.Proc., Rule 38.1(h).

**[12] Judgment 181(14)**
228k181(14) Most Cited Cases
Testimony in summary judgment affidavits concerning facts related to attorney fees and damages was immaterial to district court's decision to grant partial summary judgment on issue of liability.

**[13] Appeal and Error 1073(1)**
30k1073(1) Most Cited Cases

**[13] Trial 56**
388k56 Most Cited Cases
Inclusion of hearsay statement in affidavit in support of plaintiff's summary judgment motion was cumulative and harmless, where defendant's own summary-judgment proof established the event described in the statement.

**[14] Judgment 185(5)**
228k185(5) Most Cited Cases
Affidavit of interested witness was properly considered in support of summary judgment motion, where testimony was credible and free from contradictions and inconsistencies. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

**[15] Judgment 143(3)**
228k143(3) Most Cited Cases
Standard allowing court to set aside a default judgment and order a new trial when failure to answer is not intentional, but rather, due to a mistake or accident, applies to postanswer default judgments.

**[16] Principal and Agent 177(1)**
308k177(1) Most Cited Cases
Notice to an agent is notice to the principal.

**[17] Principal and Agent 23(2)**
308k23(2) Most Cited Cases
Agency relationship may be found from underlying facts or direct and circumstantial evidence showing the relationship of the parties.

**[18] Principal and Agent 1**
308k1 Most Cited Cases

**[18] Principal and Agent 177(3.1)**
308k177(3.1) Most Cited Cases

**[18] Trial 6(1)**
388k6(1) Most Cited Cases
(Formerly 45k115)
Agency relationship existed between litigant's attorney and another attorney who had separate office in same building, and notice of trial setting would therefore be imputed to litigant's attorney based on acceptance of notice by other attorney, given that litigant's attorney had allowed other attorney to receive and sign postal receipts for him in the past.

**[19] Notice 10**
277k10 Most Cited Cases
Party is not deemed to have received notice when such notice is signed and accepted by one who has no authority to sign it.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[20] Appeal and Error 295**
30k295 Most Cited Cases
Where litigant's motion for new trial did not assert error in district court's award of attorney fees, attorney fee issue was not preserved for appeal. Rules App.Proc., Rule 33.1(b).

**[21] Trover and Conversion 1**
389k1 Most Cited Cases
Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights.

**[22] Trover and Conversion 17**
389k17 Most Cited Cases
Lienholder may generally sue for conversion of encumbered property even though the lienholder is not entitled to possession at the time of the conversion.

**[23] Trover and Conversion 2**
389k2 Most Cited Cases
If one exercises dominion and control over an automobile by selling it without having a right to do so, he converts the vehicle.

**[24] Trover and Conversion 17**
389k17 Most Cited Cases

**[24] Trover and Conversion 24**
389k24 Most Cited Cases
Towing company converted automobile when it sold vehicle at public sale to satisfy garageman's lien without giving creditor with security interest in automobile adequate notice. V.T.C.A., Property Code § 70.006.

**[25] Costs 194.25**
102k194.25 Most Cited Cases
Statute allowing attorney fee award when suit concerns possession of a motor vehicle and a debt due on it does not restrict attorney fees to a party suing on a debt who wishes to retain possession of a vehicle. V.T.C.A., Property Code § 70.008.

**[26] Trover and Conversion 72**
389k72 Most Cited Cases
Creditor with security interest in automobile, which recovered judgment in conversion against towing company that sold vehicle to satisfy garageman's lien without proper notice, was entitled to recover attorney fees. V.T.C.A., Property Code §§ 70.006, 70.008.

**[27] Appeal and Error 230**
30k230 Most Cited Cases
Presenting complaint to district court by timely motion is necessary to preserve complaint for appellate review, so that the reviewing court may determine not only if error occurred, but whether this error was reasonably calculated to cause and did cause the rendition of an improper judgment. Rules App.Proc., Rule 33.1(a).

**[28] Appeal and Error 635(1)**
30k635(1) Most Cited Cases
Appellant's challenge to venue was not preserved for appeal, where record did not contain either motion to transfer venue or district court's ruling on such a motion. Rules App.Proc., Rule 33.1(a).
***637** James C. Mosser, James C. Mosser Inc. Lawyers, Dallas, for Appellant.

Mark S. Armstrong, Houston, for Appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

LEE YEAKEL, Justice.

Appellee LSI Financial Group ("LSI") sued appellant Elite Towing, Inc. ("Elite") [FN1] in district court urging various claims, including conversion, negligence, and violation of section 70.006 of the Texas Property Code, [FN2] arising out of Elite's disposing of an automobile in its possession. The district court granted a partial summary judgment in favor of LSI as to liability on its Property Code claim. Later, following a bench trial, the district court rendered a final judgment awarding LSI damages and attorney's fees. Elite appeals. We will affirm the district court's judgment.

FN1. LSI also sued Keshia L. Eubanks and David M. Laney, Commissioner of the Texas Department of Transportation. The district court's final judgment denied any relief against them. That portion of the judgment has not been appealed.

FN2. *See* Tex. Prop.Code Ann. § 70.006

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(West 1995 & Supp.1999).

## *638 BACKGROUND

On June 26, 1996, Elite gained possession of a 1994 Mitsubishi Mirage automobile. The vehicle, owned by Keshia L. Eubanks, was subject to a lien created by a security agreement. LSI is the loan servicer and attorney-in-fact for the secured party, First Bank of the Americas. [FN3] On July 2, Elite sent written notice regarding its possession of the vehicle to Eubanks and the original lienholder, [FN4] a copy of which was later obtained by LSI. The notice stated, *inter alia,* that the vehicle would be sold at a public sale on August 1 unless it was redeemed and removed from the premises. It is undisputed that this is the only notice that Elite sent to either the owner or any lienholder of the vehicle.

> FN3. The security agreement was initially held by Summit Acceptance Corporation. Summit assigned its interest to First Bank of the Americas which became the lienholder and secured party under the agreement.

> FN4. Elite asserts that at the time it sent the notice, Summit Acceptance Corporation was the lienholder of record.

On August 1, Lissa Ruffin, president of Elite, conducted a sale and disposed of the vehicle. Robert Ruffin was the only bidder present at the sale and bought the vehicle on behalf of Elite Wholesales for $540. Approximately one week later, LSI contacted Elite and was informed of the sale.

LSI sued Elite and later filed a motion for summary judgment asserting that it was entitled to judgment as a matter of law because in selling the vehicle Elite failed to comply with section 70.006 of the Property Code. *See* Tex. Prop.Code Ann. § 70.006 (West 1995 & Supp.1999). The district court granted the motion as to liability but reserved the issues of damages and attorney's fees for "determination at a later date." The order, signed July 30, 1997, reflects that the hearing on the motion for summary judgment had been held on June 27.

On July 1, shortly after the hearing but before the signing of the order, LSI served Elite with notice that trial of the remaining issues was set for August 25. The certificate of service attached to the notice reflects that it was sent to Elite's attorney, James C. Mosser, by certified mail return receipt requested, at the address for Mosser reflected in Elite's trial pleadings. It is not in dispute that the address shown in the certificate of service is Mosser's correct office address. On July 3, Gerald Scheff, an attorney officing in the same building as Mosser, signed the receipt for the notice. The receipt was returned to LSI's attorney. Neither Mosser nor a representative of Elite appeared at the trial. Mosser asserts that he never received the notice. In the absence of Elite, its representative, or attorney, the district court conducted a bench trial and rendered judgment for LSI for damages and attorney's fees in the amounts of $8,625 and $14,472.09, respectively. Elite filed a motion for new trial alleging lack of notice of the trial setting. Elite did not request a hearing on its motion, and it was overruled by operation of law.

Elite appeals in five issues: the first two attack the partial summary judgment; the third complains that Elite should have been granted a new trial because its attorney did not receive notice of the trial setting; the fourth addresses whether attorney's fees were appropriate in this case; the final issue asserts that venue was improper.

## DISCUSSION
### Partial Summary Judgment

The standards for reviewing a summary judgment are well established. The movant for summary judgment has the burden of showing that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548-49 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true, and every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Id.*

### *Conversion and Negligence*

[1] Elite asserts that the district court erroneously rendered summary judgment against it on LSI's conversion and negligence *639 claims. LSI's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motion for summary judgment addressed *only* section 70.006 of the Property Code. It was on this motion that the district court granted partial summary judgment. [FN5] Courts can only address issues that are expressly presented in a motion for summary judgment. *See Mafrige v. Ross,* 866 S.W.2d 590, 591 (Tex.1993) (granting motion for summary judgment on cause of action not addressed in motion is reversible error); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (summary judgment cannot be granted as a matter of law on cause of action not addressed in summary-judgment proceeding). The district court did not grant summary judgment against Elite on LSI's conversion or negligence claims. We will address only the issue before the district court in LSI's motion.

FN5. The district court's order reads:
IT IS THEREFORE, ORDERED, ADJUDGED and DECREED that Plaintiff, LSI FINANCIAL GROUP'S, Motion for Summary judgment against Defendant Elite Towing, Inc., as to liability, is GRANTED. The issue [sic] of damages and attorney's fees are reserved for determination at a later date.

***Compliance with the Texas Property Code***

Section 70.006 of the Texas Property Code provides in pertinent part:

(a) A holder of a lien under this subchapter on a motor vehicle ... who retains possession of the vehicle ... for 30 days after the day that the charges accrue shall give written notice to the owner and each holder of a lien recorded on the certificate of title....

(b) If the charges are not paid before the 31st day after the day that the notice is mailed, the lienholder may sell the vehicle ... at a public sale and apply the proceeds to the charges....

Tex. Prop.Code Ann. § 70.006 (West 1995 & Supp.1999).

[2][3] Elite argues that it could not have violated section 70.006 because it never actually *sold* the vehicle, as LSI obtained a temporary restraining order preventing Elite from transferring the vehicle's title. Elite asserts that because title was not transferred, there was no sale and section 70.006 does not apply. We find this argument to be without merit. When title to an automobile is a collateral issue, *i.e.,* where there are no direct competing claims to such title, "a litigant might show by almost any kind of evidence that ownership in fact rests in a person other than the person named as the owner in the certificate [of title]." *Arnold v. State,* 793 S.W.2d 305, 311 (Tex.App.--Austin 1990, no writ).

As there are no competing claims to title of the vehicle, we may look to the record for evidence to determine whether the vehicle was in fact "sold" by Elite. The summary-judgment proof reflects Elite sold the vehicle at a "public sale," Elite Wholesales bought the vehicle at this sale, Elite Wholesales is the present owner of the vehicle, and Robert Ruffin (presumably on behalf of Elite Wholesales) took possession of the vehicle and made repairs to it. [FN6] We conclude that section 70.006 does apply in this case because Elite did sell the vehicle to Elite Wholesales and no one else asserted a claim to its title.

FN6. The summary-judgment proof includes, *inter alia,* Elite's response to interrogatories and request for admissions submitted to it by LSI as well as the affidavits of Lissa Ruffin and Robert Ruffin. Elite states that the vehicle was sold to "Robert Ruffin, Elite Wholesales," while Ruffin avers that he individually purchased the vehicle. The receipt tendered by Elite after the sale was to "Elite Wholesales." The specific purchaser is not material to the resolution of this appeal, and we refer to "Elite Wholesales" as the purchaser merely for convenience.

[4] Having held that the vehicle was in fact sold, we must determine if Elite gave proper notice of the sale. Elite argues that section 70.006 requires only one notice [FN7] and a 31-day waiting period before a vehicle may be sold, while LSI submits that the notice ***640** provision contained in section 70.004 of the Property Code also applies to the facts of this case and further that section 70.006 mandates that Elite was required to maintain possession of the vehicle for 61 days prior to sale.
We must read chapter 70 as a whole to determine

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the underlying legislative intent. *See Citizens Bank v. First State Bank,* 580 S.W.2d 344, 348 (Tex.1979) ("The cardinal rule in statutory interpretation and construction is to seek out legislative intent from a general view of the enactment as a whole").

> FN7. In support of its "one notice" position, Elite directs us to *First State Bank v. Arsiaga,* 804 S.W.2d 343 (Tex.App.--Eastland 1991, writ denied) and *Thompson v. Apollo Paint & Body Shop,* 768 S.W.2d 373 (Tex.App.--Houston [14th Dist.] 1989, writ denied). Neither case is applicable to the issue regarding notice prior to sale. *Arsiaga* holds that notice under section 70.006 is not required to *perfect* a possessory lien. *See Arsiaga,* 804 S.W.2d at 345. *Thompson* holds that actual possession of a vehicle is required to establish a worker's lien. *See Thompson,* 768 S.W.2d at 376.

Chapter 70 of the Property Code addresses the lien of a garageman such as Elite. Section 70.003 grants a garageman with whom a motor vehicle is left for care a lien on the vehicle for charges for that care, including reasonable towing charges. *See* Tex. Prop.Code Ann. § 70.003(c) (West 1995). A garageman holding a lien pursuant to section 70.003 must send a notice to the registered owner of the vehicle and each lienholder of record no later than the 10th day after the day possession is obtained. *See id.* § 70.004(a). This notice must contain the location of the vehicle, the amount of accrued charges, a request for payment, and a request to remove the vehicle. *See id.* § 70.004(b). Finally, section 70.006 requires notice be sent to the owner and any lienholder of record when the garageman seeks to sell the vehicle. *See id.* § 70.006.

[5] Elite argues that it complied with the notice requirements set out in section 70.006 when it sent the July 2 notice. In *Dob's Tire & Auto Center v. Safeway Insurance Agency,* 923 S.W.2d 715 (Tex.App.--Houston [1st Dist.] 1996, writ dism'd w.o.j.), a case similar to the case before us, [FN8] the court of appeals examined chapter 70 in its entirety, determined that the 10-day notice requirement in section 70.004 served a different

purpose from the notice required under section 70.006, and held that section 70.006 required 31 days notice *after* the lienholder possessed the vehicle for 30 days. *See id.* at 719. The court concluded that the notice required under section 70.006 is separate and apart from any notice required or sent under section 70.004. *See id.* at 718-20.

> FN8. *Dob's Tire & Auto Center* involved a *worker's* lien under section 70.001 of the Property Code, while Elite claims a *garageman's* lien as provided in section 70.003. Both cases concern the proper notice to be given under Property Code section 70.006 before the lienholder may sell the property subject to the lien.

Section 70.006 clearly states that if possession of the vehicle is retained for 30 days after charges first accrue, it may not be sold until the 31st day after notice is mailed. *See* Tex. Prop.Code Ann. § 70.006(b) (West 1995); *Dob's Tire & Auto Ctr.,* 923 S.W.2d at 719. Elite retained possession of the vehicle on June 26 and, pursuant to section 70.003, obtained a lien on the vehicle for charges that accrued for the towing and care of it. On July 2, Elite sent a notice to whom it perceived to be the lienholder of record. This notice seemingly attempts to combine the elements required by both section 70.004 and section 70.006 in that it generally contains the information required by section 70.004, but also gives notice of the forthcoming sale of the vehicle on August 1, the 30th day after the mailing of the notice. At the time the notice was mailed, Elite had not retained possession of the vehicle for 30 days after accrual of the first charges to which it was entitled *and* did not give an additional 31 days notice of the proposed sale. We agree with the First Court of Appeals:

> Section 70.006(a) requires a lienholder who retains possession of a vehicle for 30 days to send a notice to the owner requesting payment. If the owner has not made the payments on the vehicle before the 31st day after the notice was sent, then the lienholder can sell the car. tex. Prop.Code Ann. § 70.006(b). *This amounts to a minimum of 61 days a lienholder has to retain possession of a vehicle before the lienholder can sell the vehicle.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Dob's Tire & Auto Ctr.*, 923 S.W.2d at 719 (emphasis added). [FN9] We conclude that Elite did not comply with the notice requirement under section 70.006 of the Property Code.

FN9. The "lienholder" referred to in this passage is the worker (or garageman), not the holder of a lien created by a security agreement.

***641** ***Applicability of the Texas Transportation Code***

[6] Elite also attempts to establish sufficient notice by relying on the Texas Transportation Code. While it is true that section 683.034 of the Transportation Code provides that notice sent under section 683.012 satisfies the notice requirements under chapter 70 of the Property Code, section 683.012 applies to a notice of abandonment sent by a *law enforcement agency.* [FN10] *See* Tex. Transp. Code Ann. §§ 683.034(e)(2), .012 (West 1998). Elite, a private company, retained possession of the vehicle and held a sale on its premises. The record reflects that the vehicle was towed from a church parking lot by a private wrecker service at the request of the church. The record does not indicate any law enforcement agency involvement. We conclude therefore that the Transportation Code is inapplicable here.

FN10. A "law enforcement agency" means the Department of Public Safety, the police department of a municipality, the police department of an institution of higher education, a sheriff or a constable. *See* Tex. Transp. Code Ann. § 683.001(3) (West 1998).

***Pleadings***

[7][8][9][10] Elite claims that LSI's pleadings do not support its motion for summary judgment. LSI's trial pleadings allege that Elite failed to give "the requisite notices" pursuant to sections 70.004 and 70.006 of the Property Code. LSI's motion for summary judgment claims that Elite violated section 70.006 by not sending written notice after it had retained the vehicle for 30 days and in failing to maintain possession of the vehicle for 61 days before sale. Although pleadings set out the controversy in a case, they are not considered in determining whether fact issues are expressly presented in summary judgment motions, and they are not summary-judgment proof. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). The contentions in the written motion for summary judgment are what the court must consider in determining whether to grant the motion. *See id.* The *motion* must be supported by the pleadings on file, and the final judgment must conform to those *pleadings. See Krull v. Somoza,* 879 S.W.2d 320, 322 (Tex.App.--Houston [14th Dist.] 1994, writ denied); *Baker v. John Peter Smith Hosp.,* 803 S.W.2d 454, 456 (Tex.App.--Fort Worth 1991, writ denied); *but see Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 495 (Tex.1991) (variance between motion for summary judgment and movant's pleading may be tried by consent and thus waived). As the partial summary judgment conformed to LSI's trial pleadings which in turn supported its motion for summary judgment, we overrule this claim.

***Affirmative Defenses***

Elite urges this Court to reverse the district court's partial summary judgment because Elite's answer asserts numerous "affirmative and verified defenses ... and there are genuine issues of material fact as to each element of the affirmative defense [sic]." Elite then sets out eleven so-called affirmative or verified defenses, ten of which address compliance with the notice and sale provisions of the Property Code. We have previously disposed of those issues and decline to revisit them.

[11] Elite raises as an additional affirmative defense that LSI is not authorized to do business in this state, but brings forth no summary-judgment proof whatsoever to support this contention. Nor does Elite's brief contain argument or authorities in support of this allegation. *See* Tex.R.App. P. 38.1(h). Elite has thus waived this issue. *See, e.g., Horton v. Horton,* 965 S.W.2d 78, 88 (Tex.App.--Fort Worth 1998, no pet. h.) ("By raising an issue and failing to present any argument or authority on that issue, the party waives that issue.").

***Affidavits***

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[12] Elite argues that the affidavits of Mark Armstrong and Carl Lopez attached to LSI's motion for summary judgment are defective. [FN11] First, Elite complains about Armstrong's and Lopez's testimony concerning ***642** facts related to attorney's fees and damages. [FN12] However, the district court did not grant summary judgment on either issue. We conclude therefore that this testimony is immaterial to the district court's decision to grant partial summary judgment against Elite on the issue of liability.

FN11. Mark Armstrong is LSI's attorney in this case, and Carl Lopez is the "Lien Seizure Specialist" and a custodian of records of LSI.

FN12. Armstrong testified to the type and value of work he did in this case. Lopez testified about LSI's reasoning behind hiring an attorney and to the condition of the vehicle.

[13] Elite also complains that Lopez's affidavit is defective because it contains hearsay. While Elite does not specifically direct us to statements in Lopez's affidavit that constitute hearsay, [FN13] after examining the record we find that Lopez's affidavit contains only one hearsay statement arguably material to the district court's decision to grant partial summary judgment. Lopez stated that "Elite Towing informed LSI that Elite Towing had 'sold' the Vehicle." Elite's own summary-judgment proof, however, establishes that the vehicle was sold. [FN14] Therefore, Lopez's testimony is cumulative, and any hearsay is harmless. We find this claim to be without merit.

FN13. Elite broadly asserts, "The affidavit of CARL LOPEZ is based on hearsay and is not competent summary judgment evidence."

FN14. *See* note 7, *supra.*

[14] Finally, Elite argues that Lopez's affidavit is defective because Lopez is an interested witness. Summary judgment may be based on the testimony of an interested witness if that evidence "is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex.R. Civ. P. 166a(c). Lopez's affidavit sets forth facts material to the district court's finding that Elite failed to comply with the notice requirements of section 70.006 of the Property Code. Elite did not dispute any of these facts or present any controverting proof. In fact, Elite established the same facts in its own summary judgment proof. We find that Lopez's affidavit satisfies the requirements of Rule 166a(c) and was properly considered by the district court as summary-judgment proof.

Therefore, we overrule those issues attacking the partial summary judgment.

**Motion for New Trial**

[15] Elite's third issue addresses whether it is entitled to a new trial because it did not receive notice of the August 25 trial setting.

> A default judgment should be set aside and a new trial ordered in any case in which the failure of defendant to answer before judgment was not intentional, or the result of conscious indifference on his part, but was due to a mistake or accident; provided the motion for a new trial sets up a meritorious defense and is filed at a time when granting thereof will occasion no delay or otherwise work an injury to the plaintiff.

*Craddock v. Sunshine Bus Lines, Inc.,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.1939). The *Craddock* standard applies to a post-answer default judgment, as is the case here where Elite answered but failed to appear at the trial. *See Cliff v. Huggins,* 724 S.W.2d 778, 779 (Tex.1987); *Grissom v. Watson,* 704 S.W.2d 325, 326 (Tex.1986). Elite argues that it satisfies *Craddock* and is entitled to a new trial because its failure to attend the trial was not intentional, but was due to an accident in that it did not receive notice of the trial setting.

Notice of a trial setting may be served on a party's attorney of record by certified mail. *See* Tex.R. Civ. P. 21a. Here, the record reflects that LSI properly mailed notice of the trial setting to Elite's attorney, James Mosser. However, George Scheff, an attorney officing in the same building as Mosser, signed the return receipt for the notice. LSI asserts that Scheff was acting on behalf of Mosser, imputing notice of the trial setting to Mosser.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[16] "It is universally recognized that notice to [an] agent is notice to the principal." *Grissom,* 704 S.W.2d at 327. Courts have also recognized that an attorney is deemed to have received notice when the receipt for the notice is signed by that attorney's agent or employee, finding that it would be unjust to allow a party to claim lack of notice based on ***643** the negligence of the party's own attorney or the attorney's employees. *See Bentley v. Rio Grande Dev. Group,* 607 S.W.2d 319, 321 (Tex.Civ.App.--Fort Worth 1980, no writ) (document deemed received by attorney when signed by his agent, attorney's law librarian, because it would be unreasonable to hold opposing party accountable for office procedures and practices of other party); *Mackay v. Charles W. Sexton Co.,* 469 S.W.2d 441, 444-45 (Tex.Civ.App.-- Dallas 1971, no writ) (fault or neglect of appellant's secretary to notify him of trial setting cannot be laid on appellee).

[17] Therefore, we must determine whether Scheff was Mosser's agent. We begin with the general rule guiding the creation of an agency relationship:

> As between parties to the relation, there must be a meeting of the minds in establishing the agency, and the consent of both the principal and the agent is necessary to create the agency, although such consent may be implied rather than expressed. The principal must intend that the agent act for him, the agent must intend to accept the authority and act on it, and the intention of the parties must find expression in either words or conduct between them.

*Grissom,* 704 S.W.2d at 326 (quoting *First Nat'l Bank v. Farmers & Merchants State Bank,* 417 S.W.2d 317, 330 (Tex.Civ.App.--Tyler 1967, writ ref'd n.r.e.)). An agency relationship may be found from underlying facts or direct and circumstantial evidence showing the relationship of the parties. *See Schultz v. Rural/Metro Corp.,* 956 S.W.2d 757, 760 (Tex.App.--Houston [14th Dist.] 1997, no writ) ; *Stanford v. Dairy Queen Prods.,* 623 S.W.2d 797, 800- 801 (Tex.App.--Austin 1981, writ ref'd n.r.e.).

[18] We find that an agency relationship existed between Scheff and Mosser. *See Grissom,* 704 S.W.2d at 326 (agency relationship existed between two law firms when one firm filed answer on behalf of the other in the past in the same case, and notice of docket setting sent to agent/firm was imputed to principal since it was acquired in connection with business transacted for principal). The underlying facts show that Scheff officed in the same building as Mosser. On other occasions during this very case Scheff received and signed postal receipts for Mosser, and there is no evidence that Mosser objected when Scheff signed such documents for him. In fact, though Mosser attached an affidavit to his motion for new trial in which he stated he personally did not receive notice, he never indicated that Scheff was not authorized to receive such notice for him. [FN15]

FN15. Scheff even acted as Mosser's notary on the affidavit.

[19] Elite urges that Scheff was not an employee, agent, partner, associate, or shareholder of Mosser and did not act for the benefit of Mosser in this case. While it is true that a party is not deemed to have received notice when such notice is signed and accepted by one who has no authority to sign it, the facts in this case distinguish it from authority supporting that proposition. For example, in *United National Bank v. Travel Music of San Antonio, Inc.,* 737 S.W.2d 30 (Tex.App.--San Antonio 1987, writ ref'd n.r.e.) and *Thompson v. Thompson,* 487 S.W.2d 436 (Tex.Civ.App.--Houston [1st Dist.] 1972, no writ), notice was found ineffective when it was signed for by a stranger of the intended addressee and the record did not reveal the identity of the person who signed it. *See United Nat'l Bank,* 737 S.W.2d at 31-32; *Thompson,* 487 S.W.2d at 439. Contrary to these cases, the record here clearly reveals Scheff was no stranger to Mosser. Of compelling significance to our determination of this issue is the fact that Scheff signed other receipts for documents for Mosser *in this case,* and served as the notary on Mosser's affidavit.

In *City of Houston v. Riner,* 896 S.W.2d 317 (Tex.App.--Houston [1st Dist.] 1995, writ denied), the court found that notice had not been received when a security guard, who admitted that she did not have the authority to do so, signed and accepted mail that was addressed to the city attorney who had recently moved into the building where the notice was mailed. *See id.* at 319-320. Unlike *Riner,* there is no similar evidence here that Scheff was not authorized to sign the notice. Scheff's previous acceptance of documents ***644** for Mosser in this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case met with no objection. Mosser testified by way of affidavit to his lack of receipt of the notice and final judgment, but significantly failed to state that Scheff was not authorized to receipt for them.
The record here reflects a consistent pattern whereby Scheff ordinarily transacted certain business for Mosser, while in *Riner* no such pattern is evident.

In light of the circumstances in this case, we find that Scheff was Mosser's agent and was authorized to accept notice of the trial setting for Mosser. Because notice to Scheff is imputed to Mosser, [FN16] we conclude that Elite's failure to appear at trial was not due to an accident. To hold otherwise would allow the manipulation of receipt for notices and would undermine and render useless the provisions of Rule 21a. We overrule Elite's third issue.

FN16. *See Grissom,* 704 S.W.2d at 327 (notice to agent is notice to principal); *Bradford v. McElroy,* 746 S.W.2d 294, 295 (Tex.App.--Austin 1988, no writ) (law imputes to principal whatever is communicated to agent).

**Attorney's Fees**

[20] By its fourth issue, Elite challenges the district court's award of attorney's fees on two bases. First, that the evidence does not support a judgment in LSI's favor on LSI's claim of conversion, and second, if so, because conversion is a tort, it will not support an award of attorney's fees. LSI responds that we cannot address this issue because ET failed to preserve it in its motion for new trial.
Generally, a point in a motion for new trial is not a prerequisite to a complaint on appeal. *See* Tex.R. Civ. P. 324. In *Wilson v. Dunn,* 800 S.W.2d 833 (Tex.1990), the supreme court compared Rule 324 to then Texas Rule of Appellate Procedure 52(a).
The court noted that Rule 324, as amended, was meant to limit use of motions for new trial to preserve error. The court further observed that while Rule 52(a) required all complaints urged on appeal to first be presented to the trial court, it was unclear when complaints could not be raised prior to judgment. This problem, reasoned the court, should be considered in a future amendment to the rules. *See Wilson,* 800 S.W.2d at 837 n. 9.
Effective September 1, 1997, the supreme court amended the Texas Rules of Appellate Procedure.
New Rule 33.1 is similar to previous Rule 52(a) in that it requires a complaint to first be presented to the trial court in order to preserve the complaint for appellate review. *See* Tex.R.App. P. 33.1(a). The rule then goes on to directly address the supreme court's concern expressed in *Wilson,* "In a civil case, the overruling by operation of law of a motion for new trial or a motion to modify a judgment preserves for appellate review a complaint *properly made in the motion,* unless taking evidence was necessary to properly present the complaint in the trial court." Tex.R.App. P. 33.1(b) (emphasis added). As Elite's motion for new trial asserts no error in the district court's award of attorney's fees, Elite has not preserved this issue for review by this Court.

However, even if Elite's complaint had been properly preserved, we hold that the district court was correct in awarding LSI attorney's fees.

***Conversion***

[21][22] Before the district court LSI pleaded that when Elite failed to comply with the Property Code prior to selling the vehicle, the sale was void and the transfer of the vehicle constituted an illegal conversion. "Conversion is the 'wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights.' " *Bandy v. First State Bank,* 835 S.W.2d 609, 622 (Tex.1992). Generally, a lienholder [FN17] may sue for conversion of encumbered property even though the lienholder is not entitled to possession at the time of the conversion. *See* 15 Tex. Jur.3d *Conversion* § 35 (1981); *see also Focke v. Blum,* 82 Tex. 436, 17 S.W. 770, 772 (Tex.1891) ("It is well settled that a mortgagee or lienholder may sue for a conversion of the mortgaged property"); *Collision Ctr. Paint & Body v. Campbell,* 773 S.W.2d 354, 357 (Tex.App.--Dallas 1989, no writ) (finding conversion in favor of purchase money lienholder); ***645***Hart v. Meadows,* 302 S.W.2d 448, 451 (Tex.Civ.App.--Texarkana 1957, writ ref'd n.r.e.) (lienholder may sue for conversion though not entitled to possession at time of conversion).

FN17. "Lienholder" in this instance refers to the party holding a lien under a security

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agreement and not a lien created by a statute.

[23][24] "If one exercises dominion and control over a car by selling it without having a right to do so, he converts the vehicle." *Kollision King, Inc. v. Calderon,* 968 S.W.2d 20, 23 (Tex.App.--Corpus Christi 1998, no writ) (citing *L.L.M. v. Mayes,* 733 S.W.2d 642, 646 (Tex.App.--San Antonio 1987, no writ)). We have found that Elite did not comply with section 70.006 of the Property Code because it failed to give proper notice prior to selling the vehicle. [FN18] As Elite did not have the right to sell the vehicle, Elite's unlawful sale constituted conversion.

FN18. *See* pp. 639-40, *supra.*

***Basis for Recovery***

[25] Elite further asserts that the district court erred in awarding attorney's fees to LSI because attorney's fees may not be awarded for conversion, which it alleges is the basis for LSI's cause of action. Under section 70.008 of the Property Code, "The court in a suit concerning possession of a motor vehicle ... and a debt due on it may award reasonable attorney's fees to the prevailing party." Tex. Prop.Code Ann. § 70.008 (West 1995). This statute does not restrict attorney's fees to a party suing on a debt who wishes to retain possession of a vehicle. *See Kollision King,* 968 S.W.2d at 24.

[26] Here, LSI recovered judgment against Elite in conversion because Elite, having sold the vehicle to Elite Wholesales, could not surrender the vehicle. However, as in *Kollision King,* at issue was the right to the possession of the vehicle and the debt secured by the possessory lien. *See id.* Elite could not legally sell the vehicle to discharge the debt against it without giving proper notice to LSI. This it failed to do. We do not believe that the legislature in enacting section 70.008 intended to deprive a successful litigant of reasonable attorney's fees when a garageman has rendered return of a vehicle impossible by disposing of it in violation of the very statute which creates the right to such fees. We hold that LSI, being the prevailing party, was entitled to attorney's fees under section 70.008 of the Property Code. We overrule Elite's fourth issue.

**Venue**

[27][28] In its final issue, Elite contends that venue was not proper in this case. However, Elite has failed to properly preserve this argument. To preserve a complaint for appellate review, the record must show that the complaint was made to the district court by a timely motion and that the district court ruled or refused to rule on the motion. *See* Tex.R.App. P. 33.1(a). This is necessary so that the reviewing court may determine not only if error occurred, but whether this error was reasonably calculated to cause and did cause the rendition of an improper judgment. *See Piotrowski v. Minns,* 873 S.W.2d 368, 370 (Tex.1993); *Christiansen v. Prezelski,* 782 S.W.2d 842, 843 (Tex.1990). The record before us does not contain either a motion to transfer venue or the district court's ruling on same. The docket sheet included in the court's record reflects such a motion was filed and denied. However, we find no request by Elite to include either the motion or order in the court's record brought forward to this Court. Therefore, any objection to venue has been waived.

**CONCLUSION**

Having disposed of all of the issues before us, we affirm the district court's judgment.

985 S.W.2d 635

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10

Westlaw.

Court of Appeals of Texas,
Houston (1st Dist.).
AMERICAN CENTENNIAL INSURANCE COMPANY and First State Insurance Company, Appellants,
v.
CANAL INSURANCE COMPANY; Talbert, Giessel, Stone and Lyman; Giessel, Stone, Barker and Lyman; Henry P. Giessel; and Richard S. Joseph, Appellees.
**No. 01-89-01138-CV.**

May 9, 1991.
Rehearing Overruled May 30, 1991.

Excess insurers of car rental company sued primary insurer, law firm and attorneys alleging that, in handling of underlying lawsuit against rental company, defendants breached duties of good faith and fair dealing, were negligent and grossly negligent, violated Deceptive Trade Practices Act, and violated unfair practices article of the Insurance Code. Take-nothing summary judgment was entered in favor of defendants by the 334th District Court, Harris County, and excess insurers appealed. The Court of Appeals, Dunn, J., held that: (1) excess carrier is equitably subrogated to insured's cause of action against primary carrier for breach of the *Stowers* duty to act as an ordinarily prudent person would act in the handling of lawsuit against insured; (2) there was no cause of action under the *Stowers* doctrine against any party other than the primary insurer; and (3) claims against primary insurer for breach of *Stowers* duty were not barred by statute of limitations, but other causes of action were barred by limitations.

Affirmed in part, reversed in part, and remanded.

Wilson, J., filed a dissenting opinion.

West Headnotes

**[1] Appeal and Error ⚷934(1)**
30k934(1) Most Cited Cases
In reviewing grant of motion for summary judgment, Court of Appeals will take all evidence favorable to nonmovant as true, will indulge every reasonable inference in favor of nonmovant, and will resolve any reasonable doubt in favor of nonmovant.

**[2] Judgment ⚷185(6)**
228k185(6) Most Cited Cases
Summary judgment for a defendant is proper if its summary judgment proof establishes, as a matter of law, that there exists no genuine issue of material fact concerning one or more of the essential elements of plaintiff's cause of action, or if defendant conclusively establishes all elements of an affirmative defense as a matter of law.

**[3] Insurance ⚷3349**
217k3349 Most Cited Cases
(Formerly 217k514.3, 217k514.2)
Insurer has duty to insured to settle lawsuit, if prudent person in the exercise of ordinary care would do so, and if insurer fails or refuses to do so, it is liable to insured for amount of damages eventually recovered in excess of the policy limits.

**[4] Insurance ⚷2926**
217k2926 Most Cited Cases
(Formerly 217k514.15)

**[4] Insurance ⚷3353**
217k3353 Most Cited Cases
(Formerly 217k514.2)
Insurer is under duty to act, in handling lawsuit against the insured, as ordinarily prudent person would act in the management of his own business, and
duty of insurer extends to investigation of claim, preparation for defense of lawsuit, trial of case, and reasonable attempts to settle.

**[5] Insurance ⚷3517**
217k3517 Most Cited Cases
(Formerly 217k606(5.1), 217k606(5))
Excess insurer is equitably subrogated to insured's cause of action against primary insurer for breach of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
10

duty under *Stowers* doctrine to settle lawsuit if prudent person in the exercise of ordinary care would do so, and to prudently handle defense of suit.

**[6] Insurance ⚷3513(3)**
217k3513(3) Most Cited Cases
(Formerly 217k606(1))
When insurer pays loss under policy, it becomes equitably subrogated to any cause of action the insured may have against third party who caused the loss.

**[7] Insurance ⚷3352**
217k3352 Most Cited Cases
(Formerly 217k514.2)
Primary carrier's duty to settle lawsuit if prudent person in the exercise of ordinary care would do so is not reduced because of the existence of another contract between the insured and an excess carrier.

**[8] Judgment ⚷185.3(12)**
228k185.3(12) Most Cited Cases
In excess carrier's subrogation suit against primary carrier, there was material issue of fact, precluding summary judgment, as to whether primary carrier breached its duty to insured to prudently handle lawsuit against the insured, in light of evidence that, before any depositions had been taken, attorney for primary insurer answered request for admissions in a way that admitted liability.

**[9] Insurance ⚷2926**
217k2926 Most Cited Cases
(Formerly 217k514.15)
Even if primary insurer had no opportunity to settle lawsuit within its policy limits, it may have breached duty to handle lawsuit in a prudent manner, when its agent answered request for admissions in a way that admitted liability.

**[10] Insurance ⚷1669**
217k1669 Most Cited Cases
(Formerly 217k103)
Duty imposed by *Stowers* doctrine, to prudently handle lawsuit for insured and to settle lawsuit if prudent person in the exercise of ordinary case would do so, applies only to insurer and does not apply to insurer's agents.

**[11] Attorney and Client ⚷26**
45k26 Most Cited Cases
Excess carriers, subrogated to claims of insured, had no cause of action under *Stowers* doctrine, imposing duty on insured to act prudently in handling of lawsuit against insured, against primary carrier's attorneys for breach of the *Stowers* duty.

**[12] Insurance ⚷3560**
217k3560 Most Cited Cases
(Formerly 217k619)
The two-year statute of limitations applies to a cause of action based on the *Stowers* doctrine, imposing duty on insurer to act prudently in handling lawsuit against insured. V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

**[13] Limitation of Actions ⚷55(3)**
241k55(3) Most Cited Cases
Cause of action against insurer for breach of *Stowers* duty to handle prudently a lawsuit against insured accrues when judgment in the underlying case becomes final, that is, when the judgment has disposed of all issues and parties in the case, trial court's power to alter judgment had ended, and execution of a judgment has not been superseded. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b(d); V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

**[14] Limitation of Actions ⚷30**
241k30 Most Cited Cases
Cause of action for negligence or gross negligence is governed by two-year statute of limitations. V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

**[15] Limitation of Actions ⚷43**
241k43 Most Cited Cases
Generally, cause of action accrues for limitations purposes when facts come into existence that authorize one to seek a judicial remedy.

**[16] Limitation of Actions ⚷55(2)**
241k55(2) Most Cited Cases
Cause of action for negligence and gross negligence accrues on day duty of ordinary care is breached, even though injury may not be apparent and plaintiff may be unaware of the breach. V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

**[17] Limitation of Actions ⚷95(1)**
241k95(1) Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Discovery rule applies only to causes of action that can be characterized as inherently undiscoverable.

**[18] Limitation of Actions 95(10.1)**
241k95(10.1) Most Cited Cases
(Formerly 241k95(10))
Discovery rule did not apply to delay running of statute of limitations on excess insurers' cause of action for negligence and gross negligence against primary insurer in handling of underlying lawsuit, as excess insurers could have discovered primary insurer's alleged negligence by monitoring the underlying case. V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

**[19] Limitation of Actions 55(3)**
241k55(3) Most Cited Cases
Excess insurers' equitably subrogated action against primary insurer for negligence or gross negligence in answering requests for admissions in underlying suit in a way that admitted liability accrued, for purposes of limitations, on date when primary insurer's attorney filed responses to the request for admissions.

**[20] Attorney and Client 129(1)**
45k129(1) Most Cited Cases
Cause of action for legal malpractice is covered by two-year statute of limitations. V.T.C.A., Civil Practice & Remedies Code § 16.003(a).

**[21] Limitation of Actions 95(11)**
241k95(11) Most Cited Cases
Discovery rule applies to cause of action for legal malpractice, and statute of limitations does not begin to run until claimant discovers, or should have discovered, through the exercise of reasonable care and diligence, the facts establishing the cause of action.

**[22] Limitation of Actions 55(3)**
241k55(3) Most Cited Cases
Statute of limitations on excess insurers' equitable subrogation suit against primary insurer for alleged legal malpractice in handling of underlying lawsuit, for alleged violation of Deceptive Trade Practices Act, and for alleged violation of the unfair practices article of the Insurance Code accrued, for limitations purposes, on date when attorneys for the excess insurers drafted a memorandum outlining the alleged problems of the attorneys for the primary insurer in handling the underlying suit. V.T.C.A., Civil Practice & Remedies Code § 16.003(a); V.T.C.A., Bus. & C. § 17.565; V.A.T.S. Insurance Code, arts. 21.21, 21.21, §§ 16, 16(d).

**[23] Attorney and Client 104**
45k104 Most Cited Cases
Knowledge acquired by attorney, during and within the scope of employment, is imputed to the client.

**[24] Limitation of Actions 95(3)**
241k95(3) Most Cited Cases
Cause of action for violation of the Deceptive Trade Practices Act is governed by two-year statute of limitations, but discovery rule applies so that statute does not commence to run until claimant has discovered, or in the exercise of reasonable diligence should have discovered, the false, misleading or deceptive act or practice. V.T.C.A., Bus. & C. § 17.565.

**[25] Insurance 3560**
217k3560 Most Cited Cases
(Formerly 217k619)

**[25] Limitation of Actions 95(3)**
241k95(3) Most Cited Cases
Cause of action for violation of the unfair practices article of the Insurance Code is governed by two-year statute of limitations, but discovery rule applies so that statute does not begin running until person bringing action has discovered, or in the exercise of reasonable diligence should have discovered, the occurrence of the unfair or deceptive act or practice. V.A.T.S. Insurance Code, arts. 21.21, 21.21, §§ 16, 16(d).
***248** Before DUNN, SAM BASS and WILSON, JJ.

OPINION ON MOTION FOR REHEARING

DUNN, Justice.

We deny the motion for rehearing of the appellee, Canal Insurance Company ("Canal"). We withdraw our opinion of April 4, 1991, and we substitute the following opinion.

The appellants, First State Insurance Company ("First State") and American Centennial Insurance Company ("American"), appeal the take-nothing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

summary judgment entered in favor of the appellees, Canal; Talbert, Giessel, Stone and Lyman; Giessel, Stone, Barker and Lyman (collectively referred to as "law firm"); Henry P. Giessel; and Richard S. Joseph.

*249 On May 15, 1982, Glenda Ray Russell rented a car from General Rent-A-Car International, Inc. ("General"). On May 20, 1982, Russell, her sister, Linda McDonald, and McDonald's son, Matthew, were riding in the car when they were involved in an accident. Russell and Linda McDonald died as a result of the injuries they received in the accident.

At the time of the accident, General was covered by three insurance policies. Canal insured General to $100,000; First State insured from $100,000 to $1 million, and American insured from $1 million to $4 million. Canal had the right and obligation to defend General in any lawsuit.

As a result of the accident, suit was filed against General seeking damages for personal injury, wrongful death, and survivorship (the "McDonald case"). Canal investigated and defended the suit, hiring the law firm to represent General. The law firm assigned Joseph as lead counsel on the case.

In September 1984, a request for admissions asked General to admit that a tire on the car had blown out because it was defective and that the blow out caused the accident. On October 9, 1984, Joseph, on behalf of General, admitted the fact. Furthermore, Joseph admitted that the defective tire was unreasonably dangerous and created an unreasonable risk of harm to its user. At that time, no depositions had been taken.

Fifteen depositions were taken from October 1984, to January 20, 1986, and Joseph spoke to two new experts on behalf of General. As a result, Joseph's opinion of the cause of the accident changed; he no longer believed it was caused by a blowout; instead, he believed it was caused by a rear-end collision.

In July 1985, Joseph filed a motion to withdraw General's answers to requests for admissions. The record contains no order reflecting a ruling on the motion, but Joseph's secretary told Clifford A. Lawrence, Jr., First State's attorney, that the trial court denied the motion because no evidence supported a withdrawal.

The plaintiffs in the McDonald case nonsuited all defendants except General and filed a motion for summary judgment based on General's answers to the requests for admissions. After the motion for summary judgment was filed, Joseph filed another motion to withdraw General's answers to requests for admissions. Joseph's motion was set for hearing on January 27, 1986; the motion for summary judgment was also set for hearing on January 27, 1986. Trial on the case was set for February 4, 1986.

On December 17, 1985, American hired Kyle Wheelus, Jr. to investigate the handling of the McDonald case. On January 8, 1986, First State retained Lawrence to investigate the handling of the case.

Lawrence and Wheelus jointly prepared a memorandum on January 17, 1986; the memorandum was titled "Negligent Handling Problems." The memorandum outlined six problems Canal had in handling the McDonald case, including delay in tendering policy limits and inadequately advising American and First State; in addition, the memorandum outlined ten problems the law firm, Giessel, and Joseph had in handling the case, including answering requests for admissions in a way that admitted liability. Lawrence testified, during his deposition, that when the memorandum was prepared, he had determined that the McDonald case could not be successfully defended at trial. Similarly, Wheelus testified, during his deposition, that by January 17, 1986, he had formed the opinion that the law firm had negligently handled the McDonald case.

On January 22, 1986, a meeting was held at the office of Robert Becker, corporate counsel for General. Joseph, Wheelus, Lawrence, and executives of American, First State, and Canal also attended the meeting. Becker demanded Canal, American, and First State tender their policy limits to settle the McDonald case; he felt that a verdict in excess of the $4 million insurance coverage would force General into bankruptcy. First State and American demanded Canal settle the case with its own funds; Canal refused.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***250** On January 23, 1986, First State and American reached a tentative agreement with the plaintiffs in the McDonald suit; the suit was to be settled for $3.7 million. The agreement was formalized, and a judgment was signed on February 3, 1986.

On January 21, 1988, First State and American filed suit against Canal, the law firm, Giessel, and Joseph. First State and American alleged that in handling the McDonald case, Canal, the law firm, Giessel, and Joseph:

(1) breached their duties of good faith and fair dealing;
(2) were negligent;
(3) were grossly negligent;
(4) violated the Deceptive Trade Practices-Consumer Protection Act, Tex.Bus. & Com.Code Ann. § 17.41 (Vernon 1987), ("DTPA"); and
(5) violated Tex.Ins.Code Ann. art. 21.21 (Vernon 1981).

The law firm, Giessel, Joseph, and Canal filed motions for summary judgment claiming that all causes of action were barred by the two-year statute of limitations. They claimed First State and American had actual knowledge of the actions that formed the basis of the causes of action on January 17, 1986, but did not file suit until January 21, 1988, more than two years after the cause of action accrued. In addition, the law firm, Giessel, Joseph, and Canal claimed First State and American had no cause of action for breach of the duties of good faith and fair dealing and to act as a reasonable and prudent defense attorney because neither Canal, the law firm, Giessel, nor Joseph owed any such duties to First State or American.

The trial court granted the motions for summary judgment. The court ordered First State and American take nothing from Canal, the law firm, Giessel, and Joseph.

[1][2] In reviewing the grant of a motion for summary judgment, this Court will take all evidence favorable to the nonmovant as true. *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986); *Goldberg v. United States Shoe Corp.,* 775 S.W.2d 751, 752 (Tex.App.--Houston [1st Dist.] 1989, writ denied). Every reasonable inference will be indulged in favor of the nonmovant, and any reasonable doubt will be resolved in its favor. *Continental Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex.1988); *Goldberg,* 775 S.W.2d at 752. Summary judgment is proper for a defendant if its summary judgment proof establishes, as a matter of law, that there exists no genuine issue of material fact concerning one or more of the essential elements of the plaintiff's cause of action. *Goldberg,* 775 S.W.2d at 752. Summary judgment is also proper for a defendant if it conclusively establishes all elements of its affirmative defense as a matter of law. *Munoz v. Gulf Oil Co.,* 693 S.W.2d 372, 373 (Tex.1984) (quoting *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671 (Tex.1979)). The movant has the burden of showing there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *MMP,* 710 S.W.2d at 60; *Goldberg,* 775 S.W.2d at 752.

EQUITABLE SUBROGATION

The primary question presented by this case is whether, under Texas law, an excess carrier can maintain a cause of action against a primary carrier for tortious conduct in handling a claim.

In their first point of error, First State and American contend that the trial court erred in holding that an excess insurance carrier has no remedy against a primary carrier and its agents for tortious conduct in the handling of a claim. In their second point of error, they contend that the trial court erred in granting summary judgment because an issue of fact existed concerning whether Canal and its agents committed tortious conduct in the investigation and defense of the McDonald case.

[3][4] Texas law recognizes that an insurer has a duty to the insured to settle a lawsuit, if a prudent person in the exercise of ordinary care would do so. *G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544, 547 (Tex.Comm'n App.1929, holding approved). Under the *Stowers* doctrine, an insurer is under a duty to ***251** act, in the handling of the lawsuit against the insured, as an ordinarily prudent person would act in the management of his own business. *Id.* If an ordinarily prudent person would have settled the lawsuit, and the insurer failed or refused to do so, it is liable to the insured for the amount of damages eventually recovered in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

excess of policy limits. *Id.* The duty of an insurer extends to investigation of the claim, preparation for defense of the lawsuit, trial of the case, and reasonable attempts to settle. *Ranger County Mut. Ins. Co. v. Guin,* 723 S.W.2d 656, 659 (Tex.1987). Therefore, under the *Stowers* doctrine, an insurer can be liable for tortious conduct in handling a claim.

[5] No court in Texas has addressed whether an excess carrier can sue a primary carrier for breach of the *Stowers* duty. [FN1] However, courts in other jurisdictions have allowed an excess carrier to pursue such a cause of action. The courts have allowed a cause of action under three theories: the theory of direct duty, [FN2] the doctrine of triangular reciprocity, [FN3] and the doctrine of equitable subrogation. [FN4]

FN1. Contrary to the dissent's assertions, we do not fail to follow "a policy of judicial self-restraint" by addressing whether such a cause of action exists in Texas. No Texas court, including the Texas Supreme Court, has yet addressed whether such a cause of action exists. In contrast, the cases upon which the dissent relies involved areas of law already addressed by the Texas Supreme Court and well settled in Texas law. *See Lumpkin v. H & C Communications, Inc.,* 755 S.W.2d 538, 540 (Tex.App.--Houston [1st Dist.] 1988, writ denied) (intermediate appellate court will not carve out exception to "at-will" employment rule, which is well settled in Texas law); *Witty v. American Gen. Capital Distrib., Inc.,* 697 S.W.2d 636, 639 (Tex.App.--Houston [1st Dist.] 1985) (intermediate court of appeals adopts opinion of Texas Supreme Court, which recognized cause of action for prenatal injuries if child was born alive, but not if child was not born alive), *rev'd in part, aff'd in part,* 727 S.W.2d 503 (Tex.1987); *Molder v. Southwestern Bell Tel. Co.,* 665 S.W.2d 175, 177 (Tex.App.--Houston [1st Dist.] 1983, writ ref'd n.r.e.) (court of appeals would not depart from long line of Texas cases upholding "at-will" rule in employment); *Watson v. Zep Mfg. Co.,* 582 S.W.2d 178, 180 (Tex.Civ.App.--Dallas 1979, writ ref'd n.r.e.) (duty of intermediate court of appeals is to follow law as previously declared and applied by courts in the state). The present case is a case of *first impression; no* court in Texas, including the Texas Supreme Court, has decided whether an excess carrier has a cause of action against a primary carrier for breach of the *Stowers* duty.

FN2. *See, e.g., American Centennial Ins. Co. v. American Home Assurance Co.,* 729 F.Supp. 1228, 1232 (N.D.Ill.1990); *National Union Fire Ins. v. Liberty Mut. Ins. Co.,* 696 F.Supp 1099, 1101 (E.D.La.1988); *Argonaut Ins. Co., Inc. v. Hartford Accident & Indem. Ins. Co.,* 687 F.Supp 911, 914 (S.D.N.Y.1988); *Bohn v. Sentry Ins. Co.,* 681 F.Supp. 357, 362 (E.D.La.1988), *aff'd,* 868 F.2d 1269 (5th Cir.1989); *Estate of Penn v. Amalgamated Gen. Agencies,* 148 N.J.Super. 419, 372 A.2d 1124, 1127 (Ct.App.Div.1977); *Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.,* 93 A.D.2d 337, 462 N.Y.S.2d 175, 178 (App.Div.1983), *aff'd,* 61 N.Y.2d 569, 463 N.E.2d 608, 475 N.Y.S.2d 267 (1984). *But see, e.g. Pacific Employers Ins. Co. v. United Gen. Ins. Co.,* 664 F.Supp. 1022, 1024 (W.D.La.1987); *Great Southwest Fire Ins. Co. v. CNA Ins. Cos.,* 547 So.2d 1339, 1346 (La.Ct.App.1989); *Allstate Ins. Co. v. Reserve Ins. Co.,* 116 N.H. 806, 373 A.2d 339, 340 (1977); *accord Twin City Fire Ins. Co. v. Superior Court,* 164 Ariz. 295, 296, 792 P.2d 758, 759 (1990) (direct duty theory should not be applied since excess carrier had adequate remedy under doctrine of equitable subrogation); *Laper v. Board of Comm'rs,* 523 So.2d 926, 928 (La.Ct.App.1988) (insurer owes duty to defend to insured; insurer owes no such duty to excess insurer) (Plotkin, J., dissenting).

FN3. *See, e.g. Transit Casualty Co. v. Spink Corp.,* 94 Cal.App.3d 124, 132-35, 156 Cal.Rptr. 360, 365-67 (Ct.App.1979).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.