

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAY 1 6 2005

CLERK, U.S. DISTRICT COURT
By _____
Deputy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

FARAWAY ENTERPRISES, INC.,               §
                                         §
    Plaintiff,                           §
                                         §
    **ORIGINAL**                          §
                                         §
v.                                       §    CAUSE NO. 3-02-CV-0106-K
                                         §
TESTAMERICA, INC., SAGAPONACK            §
PARTNERS, L.P., MARC WEISMAN,            §
                                         §
    **Defendants.**                       §

---

## DEFENDANT TESTAMERICA'S RESPONSE TO PLAINTIFF FARAWAY ENTERPRISES, INC.'S MOTION FOR JUDGMENT AND BRIEF IN SUPPORT

---

Michael P. Lynn, P.C.
Texas Bar No. 12738500
Edward Jason Dennis
Texas Bar No. 24045776
LYNN TILLOTSON & PINKER, LLP
750 North St. Paul Street, Suite 1400
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**ATTORNEYS FOR DEFENDANT
TESTAMERICA, INC.**

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................. 1

II.   THE COURT SHOULD HAVE CONSTRUED THE CONTRACTS AS A
      MATTER OF   LAW ......................................................................................................... 2

III.   PLAINTIFF MISCALCULATES ACTUAL DAMAGES UNDER THE NOTE ............. 4

IV.   THERE IS NO BASIS FOR PLAINTIFF'S CLAIM FOR FAILURE TO
      PROVIDE  PERIOD INCOME STATEMENT AND PLAINTIFF HAS MADE
      UP AN AMOUNT OF NONEXISTENT DAMAGES FOR THIS CLAIM. ...................... 7

V.    NO FRAUD OR MALICE EXISTS IN THIS CASE, THEREFORE, THERE IS
      NO BASIS FOR EXEMPLARY DAMAGES. .................................................................. 8

VI.   THERE CAN BE NO FRAUD OR MALICE FINDING WITH REGARD TO
      THE VERSION 6/VERSION 7 OF THE SUBORDINATION AGREEMENT
      WHERE PLAINTIFF'S ATTORNEY ADMITS TO KNOWING AND
      APPROVING THAT SAGAPONACK WOULD BE ADDED TO THE
      AGREEMENT'S SCHEDULE. ...................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*American Cent. Ins. Co. v. Canal Ins. Co.*
  810 S.W.2d 246 (Tex.App.—Houston [1st Dist.] 1991) .......................................................... 10

*Archer v. Griffith*
  390 S.W.2d 735 (Tex. 1964) ........................................................................................... 8

*City of Pinehurst v. Spooner Addition Water Co.*
  432 S.W.2d 515 (Tex. 1968) ........................................................................................ 1, 2

*Coker v. Coker*
  650 S.W.2d 391 (Tex. 1983) ............................................................................................. 2

*Edwards v. Lone Star Gas Co.*
  782 S.W.2d 840 (Tex. 1990) ......................................................................................... 2, 8

*Stovall v. Illinois Central Gulf R. Co.*
  722 F.2d 190 (5th Cir. 1984) ........................................................................................... 4

**Statutes**

TEX. CIV. PRAC. & REM. CODE § 41.003 ............................................................................. 8, 10

TEX. CIV. PRAC. & REM. CODE § 41.006 ................................................................................ 8

Defendant TestAmerica, Inc. ("TA") files this Response to Plaintiff Faraway Enterprises, Inc.'s Motion For Entry of Judgment and Brief in Support and would respectfully show the Court the following:

## I.   INTRODUCTION

MR. LYNN:   Well, objection, I think there is no statement or no allegation of ambiguity.  This document speaks for itself.

THE COURT: Sustained.[1]

\*　　　\*　　　\*　　　\*　　　\*

MR. GUILLOT:  Your Honor, we'll object.  There's no plea of ambiguity and the intent is not an issue.  The language and the document speaks for itself.

THE COURT: Sustained.[2]

\*　　　\*　　　\*　　　\*　　　\*

"It is elementary that if there is no ambiguity, the construction of the written instrument is a question of law for the Court."

*City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968).

\*　　　\*　　　\*　　　\*　　　\*

Plaintiff's Proposed Judgment invites this Court into error.  First, the agreements at issue in this case are indisputably unambiguous.  Plaintiff, Defendants and the Court agree that those contracts are unambiguous.  Accordingly, interpretation of the contracts is a question for the Court as a matter of law.  Therefore, entry of judgment based on the jury's verdict would be error because the jury should not have been given the task of construing the contracts.  Second, Plaintiff's computation of its alleged actual damages is seriously flawed and at odds with what

---

[1] Def's Apx. at 78 (Tr. at Vol. 1, 151:13-16).

[2] Def's Apx. at 83-84 (Tr. at Vol. 2, 80:24-25; 81:1-2).

Plaintiff sought at trial as well as the evidence presented. Third, there is no evidence to support Plaintiff's claim for alleged breach of contract based on the failure to provide an income statement or Plaintiff's proposed damages resulting from this claim. Finally, there is no basis for punitive damages given the evidence presented at trial. No evidence of fraud or malice was offered to support the award of exemplary damages. As a result, Plaintiff's Proposed Judgment should not be entered.

## II.   THE COURT SHOULD HAVE CONSTRUED THE CONTRACTS AS A MATTER OF LAW

Plaintiff's principal complaint in this case was that Sagaponack Partners, L.P. ("Sagaponack") received payment in connection with the HIG transaction and Plaintiff did not. The Plaintiff argues that Sagaponack should not have been paid ahead of Plaintiff. However, neither side alleged in their pleadings that the governing contracts were ambiguous. To the contrary, both counsel for Plaintiff and Defendants repeatedly stated that the Contracts were clear and unambiguous on their face. *See, e.g., supra,* notes 1 and 2. Both sides objected to the introduction of parol evidence regarding the intent of the contracts. The construction of an unambiguous contract is a matter of law for the court. *City of Pinehurst*, 432 S.W.2d at 518; *Edwards v. Lone Star Gas Co., a Div. of Enserch Corp.*, 782 S.W.2d 840, 841 (Tex. 1990). When a contract is worded so that a definite meaning can be ascertained from the clear language, then the court should construe the contract as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Because both sides, and the Court in sustaining those objections, agreed that the contracts at issue were unambiguous, the Court rather than the jury should have construed the agreements as a matter of law.

Plaintiff's Subordinated Note specifically states that it is "subject in right of payment to the prior payment in full of all of [Defendant's] debt facilities whether now existing or hereafter

---

created." *See* Def's Apx. at 113 (Subordinated Note at 1). It continues, "The indebtedness evidenced by this Note is hereby expressly subordinated to the extent and the manner set forth in this note is subject to the provisions contained in the Subordination Agreement..." *Id.* Likewise, Section 2(c)(iv) of the Purchase Agreement states, "[t]he Subordinated Note shall be subordinated and subject in right of payment to the prior payment by Purchaser in full of all of Purchaser's debt facilities." *See* Def's Apx. at 135 (Asset Purchase Agreement). The subordination clauses in the Subordinated Note and Purchase Agreement unambiguously provide that Plaintiff's Note is subordinate to all other debt facilities of TA. Moreover, it is expressly provided that the Subordination Agreement does not affect that status but only specifies additional subordination related to the Senior Lenders. Therefore, as a matter of law, Plaintiff is subordinate in right of payment to Fleet, Sagaponack, Key/Regis and all of the other creditors of TA. Plaintiff did not and could not refute that TA owed over $9 million to Sagaponack at the time of the HIG Transaction. *See* Def's Apx. at 100-101; 105 (Tr. at Vol. 4, 93:2-9, 93:21-23, 105:16-18, 133:6-19); *see also* Def's Apx. at 181 (Def's Ex. 115). Accordingly, TA has not breached its Note and Plaintiff has not been damaged.

Plaintiff attempts to rely on the Subordination Agreement to get around the clear and unambiguous total subordination language in its Note that eviscerates its claims against TA and Sagaponack. However, regardless of which version of the Subordination Agreement is accepted as the final executed version, the Agreement states that "nothing contained in this Agreement...is intended to or shall affect the relative rights of the holders of Subordinated Debt, on the one hand, and the creditors of the Company other than the holders of Senior Debt, on the other hand." *See* Def's Apx. at 188 (Subordination Agreement at 8). Again, the language is unambiguous. The Subordination Agreement does not apply to Plaintiff's complaint of payment

---

**DEFENDANT TESTAMERICA'S RESPONSE TO PLAINTIFF FARAWAY**                    **Page 3**
**ENTERPRISES, INC.'S MOTION FOR JUDGMENT AND BRIEF IN SUPPORT**
::ODMA\PCDOCS\DOCS1\135357\5

to Sagaponack – a subordinated creditor – over itself – another subordinated creditor. The "relative rights of the holders of Subordinated Debt" are not effected by the Subordination Agreement. Therefore, the Subordination Agreement is inapplicable to Plaintiff's claim that its rights are superior to Sagaponack. Further, unlike that of the Plaintiff, Sagaponack's Notes do not contain any subordination language. *See* Def's Apx. at 196; 199; 202 (Def's Exs. 51B, 51C, and 51D).

There was nothing for the jury to decide. Respectfully, the Court should render judgment for Defendants. Accordingly, Plaintiff's Proposed Judgment entering judgment based upon the jury's findings invites clear error. There is no legal basis for the actual damages sought against TA, and the Court should not enter the judgment requested by Plaintiff.

### III.   PLAINTIFF MISCALCULATES ACTUAL DAMAGES UNDER THE NOTE

There is a reason that most lawyers should avoid math, and Plaintiff's calculations of its "actual damages" prove the point. Plaintiff's computation of its alleged actual damages is at odds with what it sought at trial and seriously flawed.

First, Plaintiff has calculated the Note based on compound interest.[3] The Subordinated Note, however, provides for simple not compound interest: "Interest on the principal amount outstanding on this Note shall accrue at the rate of 8% per annum and be paid annually..." Def's Apx. at 114 (Subordinated Note at 2). Plaintiff has not cited any authority for imposing compound interest. When interest is allowable, interest is to be computed on a simple rather than a compound basis, in the absence of express authorization to do so. *Stovall v. Illinois Central Gulf R. Co.*, 722 F.2d 190 (5th Cir. 1984). Therefore, even in the event that Plaintiff is entitled

---

[3] Compound interest means interest upon interest, in that accrued interest is added to the principal, and the interest is then computed upon the new principal thus formed.

to an amount due under the Subordinated Note, such amount would not be calculated based on compound interest.

Second, Plaintiff seeks to impose a 15% default interest rate (which Plaintiff has applied in its calculation of damages), but there has been no finding of when default occurred and therefore no way to determine from what date such interest rate would apply. Plaintiff argues that he is entitled to the default rate of interest starting on January 1, 2001. *See* Pltf's Brief at 3. However, contrary to what Plaintiff suggests, the jury did not determine a date of default in its answer to Question No. 3 in the verdict. Question No. 3 provides:

> Do you find by a preponderance of the evidence that TestAmerica failed to comply with the terms of the Purchase Agreement, Subordination Agreement, and/or the Note in failing to make interest and principal payments?

The jury's answer was as follows:

> The Purchase Agreement:     Yes
> The Subordination Agreement:          Yes
> The Note:       Yes

*See* Def's Apx. at 57 (Court's Charge to Jury). There is no finding of any date of default in the answer to Question 3, nor anywhere else in the verdict.[4] The date of default is a fact issue that the Plaintiff has the burden of proving. Without a finding of when the default occurred, Plaintiff is not entitled to any default interest.

In addition, Plaintiff's own theory of the case as reflected in Plaintiff's "Damages" exhibit at trial does not claim a default until after Fleet and Key/Regis were repaid in January 2003. *See* Pltf's Apx. at 33. In this exhibit, Plaintiff applies the 15% interest starting on January 3, 2003. *Id.* This exhibit flatly contradicts the new argument in Plaintiff's Brief that the default

---

[4] Note that simply failing to pay interest and principal payments under the Subordinated Note does not constitute a "default" because the Subordination Agreement suspends the Company's obligations to pay Plaintiff if TA is in default to the Senior Lenders. Plaintiff stipulated that TA was in default to its senior lenders. *See* Def's Apx. at 35 (Stipulated Facts, ¶ 13).

rate of interest should be applied starting on January 1, 2001.  Moreover, Plaintiff's counsel

argued to the contrary:

> 19   [MR. HUNNICUTT] And we've done a damage calculation here to show you
> 20   what the total amount is today.  So by the terms of the
> 21   contract the 8 percent interest went back to the time of the
> 22   sale, 12/18/98, and we've run this forward each year to show
> 23   you what that would be.  And we subtracted out the $160,000
> 24   payment that I told you Bill received earlier.  And this is
> 25   the amount, $2,795,000, that was due to Bill the day before
> 1   TestAmerica sold its assets to HIG.
> 2   Then at that point since they were not -- did not pay
> 3   Bill that's when the 15 percent interest calculation kicks
> 4   in because they're in default.

See Def's Apx. at 76 (Tr. at Vol. 1, 89:16-25, 90:1-4) (emphasis added).  Plaintiff adopted this

position at trial regarding default because it abandoned its claim that the Subordinated Note was

superior in right of payment to the debt of Fleet and Key/Regis.  See Def's Apx. at 35 (Stipulated

Facts ¶ 7-9).  Plaintiff even stipulated that TA was in default with its senior lenders, and that

there was only disagreement as to when that default occurred.  Defs' Apx. at 35 (Stipulated

Facts, ¶13).  In event of such a default with the Senior Lenders, the Subordination Agreement

specifically prevented any payment to the Plaintiff.  See Def's Apx. at 186 (Subordination

Agreement at 4).  Plaintiff offered no evidence to support its new allegation that default occurred

in 2001.  To the contrary, even the Plaintiff, through its principal Mr. Mullins, testified that

Plaintiff does not allege any default occurred until January 3, 2003:

> 24   Okay.  Bill, can you walk us through these calculations
> 25   that tell us how we end up with 3.7 million?
> 1   A.  Yes.  The 2,233,000 was the arbitrator's award.
> 2   And then according to documents it was going to accrue
> 3   at 8 percent.
> 4   And so for the first period of time there we calculated
> 5   at 8 percent for those four years.
> 6   And then from the December the 19th through January the
> 7   2nd of '03 we calculate that interest at 8 percent.
> 8   And then we subtract the $106,000 they paid in January.

9   And then we go to the default interest.  And the reason
10  we're doing that is -- the reason I calculated it that way
11  is that TestAmerica says, well, we were in default and we
12  couldn't pay you in 2002 and 2001.  And so -- and so we
13  didn't use the default interest rate until they sold
14  TestAmerica to HIG.  And then we felt like we should have
15  been paid.  And so that's when we applied the 15 percent
16  default rate and add that interest for the last two years.
17  So up to the date that's how we get to the interest
18  number.
19  And the due as of today would be three million 749,
20  including all the interest.

*See* Def's Apx. at 79-80 (Tr. at Vol. 1, 155:24-25; 156:1-20) (emphasis added).  Both Plaintiff's

counsel and Plaintiff stood up in open Court and stated that "default" occurred in 2003 following

the HIG Transaction.  Either by waiver, estoppel, or their own judicial admissions, Plaintiff

cannot now claim post-trial that default occurred at some other time.

Accordingly, Plaintiff's interest calculation — and therefore its proposed amount of

actual damages — is clearly in error and contrary to the evidence.

## IV.  THERE IS NO BASIS FOR PLAINTIFF'S CLAIM FOR FAILURE TO PROVIDE PERIOD INCOME STATEMENT AND PLAINTIFF HAS MADE UP AN AMOUNT OF NONEXISTENT DAMAGES FOR THIS CLAIM.

Plaintiff's breach of contract claim based on TA's alleged failure to provide an income

statement has no merit.  TA did provide Plaintiff with the information required to determine the

Subordinated Note's "earn-out" value.  In fact, the period income statement provided to Plaintiff

is in the record.  *See* Def's Apx. at 205 (Def's Ex. 82).  Plaintiff offered no evidence at trial to

support this alleged breach or to rebut Defendants' Exhibit 82.

In Plaintiff's Proposed Judgment, Plaintiff includes $46,999.79 in actual damages against

TA for failure to provide Plaintiff with a period income statement.   Plaintiff, however, concedes

that it made up the number in merely repeating the number without any discussion whatsoever in

its Brief.  *See* Pltf's Brief at 5.  Plaintiff fails to provide an explanation as to how this figure was

calculated and cites no supporting evidence in the record. The Court should not enter judgment on these fictional damages.

## V.   NO FRAUD OR MALICE EXISTS IN THIS CASE, THEREFORE, THERE IS NO BASIS FOR EXEMPLARY DAMAGES.

The record in this case clearly demonstrates the factual insufficiency for any finding of malice or fraud by TA. To recover exemplary damages, Plaintiff must prove by clear and convincing evidence that the defendant caused the injury by a type of aggravated conduct that supports exemplary damages. TEX. CIV. PRAC. & REM. CODE §§ 41.003(a) and (b). Such aggravated conduct may consist of fraud or malice. §§ 41.003(a)(1) and (a)(2). Actual fraud involves dishonesty of purpose or intent to deceive. *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964). This is distinct from constructive fraud, which is not a basis for recovering exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.006(6). Constructive fraud is the breach of some legal or equitable duty that the law declares fraudulent, irrespective of moral guilt, because it tends to deceive others, violate confidences, or injure public interests. *Archer* 390 S.W.2d at 740. Plaintiff offered no evidence that TA maliciously or fraudulently caused injury to Plaintiff.

As discussed *supra*, TA interprets the language of the relevant contracts in this case as providing for payment to other creditors ahead of Plaintiff. TA asserts that the court should have construed the meanings of the agreements because the construction of an unambiguous contract is a matter of law for the court. *Edwards*, 782 S.W.2d at 841. Nevertheless, even if the court had determined that TA was liable for actual damages for failing to make interest and principal payments to Plaintiff, there is nothing in the record that demonstrates that TA's interpretation of the agreements was unreasonable, much less a result of fraud or malice. To the contrary, Mr.

---

Mullins admits that Defendants' interpretations are reasonable, and the parties simply have different interpretations of the agreements:

```
4    [MR. LYNN] Q.  So is it fair for us then to narrow your complaint down
5    to this:  That you believe under the note, subordination
6    agreement and asset purchase agreement, that you were
7    entitled to be paid a certain sum of money and you weren't
8    paid that money and you believe that that was wrong?
9    [MR. MULLINS] A.  That is correct.
10   Q.  Okay.  And to the extent that the other parties, that
11   is TestAmerica or Sagaponack or Marc Weisman, read the
12   documents differently than you, because you cannot interpret
13   those documents I think you've told us because you're not a
14   lawyer and you haven't talked to the authors, you're not in
15   a position to say categorically that their interpretation is
16   wrong?
17   A.  I think that's why we're here today.
18   Q.  Okay.  Is that correct, you cannot --
19   A.  Yes, that's correct.
9    Q.  And I understand that you have strong beliefs.  But
10   you've also told us that you're uncertain as to the meaning
11   of some of the documents and you're uncertain as to the
12   effect of some of the documents.  And what I'm saying is to
13   the extent that they're interpreted, as you said, by someone
14   different than you, you will leave open the possibility that
15   you're wrong?
16   A.  I think that I am not uncertain.  I think that there's
17   other people that can view the documents differently.  And I
18   think that's why we're here.
```

*See* Def's Apx. at 85-86 (Tr. at Vol. 2, 90:4-19; 91:9-18) (emphasis added).   Even in the Plaintiff's own words, this case is a dispute over the interpretation of some agreements. Likewise, from the Defendants' perspective, as stated by Defendant Weisman, "based on my reading of Mr. Mullins' note and my reading of the Sagaponack's notes and all of the other documents here and the advice of Sagaponack's counsel in the original deal, conversations with company counsel, Sagaponack was clearly a creditor with a higher priority than Mr. Mullins.  So from a legal perspective, we didn't -- we didn't believe that he was entitled to be paid anything." *See* Def's Apx. at 106 (Tr. at Vol. 4, 136:6-13).   Because there is insufficient evidence of fraud

---

or malice, punitive damages are not appropriate in this case. TEX. CIV. PRAC. & REM. CODE §
41.003(a).

## VI. THERE CAN BE NO FRAUD OR MALICE FINDING WITH REGARD TO THE VERSION 6/VERSION 7 OF THE SUBORDINATION AGREEMENT WHERE PLAINTIFF'S ATTORNEY ADMITS TO KNOWING AND APPROVING THAT SAGAPONACK WOULD BE ADDED TO THE AGREEMENT'S SCHEDULE.

There is no possible fraud with regard to the two versions of the Subordination
Agreement because Plaintiff's own attorney admits to having knowledge that Sagaponack would
be added as a creditor to the subordinated schedule.  An attorney's knowledge is imputed to the
client. *American Cent. Ins. Co. v. Canal Ins. Co.*, 810 S.W.2d 246, 256 (Tex.App.—Houston
[1st Dist.] 1991), *aff'd in part & reversed in part on other grounds*, 843 S.W.2d 480 (Tex. 1992).
There is no dispute that the Senior Creditors prepared the Subordination Agreement. *See* Def's
Apx. at 209 (Fax from Letsou to Hamilton forwarding version 6 of the Subordination
Agreement).  While Plaintiff argues that version 6 of the Subordination Agreement is the version
that Mullins signed and agreed to, Plaintiff's own attorney admits he knew that the Senior
Creditors would prepare a new payment and creditor schedule to the Subordination Agreement
and that version 6 was circulated as a draft.  Moreover, Plaintiff's attorney, Richard Hamilton,
admits that he knew the version 6 schedule would be updated and that Sagaponack would be
added to the new version of the schedule:

> 25 [MR. LYNN] Q.  Okay.  So you understand when after Mr. Mullins signed
> 1 this document, this Version 6, that it was going -- that he
> 2 was going to sign the signature pages and the signature
> 3 pages were going to be faxed up to New York for the closing
> 4 on December 18th?
> 5 A.  [MR. HAMILTON] Yeah.  All of the documents that they sent me.
> 6 Q.  So you sent signature pages, you didn't actually send
> 7 the entire document signed, you sent faxes of your
> 8 signature -- of the signature pages?
> 9 A.  And the same day we FedEx-ed all of the documents.
> 10 Q.  Right.

11   A.   So they would have it the next morning, yes.
12   Q.   Yes, sir.
13   Now, when it got up there you understood that the
14   schedule was going to be filled out and then it would be
15   placed with another version of the document up there?
16   A.   I did not understand it would be placed with another
17   version.  But I, you know, understood that it would be
18   filled out.
19   Q.   Other than changes to the schedule, the document would
20   remain the same?
21   A.   That was my understanding, yes.
22   Q.   Okay.  And do you understand that both Version 6 and
23   Version 7, other than the schedule and filling in of the
24   title of the company, are the same?
25   A.   At my first deposition I had to read both of them word
1   for word, and there were a few word changes.  But --
2   Q.   Nothing material?
3   A.   Not that I can recall.
4   Q.   And so as far as you were concerned, it was okay to
5   attach that signature to a new document that contained a
6   schedule that was filled out?
7   A.   It would -- we attached the signature to the document
8   which I had there, which --
9   Q.   And the schedule would be filled out by Mr. Letsou?
10   A.   That's right.
11   Q.   And at the time, you knew that Sagaponack was a
12   subordinated creditor?
13   A.   That was in the document, yes.
14   Q.   And so it wouldn't surprise you that Sagaponack would
15   have been in this schedule?  That's what you told us in your
16   deposition; isn't that right?
17   A.   That's correct.  They could have been on there.
18   Q.   Now, what I want to make sure of is that you were
19   communicating all of this to Mr. Mullins.  Were you doing
20   that, sir?
21   A.   I am not -- I do not remember if I communicated to him
22   the fact Sagaponack would also be on that exhibit.
23   Q.   But you might have?  You're not sure?
24   A.   I don't recall, that's correct.
25   Q.   But you knew that?
1   A.   It was -- at that time I believe I knew that at the
2   time.  It was in a document and I had read the document.  I
3   did not, you know, look at that as being a -- a major
4   thing.  If they were going to be a partner, and sometimes
5   partners, you know, they put capital in and sometimes they
6   make loans to it 'cause they -- so they can get the money

```
7    back out.  So that's why it's --
8    Q.  Thank you.
9    A.  It would not have raised a big flag with me because it
10   would be kind of like a normal thing.
11   Q.  Thank you.
12   A.  And I may not have told him, I don't know.  It's been
13   seven years -- six years.
14   Q.  I appreciate that.
```

*See* Def's Apx. at 87-90 (Tr. at Vol. 2, 155:25-158:14).

Furthermore, there is no evidence in the record that TA was ever involved in the preparation of the Subordination Agreement.  To the contrary, all the evidence in the record demonstrates that counsel for the lenders drafted the Subordination Agreement.  Even counsel for Plaintiff concedes this reality in his cross-examination of TA's corporate counsel, Mr. Thomas Letsou:

```
18   [MR. GUILLOT] Q.  Okay.  Isn't it true that in this case there were some
19   changes made between Version 6 and Version 7 of the
20   subordination agreement that were not highlighted?
21   [MR. LETSOU] A.  I don't have any personal knowledge of that.
22   Q.  Okay.  You were the one that was transmitting the
23   documentation but you didn't look at it to determine that?
24   A.  No.
25   Q.  And, in fact, you didn't draft the subordination
1    agreement at all, did you?
2    A.  I did not.
3    Q.  And you don't have any idea what the intent of the
4    bankers were because you didn't represent them, correct?
5    A.  That's correct.
6    Q.  So you can't tell the jury the intention of Fleet and
7    Key and Regis with respect to the language you went over?
8    A.  Well, that's not entirely correct, because these were
9    fairly standard type documents.  It's not this is being
10   drafted as a one -- if this were a truly unique document
11   that statement would be correct.  This is a standard type
12   document though.
13   MR. GUILLOT:  Well, we'll object as being
14   nonresponsive, Your Honor.
15   BY MR. GUILLOT:
16   Q.  Mr. Letsou, let me ask you --
17   THE COURT:  Overruled.
```

18  BY MR. GUILLOT:
19  Q.  You didn't ask anyone at Fleet, Key, or Regis, because
20  you weren't allowed to talk to them, correct, as to what
21  their intents were?
22  A.  No.
23  Q.  And you didn't talk to anyone at Moses & Singer about
24  the intent of the language that was contained in the
25  subordination agreement?
1  A.  There was -- there would be no reason for me to ever --
2  no, I wouldn't have.
3  Q.  Okay.  You didn't.
4  Thank you.

*See* Def's Apx. at 93-95 (Tr. at Vol. 3, 62:18-64:4) (emphasis added).

Accordingly, as a matter of law, Plaintiff knew through its counsel that Sagaponack would be listed as a creditor and cannot show any fraud resulting from a "different schedule" of creditors and payments provided in version 7.  That knowledge is imputed to Plaintiff as a matter of law, and the consent of its attorney likewise binds Plaintiff.  In addition, Plaintiff cannot point to any evidence in the record that even suggests that TA drafted the Subordination Agreement or had any role in the alleged fraud in the completion of the Agreement's schedule.  Therefore, as a matter of law, no fraud exists to support the award of exemplary damages – much less the requisite malice.  As a result, any exemplary damages must be rejected.

Respectfully submitted,

Michael P. Lynn, P.C.
Texas Bar No. 12738500
Edward Jason Dennis
Texas Bar No. 24045776
**LYNN TILLOTSON & PINKER, LLP**
750 North St. Paul Street, Suite 1400
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile:  (214) 981-3839

**ATTORNEYS FOR DEFENDANT
TESTAMERICA, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served as shown below on counsel of record on May /6th, 2005.

**VIA FACSIMILE**
J. Stephen Hunnicutt
THE HUNNICUTT LAW FIRM
5949 Sherry Lane, Suite 1650
Dallas, Texas 75225
(214) 361-6740 Telephone
(214) 691-5099 Facsimile

Edward Jason Dennis

**DEFENDANT TESTAMERICA'S RESPONSE TO PLAINTIFF FARAWAY ENTERPRISES, INC.'S MOTION FOR JUDGMENT AND BRIEF IN SUPPORT**
::ODMA\PCDOCS\DOCS1\135357\5